# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | | |
|---|---|---|
| **MAYTAG CORPORATION, a subsidiary of WHIRLPOOL CORPORATION, and WHIRLPOOL CORPORATION** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 08-cv-00291-JEG-RAW** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al.,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFFS' PRE-TRIAL BRIEF

## TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................................................... 1

ARGUMENT ............................................................................................................ 3

I.   THIS LAWSUIT PRESENTS A CLEAR CASE OR CONTROVERSY OVER
     WHICH THE COURT HAS JURISDICTION................................................... 3

     A.   Plaintiffs Are In Immediate Danger Of Sustaining A Threatened Injury If
          This Case Is Not Promptly Resolved ...................................................... 4

     B.   Plaintiffs' Threatened Injury Is Traceable To The Union ..................... 7

II.  THIS MATTER SHOULD PROCEED AS A CLASS ACTION AND THE
     UNION IS THE PROPER REPRESENTATIVE OF THE RETIREES IN THIS
     LAWSUIT........................................................................................................ 8

     A.   Numerosity............................................................................................... 9

     B.   Commonality............................................................................................ 9

     C.   Typicality ................................................................................................. 9

     D.   Rule 23(b) .............................................................................................. 10

     E.   The Union Is The Proper Representative Of The Defendant Class Of
          Retirees Under Federal Rule Of Civil Procedure 23 ........................... 10

     F.   Rule 23 Does Not Contain A Consent To Representation Requirement............. 11

     G.   Arguendo, The Union's Representative Status Is Well-Established .................. 12

III. THE DEFENDANT CLASS MEMBERS ARE NOT ENTITLED TO VESTED
     RETIREE HEALTH INSURANCE BENEFITS BECAUSE THE PLAN
     DOCUMENTS DO NOT CONTAIN VESTING LANGUAGE .................................. 14

     A.   The Controlling Plan And Legal Documents Contain Unambiguous
          Reservation Of Rights Language ......................................................... 16

     B.   The Controlling Plan And Legal Documents Are Unambiguous And Do
          Not Create A Vested Right To Health Insurance Benefits ................................. 20

          1.   The Durational Clauses In The SIAs Are Evidence Against
               Vesting ................................................................................. 21

# TABLE OF CONTENTS
(continued)

Page

      2.     The Coordination Of Benefits And Reopener Clauses In The SIAs Are Conclusive Of the Vesting Issue ....................................................... 22

      3.     The Continuation Of Prior Benefits Clause In The SIAs Demonstrate That The Retiree Health Insurance Benefits Were Not Vested ................................................................................................... 24

IV.   EVEN IF RECOURSE TO EXTRINSIC EVIDENCE WERE APPROPRIATE, WHICH IT IS NOT, SUCH EVIDENCE CONFIRMS THE PARTIES DID NOT INTEND FOR THE BENEFITS TO VEST .................................................... 25

    A.    The Numerous Modifications And Reductions To The Retiree Health Insurance Benefits Confirms That Those Benefits Were Not Vested ................ 25

      1.     The Imposition Of The Medicare Coordination Of Benefits Clause Constituted A Reduction In Retiree Benefits .......................................... 27

      2.     Modifications To The Prescription Drug Plan Also Decreased The Level Of Retiree Health Insurance Benefits ........................................... 28

      3.     The Elimination Of The John Deere HMO Plan Provides Further Evidence Against Vesting ...................................................................... 30

      4.     Other Negotiated Changes To The Retiree Health Insurance Benefits Further Support The Absence Of Vested Benefits ................... 31

    B.    The Negotiation And Implementation Of Various Clauses In The SIAs Mandates A Finding That The Parties Did Not Intend To Vest Retiree Health Insurance Benefits ................................................................................... 33

      1.     The Agreement To And Enforcement Of The Durational Clauses In The SIAs Preclude The Vesting Of Benefits ...................................... 34

      2.     The Union's Agreement To The Two Coordination Of Benefits Clauses And The Reopener Clause In the SIAs Undermines Its Position That The Retiree Health Insurance Benefits Are Vested .......... 35

      3.     The Union's Agreement To The Continuation Of Benefits Clause In The Relevant SIAs Undermines Its Position That The Retirees' Benefits Were Vested .............................................................................. 35

      4.     The Union's Agreement To The Reservation Of Rights Language In The Controlling Legal Documents Contradicts Any Intent To Vest Retiree Health Insurance Benefits .................................................. 36

**TABLE OF CONTENTS**
(continued)

Page

     5. Because The Level Of Active Employee Health Insurance Benefits Was Coterminous To The Level Of Retiree Health Insurance Benefits, Those Benefits Were Not Vested ............................................. 37

V. ARGUENDO, THE DEFENDANT RETIREES' HEALTH INSURANCE BENEFITS ARE NOT VESTED AT AN UNALTERABLE LEVEL ........................... 38

**CONCLUSION** ................................................................................................................. 41

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*AgriStor Leasing v. Farrow,*
   826 F.2d 732 (8th Cir. 1987) ..............................................................................13

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997)...........................................................................................10

*American Fed'n of Grain Millers v. International Multifoods Corp.,*
   116 F.3d 976 (2d Cir. 1997)...............................................................................22

*Anderson v. Alpha Portland Indus., Inc.,*
   836 F.2d ..................................................................................................... passim

*Anderson v. Alpha Portland Indus.,*
   752 F.2d 1293 (8th Cir. 1985) ..............................................................................7

*Arana v. Ochsner Health Plan,*
   352 F.3d 973 (5th Cir. 2003) ..............................................................................27

*Barnett v. Ameren Corp.,*
   436 F.3d 830 (7th Cir. 2006) ..............................................................................33

*Bd. of Regents v. Dawes,*
   522 F.2d 380 (8th Cir. 1975) ................................................................................8

*Beaty v. Continental Automotive Systems U.S., Inc.,*
   Case No. 10 cv 14217 (E.D. Mich. Oct. 21, 2010)...............................................6

*Blake v. Arnett,*
   663 F.2d 906 (9th Cir. 1981) ..............................................................................11

*Brubaker v. Deere & Co.,*
   664 F. Supp. 2d 972 (S.D. Iowa 2009) ...............................................15, 17, 20, 25

*Cherry v. Auburn Gear, Inc.,*
   441 F.3d 476 (7th Cir. 2006) ..............................................15, 19, 26, 29

*Clark Equip. Co. v. Int'l Union, Allied Indust. Workers of America.,*
   803 F.2d 878 (6th Cir. 1986), *cert denied,* 480 U.S. 934 (1987)...........................11

*Cotton v. Mass. Mut. Life Ins. Co.,*
   402 F.3d 1267 (11th Cir. 2005) ..........................................................................17

*Crown Cork & Seal Co. v. Int'l Ass'n of Machinist & Aerospace Workers,*
  501 F.3d 912 (8th Cir. 2007) ......................................................................... passim

*Curtiss-Wright Corp. v. Schoonejongen,*
  514 U.S. 73 (1995)..........................................................................................14

*DeGeare v. Alpha Portland Indus., Inc.,*
  837 F.2d 812,816 (8th Cir. 1988) ...................................................................24

*Des Moines Mailers Union, Teamsters Local No. 358 v. NLRB,*
  381 F.3d 767 (8th Cir. 2004) ..........................................................................22

*DeSantiago v. Laborers Int'l Union, Local No. 1140,*
  914 F.2d 125 (8th Cir. 1990) ..........................................................................12

*Diehl v. Twin Disc, Inc.,*
  102 F.3d 301 (7th Cir. 1996) .....................................................................39, 40

*District 29, UMW v. Royal Coal Co.,*
  768 F.2d 588 (4th Cir. 1985) ..........................................................................26

*Franchise Tax Bd. v. Construction Laborers Vacation Trust,*
  463 U.S. 1 (1983)..............................................................................................7

*Frontier Communs. of N.Y., Inc. v. IBEW, Local Union 503,*
  2008 U.S. Dist. LEXIS 37213 .........................................................................13

*Ginter v. Whirlpool Corp.,*
  Case No. 08 cv 750 (W.D. Mich. Aug. 8, 2008) ...............................................5

*Halbach v. Great-West Life & Annuity Ins. Co.,*
  561 F.3d 872 (8th Cir. 2009) ..........................................................................25

*Horne v. Firemen's Retirement Sys.,*
  69 F.3d 233 (8th Cir. 1995) ..............................................................................4

*Hughes v. 3M Retiree Med. Plan,*
  134 F.Supp.2d 1062 (D. Minn. 2001), *aff'd* ..............................................15, 19

*Hughes v. 3M Retiree Med. Plan,*
  281 F.3d 786 (8th Cir. 2002) ...........................................................14, 15, 16, 20

*IBEW Local 1 v. GKN Aerospace North American, Inc.,*
  431 F.3d 624 (8th Cir. 2005) .......................................................................7, 11

*Int'l Brotherhood of Electrical Workers, AFL-CIO v. Hechler,*
  481 U.S. 851 (1987)........................................................................................12

*Interfood Holding, B.V. v. Rice, et. al.,*
    607 F. Supp. 2d 1059 (8th Cir. 2009) ..............................................................9, 10

*Jobe v. Medical Life Ins. Co.,*
    598 F.3d 478 (8th Cir. 2010) ...........................................................................17

*John Morrell & Co., v. UFCW,*
    37 F.3d 1302 (8th Cir. 1994) .................................................................... passim

*John Morrell &Co. v. UFCW,*
    825 F. Supp. 1440 (Dist. S.D. 1993), *aff'd John Morrell*, 37 F.3d........................25

*Litton Fin. Printing Div. v. NLRB,*
    501 U.S. 190 (1991).........................................................................................21

*Maytag Corp., v. UAW,*
    Case No. 08 cv 00291 (June 22, 2010) ("Docket No. 178") .......................... passim

*Maytag Corp., v. UAW,*
    Case No. 08 cv 00291 (June 24, 2009) ("Docket No. 75") .................................1, 3, 6

*Maytag Corp., v. UAW,*
    Case No. 08 cv 00291 (November 10, 2010) ("Docket No. 195")................... passim

*Maytag Corp., v. UAW,*
    Case No. 08 cv 00291, 2009 U.S. Dist. LEXIS 12869 (S.D. Iowa Feb. 11, 2009)
    ("Docket No. 63")........................................................................................... passim

*McPeek v. Beatrice Co.,*
    936 F. Supp. 618 (N.D. Iowa 1996).....................................................................22

*Merck v. Jewel Cos.,*
    848 F.2d 761 (7th Cir. 1988) ...........................................................................12, 13

*Olander v. State Farm Mutual Auto Ins. Co.,*
    317 F.3d 807 (8th Cir. 2003) .............................................................................19

*Pabst Brewing Co. v. Corrao,*
    161 F.3d 434 (7th Cir. 1998) ............................................................................32

*Paxton v. Union Nat'l Bank,*
    688 F.2d 552 (8th Cir. 1982) .............................................................................8, 10

*Reese v. CNH America, LLC,*
    574 F.3d 315 (6th Cir. 2009) ...........................................................32, 33, 39, 40

*Saltzman v. Independence Blue Cross,*
    2010 U.S. App. LEXIS 11917 (3d. Cir. June 10, 2010) ........................................17

*Schneider v. Robbins*,
    466 U.S. 364 (1984) ..................................................................................................12

*Senior v. NSTAR Elec. & Gas Corp.*,
    449 F.3d 206 (1st Cir. 2006) ....................................................................................26

*Senn v. United Dominion Indus.*,
    951 F.2d 806 (7th Cir. 1992) ....................................................................................36

*Sherfel, et al. v. Gassman, et al.*,
    Case No. 09 cv 00871 (S.D. Ohio, Sep. 27, 2010) ....................................................6

*Sprague v. General Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) (en banc) ....................................................15, 16, 19

*State v. Sellers*,
    258 N.W.2d 292 (Iowa 1977) ..................................................................................13

*Stearns v. NCR Corp.*,
    297 F.3d 706 (8th Cir. 2002) ....................................................................16, 17, 25, 37

*Temme v. Bemis Co.*,
    2010 U.S. App. LEXIS 19062 (7th Cir. Sep. 13, 2010) ..........................................39

*The American Registry of Radiologic Technologist v. Diane Wood Bennett, et. al.*,
    655 F.Supp. 2d 944 (D. Minn 2009) ....................................................................9, 10

*UAW et al. v. General Motors Corp., and UAW et al. v. Ford Motor Co.*,
    Case Nos. 06-1475/2064 (6th Cir.) (Trial Ex. 106) ..................................................6

*UAW, et al. v. General Motors Corp.*,
    Case No. 05-73991 (E.D. Mich.) (Trial Ex. 82) ......................................................6

*United Paperworkers Int'l Union v. Jefferson Smurfit Corp.*,
    961 F.2d 1384-1385 (8th Cir. 1992) ........................................................................37

*Winnet v. Caterpillar, Inc.*,
    609 F.3d 404 (6th Cir. 2010) ..............................................................................28, 32

*Wooddell v. International Bhd. of Elec. Workers, Local 71*,
    502 U.S. 93 (1991) ..................................................................................................12

*Zielinski v. Pabst Brewing Co.*,
    463 F.3d 615 (7th Cir. 2006) ..............................................................................39, 40

**STATUTES**

29 U.S.C. §185 ..................................................................................................................1, 12

29 U.S.C. § 1051(1) ..................................................................................................................14

29 U.S.C. § 1102(a)(1) .............................................................................................................17

29 U.S.C. §1132 ....................................................................................................................1, 2

29 USCS § 185(c) ......................................................................................................................8

29 USCS § 1132(e)(2) ...............................................................................................................8

## INTRODUCTION

Plaintiffs, Maytag Corporation and Whirlpool Corporation (collectively, "Plaintiffs" or the "Company"), by their attorneys and pursuant to Federal Rule of Civil Procedure 16 and Local Rule 16.1(d), hereby submit their pre-trial brief in this matter.[1]

On July 24, 2008, Plaintiffs filed this Declaratory Action, pursuant to the Labor Management Relations Act ("LMRA"), 29 U.S.C. §185 and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132.  In this action, Plaintiffs seek a judgment that the current retiree medical benefits schedule for the named Defendants expired on July 31, 2008, upon the expiration of the Collective Bargaining Agreement entered into between the Company and the Defendants International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") and its Local 997 ("Local 997") (collectively, "the Union") and that therefore, the Company has a legal right to modify the retiree medical benefit schedule effective January 1, 2009.

On September 3, 2008, Defendants filed a Motion to Dismiss this declaratory action (Docket No. 22).  On February 11, 2009, the district court denied Defendants' Motion (Docket No. 63).  Thereafter, on February 27, 2009, Defendants filed a Motion to Reconsider their Motion to Dismiss (Docket No. 64).  The district court denied Defendants' Motion to Reconsider on June 24, 2009 (Docket No. 75).  On June 22, 2010, the Court certified the Defendant class and named the Union class representative (Docket No. 178).  The Defendant class consists of:

> The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, AFL-CIO, its Local 997, and all persons who: (1) are or were employee participants, dependents or participants, or spouses of participants in the Maytag employee benefit plans that provided for retiree medical benefits

---

[1] The following introduction provides a brief summary of the procedural history of this lawsuit.  For a complete summary of the facts surrounding this lawsuit, please refer to Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment (Docket No. 143).

and (2) who worked at the Newton Plants and as to whom the Union had been the participants' collective bargaining representative at the time of and prior to their retirement from Maytag and/or Whirlpool and (3) who retired from Maytag and/or Whirlpool before July 31, 2008, or, in the case of dependents or surviving spouses, who received benefits by virtue of retirees from Maytag and/or Whirlpool on or before July 31, 2008 and (4) who are living and thus affected by Plaintiffs' modification to retiree medical benefits.

*Id.* On February 12, 2010, Plaintiffs filed a Motion for Summary Judgment on both claims (§ 301 and § 502) (Docket No. 143). On November 10, 2010, the Court denied Plaintiffs' Motion for Summary Judgment, albeit after finding Plaintiffs had standing to bring the claims (Docket No. 195). This matter is scheduled for trial commencing on December 6, 2010.

The evidence at trial will establish that this Court has subject matter jurisdiction over this lawsuit because a case or controversy exists between the Company and the Defendant class. The evidence at trial will likewise confirm that the Union may properly represent the Defendant class of retirees in these proceedings under Federal Rule of Civil Procedure 23. Alternatively, the Union may properly represent the individuals in the Defendant class of retirees because those class members designated (and the Union accepted) the Union as their exclusive representative for purposes of collective bargaining and the resolution of post-retirement disputes with the Company.

The evidence at trial will also establish that the controlling Plan (and Legal) Documents, either under the SIAs or ERISA, including the Labor Contract, the Supplemental Insurance Agreements ("SIA"),[2] the Summary Plan Descriptions ("SPD"), the Welfare Benefit Plans, and the Benefit Certificates, (collectively, the "Collective Bargaining Agreement"), are unambiguous and do not contain an intent to vest retiree health insurance benefits. Additional negotiated documents, including the Hourly Retirement Benefit Summaries and Group Insurance

Enrollment Forms, signed by individuals upon their retirement, similarly establish that there was no intent to vest the benefits. The evidence at trial will likewise confirm that several of the controlling Plan (and Legal) Documents unambiguously reserve to the Company the right to modify the retirees' health insurance benefits. Thus, the evidence at trial will demonstrate that a resort to extrinsic evidence is unwarranted and unnecessary to determine whether the parties intended to vest those benefits. Even were the Court to consider extrinsic evidence, the facts will demonstrate that the parties routinely modified the retiree health insurance benefits, thus precluding a finding of an intent to vest those benefits. Finally, the evidence presented at trial will establish that even if the retiree health insurance benefits were vested, they were not vested at an unalterable level, but rather, are subject to "reasonable" modification.

For the reasons set forth above and below, judgment should be entered in favor of the Company and against the Union, the Defendant class, and the individually named Defendants.

## ARGUMENT

## I.     THIS LAWSUIT PRESENTS A CLEAR CASE OR CONTROVERSY OVER WHICH THE COURT HAS JURISDICTION

This Court has affirmatively held on three (3) occasions that Plaintiffs have established the existence of a case or controversy. *See Maytag Corp., v. UAW*, Case No. 08 cv 00291, 2009 U.S. Dist. LEXIS 12869, * 12 (S.D. Iowa Feb. 11, 2009) ("Docket No. 63") ("A controversy by definition existed from the moment [Local 997 and UAW] notified the Company that the Union took a different, adverse position on the Company's ability to modify the retiree medical benefit plan"); *Maytag Corp., v. UAW*, Case No. 08 cv 00291 (June 24, 2009) ("Docket No. 75") (denying Union's Motion for Reconsideration of Motion to Dismiss and holding that the Company has not made improper use of the declaratory judgment statute); *Maytag Corp., v.*

---

[2] It should be observed that, standing alone, the SIAs do not constitute a "plan document" under ERISA.

*UAW*, Case No. 08 cv 00291 (November 10, 2010) ("Docket No. 195") ("therefore, for the third

time, the court concludes that the Company has standing in this declaratory action"); *see also*

*Maytag Corp., v. UAW*, Case No. 08 cv 00291 (June 22, 2010) ("Docket No. 178") (granting

class certification and noting that the Union is a proper defendant in this lawsuit).

　　　　While this Court has conclusively held that the material facts establish the existence of a

case or controversy, this Court also stated that the issue of standing may be raised at any time

during the proceedings (Docket No. 195, p. 5, n. 3).  For this reason, Plaintiffs provide the

following argument, albeit, out of an over-abundance of caution.

### A.　　Plaintiffs Are In Immediate Danger Of Sustaining A Threatened Injury If This Case Is Not Promptly Resolved

　　　　In a declaratory judgment action, a case or controversy generally exists when the

claimant demonstrates that it is in immediate danger of sustaining a *threatened* injury traceable

to the action of the defendant.  *See Horne v. Firemen's Retirement Sys.*, 69 F.3d 233, 236 (8th

Cir. 1995) ("[t]he essential distinction between a declaratory judgment action and an action

seeking other relief is that in the former no actual wrong need have been committed or loss have

occurred in order to sustain the action") (*quoting United States v. Fisher-Otis Co.*, 496 F.2d

1146, 1151 (10th Cir. 1974)).[3]  Here, the Union's adverse position with respect to the

modification of retiree health insurance benefits, together with its history of litigation over such

matters, renders the existence of a case or controversy absolute.

---

[3] Generally, to prove the existence of a case or controversy, the claimant must establish "that [it] has suffered an injury in fact, that the injury is fairly traceable to the actions of the defendant and that the injury will likely be redressed by a favorable decision."  Docket No. 63, p. 5 (*quoting County of Mille Lacs v. Benjamin*, 361 F.3d 460, 463 (8th Cir. 2004)).  In a declaratory judgment action, however, no actual wrong need have been committed or loss have occurred in order to sustain the action.  *Horne*, 69 F.3d at 236.

The Union's adverse stance regarding changes to the retiree health insurance benefits is confirmed by the following facts, which will be presented at trial:

- On May 13, 2006, before this lawsuit was filed, Ted Johnson, former Local 997 President, told the *Des Moines Register* that "[t]he UAW's objections is the retirees go out with the benefits and keep them, and there should be no argument about that [with Whirlpool] and I don't look for one …"  (Trial Ex. 104);

- In 2007, Ted Johnson was concerned that Whirlpool would change or alter the current retirees' health insurance benefits and therefore began to gather documents pertaining to those benefits.  *See* Plaintiffs' Statement of Material Facts In Support of Motion for Summary Judgment, Docket No. 143, Attachment 2, ¶ 149, hereinafter ("SF ¶__");

- During its preparations preliminary to the onset of the 2008 negotiations, the Union Negotiating Committee anticipated the Company would make a proposal to modify the current retirees' health insurance benefits and decided to reject them (SF ¶ 136).

Furthermore, Kevin Bradley, the Company's Chief Labor Negotiator for the 2008 NEMC-UAW negotiations, will testify at trial that on July 1, 2008, Ron McInroy, then a UAW Representative and Chief Spokesman for the Union, refused to negotiate over the Company's proposal to change the then current retirees' health insurance benefits.[4]   The Union's actions and position were echoed in a September 2008 letter from Dennis Williams to the Newton retirees, which provided in relevant part: "When the company asked the UAW to bargain reductions in retiree health care benefits in 2004, the UAW refused" and that the Union would "use all [its] resources to compel the company to live up to its agreement to provide you with lifetime retiree health care benefits." (Trial Ex. 5).[5]

---

[4] The events of the July 1, 2008 meeting, as well as the UAW's refusal to bargain over retiree health benefits, were confirmed in a July 15, 2008 letter from Bradley to McInroy (Trial Ex. 1).

[5] The existence of a case or controversy is further evidenced by the fact that on August 8, 2008, the Newton hourly retirees filed a lawsuit in the United States District Court for the Western District of Michigan, claiming that the Company's plan to modify the retiree benefit schedule effective January 1, 2009 violated the 2004 Collective Bargaining Agreement between Maytag and the Union. *See Ginter v. Whirlpool Corp.*, Case No. 08 cv 750 (W.D. Mich. Aug. 8, 2008).  Notably, this lawsuit was funded by the UAW.

Likewise, Maytag will present evidence at trial that the Union's own admissions establish that it zealously protects negotiated retiree health insurance benefits, both at the bargaining table and in court.[6]  For example, the UAW has previously admitted that it has a "long and storied history of litigating, and funding litigation, on behalf of its retirees over health care and other benefits."  *UAW, et al. v. General Motors Corp.*, Case No. 05-73991 (E.D. Mich.) (Trial Ex. 82). In the same vein, the UAW has asserted in open court that it has litigated and/or funded the litigation of over twenty cases to protect retirees from unilateral modifications to their health insurance benefits.  *UAW et al. v. General Motors Corp., and UAW et al. v. Ford Motor Co.*, Case Nos. 06-1475/2064 (6th Cir.) (Trial Ex. 106).[7]  Notably, all of the above-referenced statements were made before this lawsuit was filed.

In sum, the evidence introduced at trial will confirm that the Union's adverse stance regarding modifications to the retirees' health insurance benefits and its recurrent litigation in similar cases, places the Company in immediate danger of sustaining an injury, as reasonable "uncertainty, insecurity and controversy" exists as to whether the Company will face litigation and/or liability for its decision to modify the retiree health insurance benefits.  *See* Docket No. 75, p. 7; *see also Sherfel, et al. v. Gassman, et al.*, Case No. 09 cv 00871 (S.D. Ohio, Sep. 27,

---

[6] It is worth noting that this Court has recognized the Union's acknowledgement of its history of litigating on behalf of retirees: "[t]he Union does not dispute that it 'has fought and will continue to fight for its retirees as [the Company] has argued in [its] briefs, and the UAW has always done that and will continue to do that.'"  Docket No. 178, p. 8.  Indeed, as recent as October 21, 2010, the UAW, together with a proposed class of Plaintiff retirees, filed suit in *Beaty v. Continental Automotive Systems U.S., Inc.*, Case No. 10 cv 14217 (E.D. Mich. Oct. 21, 2010) (Docket No. 1), alleging that the Company breached its contractual obligation to provide the retirees with vested, lifetime health insurance benefits.

[7] The evidence at trial will also establish that the Company could reasonably anticipate that Local 997 would be party to a suit against it, as the UAW frequently brings such actions jointly with the appropriate local.  *See* Docket No. 63, p. 5 (collecting cases).

2010) (Docket No. 60) (threat of future litigation sufficient to establish "injury in fact" for purposes of standing).

### B.    Plaintiffs' Threatened Injury Is Traceable To The Union

Generally, federal jurisdiction exists over declaratory judgment actions in which the declaratory defendant would have had standing to bring a coercive action to enforce its rights. *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 19 (1983).  Here, if desired, the Union could establish the requisite standing to bring a suit against the Company to enforce the terms of the Collective Bargaining Agreement.  *See* Docket No. 63, p. 8 (noting that a party to a contract has standing to enforce that contract, even when the breach affects a third party); *see also* Docket No. 178, pp. 22-23 ("… the Court has already held that the Union suffered an injury-in-fact ... [and is] a proper defendant in this case …").

Indeed, the Eighth Circuit has affirmatively held that a union has standing to enforce the terms of a collective bargaining agreement.  *See, e.g. IBEW Local 1 v. GKN Aerospace North American, Inc.*, 431 F.3d 624, 627 n. 1 (8th Cir. 2005) (holding that the union had standing to represent retirees because the union alleged an injury in fact deriving from its right to enforce the agreement it negotiated); *Anderson v. Alpha Portland Indus.*, 752 F.2d 1293, 1296 (8th Cir. 1985) ("a union has standing to assert retirees' rights under a collective bargaining agreement to which it is a party if it chooses …"). [8]  Likewise, the Eighth Circuit has implicitly recognized the Court's jurisdiction over unions in declaratory actions related to the modification of retiree health insurance benefits.  *See John Morrell & Co., v. UFCW*, 37 F.3d 1302 (8th Cir. 1994) (affirming judgment granting employer declaratory relief in an action to modify retiree health insurance benefits under collective bargaining agreements).

---

[8] Courts elsewhere have likewise held that unions have standing to represent retirees.  *See* Docket No. 63, p. 8 (collecting cases).

Therefore, because the Union has a legitimate interest in protecting the benefits it negotiated on behalf of the then current and future retirees, the Union has standing to bring suit under both § 301 of the LMRA to enforce the terms of the Collective Bargaining Agreement and § 502 of ERISA to enforce the retirees' benefits.  To that end, the "Company's reasonable apprehension of an imminent lawsuit is fairly traceable to the union."  *See* Docket No. 63, p. 8-9.

Similarly, the retirees who are members of the Defendant class have standing to bring suit under § 301 of the LMRA to enforce the terms of the Collective Bargaining Agreement and § 502 of ERISA to enforce their benefits.  *See* 29 USCS § 185(c) and 29 USCS § 1132(e)(2). Consequently, this Court has jurisdiction over Plaintiffs' declaratory judgment action.

## II.   THIS MATTER SHOULD PROCEED AS A CLASS ACTION AND THE UNION IS THE PROPER REPRESENTATIVE OF THE RETIREES IN THIS LAWSUIT

It is the Plaintiffs' position that this matter has been dispositively resolved in the Order granting class certification.  However, to the extent necessary, this argument is presented. Rule 23 of the Federal Rules of Civil Procedure governs certification of both plaintiff and defendant classes.  *Bd. of Regents v. Dawes*, 522 F.2d 380 (8th Cir. 1975) (defendant class designated pursuant to Fed. R. Civ. P. 23(a) and (b)(2)).  In order for there to be a certified class, the requirements of Rule 23(a) must be met and the class must fall within one of the three subdivisions of Rule 23(b).  *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559-63 (8th Cir. 1982). Under Rule 23(a), class certification is proper if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative will fairly and adequately protect the interests of the class.  *Id.* at 559.

### A. Numerosity

The evidence at trial will show that there are approximately 3,000 class members. This meets the numerosity requirement. Indeed, in its response to the Motion for Class Certification, the UAW did not contend that lack of numerosity is a bar to class certification. Accordingly, under widely accepted principles, the UAW conceded this issue. *See Interfood Holding, B.V. v. Rice, et. al.,* 607 F. Supp. 2d 1059, 1065 (8th Cir. 2009) (holding that by failing to address an issue in its opposition, plaintiff conceded the issue). *See also The American Registry of Radiologic Technologist v. Diane Wood Bennett, et. al.,* 655 F.Supp. 2d 944, fn 2 (D. Minn 2009) ("It is well-established that a party concedes an issue by failing to address it in an opposing brief" (collecting cases)).

### B. Commonality

The evidence will show that Company's claim is based on a collective bargaining agreement, which is common to all class members. Again, in its response to the Motion for Class Certification, the UAW did not contend that lack of commonality is a bar to class certification. Accordingly, UAW conceded this issue. *See Interfood Holding, B.V., supra*; *The American Registry of Radiologic Technologist, supra*.

### C. Typicality

The evidence at trial will also show that the claims and defenses of the class members will all be based on the same collective bargaining agreements. As before, in its response to the Motion for Class Certification, the UAW did not contend that lack of typicality is a bar to class certification. Accordingly, UAW conceded this issue. *See Interfood Holding, B.V., supra*; *The American Registry of Radiologic Technologist, supra*.

### D. Rule 23(b)

The UAW did not contend that the proposed class cannot be certified under Rule 23(b)(2) or, in the alternative, Rule 23(b)(1)(A).   Accordingly, UAW conceded this issue.   *See Interfood Holding, B.V., supra*; *The American Registry of Radiologic Technologist, supra*.

### E. The Union Is The Proper Representative Of The Defendant Class Of Retirees Under Federal Rule Of Civil Procedure 23

Similar to the case or controversy issue, the Union's ability to properly represent the individual retirees, their spouses, surviving spouses and their dependents, who are members of the Defendant class in this lawsuit, is well-settled.   Indeed, this Court has already designated the Union as class representative of the Defendant class, thereby eliminating any question of the Union's adequacy of representation.   *See* Docket No. 178.   In so holding, the Court noted that "the numerous filings in this case show that the Union has the ability to protect the putative class members since modifications will affect [retired Union members.]."   *Id*. at p. 13.

Pursuant to Rule 23(a)(4), the adequacy requirement is met when the class representatives: (1) have common interests with the members of the class; and (2) vigorously prosecute the interest of the class through qualified counsel.   *Paxton, et. al. v. Union Nat'l Bank, et. al.,* 688 F.2d 552, 562-63 (8th Cir. 1982).   The primary purpose of the adequacy requirement is to ensure that there are no conflicts of interest between the named parties and the class they represent.   *Amchem Prods. v. Windsor,* 521 U.S. 591, 625-26 (1997).   The class representative "must be part of the class and possess the same interest and suffer the same injury" as the class members.   *Id.* (citation omitted).   Where the claims or defenses of the representative are typical of those of the members of the class, it is unlikely that any potential for antagonistic interests exists sufficient to defeat class certification.

The UAW unquestionably shares common interest with the Defendant class of retirees. Indeed, the evidence at trial will establish that the UAW represented the retirees in collective bargaining over the retirement benefits and therefore, has an interest in litigating and enforcing the terms of the CBAs (Docket No. 63); *see also IBEW Local 1 v. GKN Aerospace North America, Inc.*, 431 F.3d 624, 627 n. 1 (8th Cir. 2005)).  Moreover, there is absolutely no indication that the defenses or interests of the UAW diverge from those of the Defendant class of retirees in any way.  That the Union contests representation is of no import.  "Where a defendant class is involved, the court can designate representatives over whom it already has jurisdiction, even if they do not wish to serve."  *Blake v. Arnett*, 663 F.2d 906, 912 (9th Cir. 1981) (emphasis added).  This is especially true where, as in the present case, the class representative's zealous advocacy is not in question.  *Id*.  Furthermore, membership in the bargaining unit is not a *sine qua non* of membership in a class.  *See Clark Equip. Co. v. Int'l Union, Allied Indust. Workers of America.,* 803 F.2d 878, 880 (6th Cir. 1986), *cert denied,* 480 U.S. 934 (1987) (holding the union could properly represent a class, even though the class contained non-union employees).

**F.      Rule 23 Does Not Contain A Consent To Representation Requirement**

A class of retirees, their spouses, surviving spouses, and their dependents with the Union as class representative is proper.  The Union's ability to represent the class is governed by Federal Rule of Civil Procedure 23.  As held by this Court, "Rule 23 does not require class members' consent for 'one or more members of a class [to] sue or be sued as representative parties.'"  *See id*. (*Quoting* Fed. R. Civ. P. 23(a)).  Similarly, Rule 23 does not give the Court an option to supplement its prerequisites with a consent requirement.  *Id*.

### G.   *Arguendo*, The Union's Representative Status Is Well-Established

Assuming *arguendo*, that the retirees must consent to the Union's representation in this lawsuit, the overwhelming evidence establishes that the retirees have already done so on several occasions.  *See* Docket No. 178.

The evidence at trial will establish that the foundation for the relationship between the Union and the retirees is embedded in the UAW Constitution.  Specifically, Article 6, § 16 of the UAW Constitution irrevocably designates the UAW the exclusive representative of its members, including retired members,[9] in all employment-related disputes with the Company and authorizes the Union to bind the retirees to the outcome of any such disputes (Trial Ex. 109).  At the time they became members of the Union, each retiree signed a membership card whereby they acknowledged the authority of the UAW Constitution and therefore consented to Union representation over any employment-related disputes that they had with the Company (Trial Ex. 110).[10]

---

[9] Article 6, Section 19 of the UAW Constitution entitles any member in good standing who retirees to a "retired membership status, which entitles him or her to all of the privileges of membership, except the right to vote in certain enumerated elections."  *See* Docket No. 178, p. 13, fn. 10.  In recognition of this principle, on September 27, 2009, class counsel stated in a letter to Plaintiffs' counsel that Local 997 considers an individual who retired from Maytag to be in retired membership status (Trial Ex. 111).

[10] A union's constitution is a contract and is enforceable as such.  *See Wooddell v. International Bhd. of Elec. Workers, Local 71,* 502 U.S. 93 (1991); *DeSantiago v. Laborers Int'l Union, Local No. 1140,* 914 F.2d 125, 128 (8th Cir. 1990) ("a union constitution is a 'contract' within the plain meaning of § 185 [of the LMRA]").  To that end, it is settled that a non-bargaining unit member, such as a retiree, can consent to union representation by contract, such as a CBA or a union's constitution.  *See,* e.g. *Int'l Brotherhood of Electrical Workers, AFL-CIO v. Hechler,* 481 U.S. 851, 860 (1987) ("[a]nother party, such as a labor union … may assume a responsibility towards employees by accepting a duty of care through a contractual arrangement"); *Schneider v. Robbins,* 466 U.S. 364, 376 (1984), *aff'g,* 700 F.2d 433 (8th Cir. (en banc)) (implicitly recognizing that a union can assume a contractual duty to represent non-bargaining unit entities); *Merck v. Jewel Cos.,* 848 F.2d 761, 766 (7th Cir. 1988) ("employees may assent through the agreement itself to make the union their agent to resolve all disputes arising out of the implementation of that agreement – disputes that by definition arise during the employment relationship – even if they leave work before its end.").

The evidence at trial will further confirm that the retirees both expressly and implicitly acknowledged the representative status of the Union.  For example, the Company will present evidence at trial of the Hourly Retirement Benefit Summaries signed by each individual who retired between March 1989 and May 2006, which provided a summary of their retirement benefits, including medical and prescription drug coverage (Trial Exs. 38-56).  These Summaries contained express language by which the retirees acknowledged that their health insurance benefits were negotiated on their behalf by the Union and were subject to change (*Id.*).

Consistent with their acknowledgement on the Retirement Summaries, the retirees repeatedly allowed the Union to negotiate the termination of, changes to, and the continuation of their health insurance benefits without objection and knowingly accepted the corresponding changes to those benefits.[11]  The retirees' conscious acquiescence to the negotiation of their benefits by the Union demonstrates that the Union had actual or apparent authority to act as the retirees' agent for the purposes of negotiating those benefits.  *See AgriStor Leasing v. Farrow*, 826 F.2d 732, 737 (8th Cir. 1987) (apparent authority is "that which, although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent out as possessing."); *State v. Sellers*, 258 N.W.2d 292, 297 (Iowa 1977) (apparent authority arises "out of the conduct or statements of the principal" and if a principal acts or conducts his business

---

[11] During the period when they were active employees, these same individuals repeatedly ratified modifications to the SIA, thereby ratifying changes to the then current retirees' health insurance benefits. The active employees' ratification of such modifications necessarily establishes that the active employees understood that their health insurance benefits would be negotiated on their behalf by the Union upon their retirement.  *See Frontier Communs. of N.Y., Inc. v. IBEW, Local Union 503*, 2008 U.S. Dist. LEXIS 37213, at **18-19 (S.D.N.Y. May 6, 2008) ("While employees have, in a sense, consented to the union pursuing claims on their behalf by choosing the union as their bargaining representative, the same is true for retirees who, before they retired, chose the union to be their representative in negotiating the very contract provision the union now seeks to enforce."); *see also* Merk, 848 F.2d at 766 (holding that former employees "may assent through the [collective bargaining] agreement itself to make the union their agent to resolve all disputes arising out of the implementation of that agreement …") (emphasis added).

"or fails to disapprove of the agent's act or course of action so as to lead the public to believe that [he] possesses authority to act or contract on the name of the principal, such principal is bound by the acts of the agent within the scope of his apparent authority.").[12]

In sum, the facts presented at trial will prove that both the Union and the retirees acknowledged and assented to the designation of the Union as the retirees' exclusive representative in disputes over their welfare benefits, including but not limited to, this lawsuit. Accordingly, even independent of Federal Rule of Civil Procedure 23, the Union may properly represent the retirees in these proceedings.

## III. THE DEFENDANT CLASS MEMBERS ARE NOT ENTITLED TO VESTED RETIREE HEALTH INSURANCE BENEFITS BECAUSE THE PLAN DOCUMENTS DO NOT CONTAIN VESTING LANGUAGE

It is well-established that retiree health insurance benefits are welfare benefits, and as such, do not vest automatically. *See* 29 U.S.C. § 1051(1); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *Crown Cork & Seal Co. v. Int'l Ass'n of Machinist & Aerospace Workers*, 501 F.3d 912, 920 (8th Cir. 2007). To that end, an employer that offers welfare benefits may unilaterally modify and terminate those benefits at the employer's discretion, provided that the employer has not made a contractual agreement to the contrary. *Id.*; *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510, 516 (1997); *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d at 1516.

In this Circuit, any contractual agreement by the Company to provide the retirees vested health insurance benefits must be written and incorporated in the plan documents. *See Hughes v.*

---

[12] This acceptance is further evidenced by the following facts that will be introduced at trial: (1) a Local 997 Hotline article published during a 2004 strike between the Company and the Union, which stated that a retiree couple's future benefits would be determined by the terms of the next contract (Trial Ex. 3); (2) the Union's representation of retirees in pension disputes with the Company (SF ¶ 33); (3) the retirees' participation in Local 997 elections and ability to elect a representative on the UAW executive committee (SF ¶ 31); and (4) the retirees' participation in contract proposal meetings (SF ¶ 32).

*3M Retiree Med. Plan*, 281 F.3d 786, 790 (8th Cir. 2002) (noting that a welfare benefit may vest only if a promise to provide vested benefits is incorporated, in some fashion, into the formal written ERISA plan); *Brubaker v. Deere & Co.*, 664 F. Supp. 2d 972, 988 (S.D. Iowa 2009) (same); *see also Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (en banc) (vesting "is not to be inferred lightly; the intent to vest must be found in the plan documents and must be stated in clear and express language").  An inference of vesting does not arise simply because employees are eligible for benefits upon retirement.  *Anderson*, 836 F.2d at 1516-1517. Moreover, the plan documents need not specifically disclose that benefits are not vested; rather, for benefits to be vested, the language in the plan documents must contain an affirmative intent to vest benefits.  *Id*. at 1519; *Hughes v. 3M Retiree Med. Plan*, 134 F.Supp.2d 1062, 1070 (D. Minn. 2001), *aff'd Hughes*, 281 F.3d at 790 ("where a document is silent on the issue of vesting, it is presumed that the benefits were not intended to vest.").

When assessing whether an employer intended welfare benefits to vest, the Court must first examine the language in the plan documents.  *Anderson*, 836 F.2d at 1516-7.  In reviewing the plan documents, the court gives "the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean."  *Brubaker*, 664 F. Supp. 2d at 988 (*quoting Hughes*, 281 F.3d at 790).  Thereafter, if the court determines that the contract language is ambiguous, it may refer to extrinsic evidence to aid in the construction of the parties' contracts.  *Anderson*, 836 F.2d at 1516-17.

"[Retirees] have the burden of proof as to whether vesting language exists in order to confer a vested right to employee welfare benefits."  Docket No. 195, p. 6 (*quoting Hughes*, 281 F.3d at 791); *John Morrell*, 37 F.3d at 1304 (same); *see also Cherry v. Auburn Gear, Inc*., 441

F.3d 476, 481 (7th Cir. 2006) ("the presumption that healthcare benefits do not exceed the life of an agreement imposes a high burden of proof on the retirees."). For the reasons discussed below, Defendants cannot meet their difficult burden of establishing that the plan documents at issue in this matter contain an unambiguous promise to vest the retiree health insurance benefits. Accordingly, judgment must be entered in favor of the Company.

### A. The Controlling Plan And Legal Documents Contain Unambiguous Reservation Of Rights Language

It is settled law in this Circuit that where the plan documents unambiguously and unqualifiedly reserve to a company the right to terminate, modify, or amend a health insurance benefits plan, that alone is sufficient to defeat a claim that the benefits in that plan are vested and may not be modified. *Stearns v. NCR Corp.*, 297 F.3d 706, 712 (8th Cir. 2002) (collecting cases and holding that because "a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits," there must be an affirmative indication of vesting in the plan documents to overcome an unambiguous reservation of rights clause); *see also Crown Cork*, 501 F.3d at 918 (clause reserving the employer's right to terminate the plan benefits in the future was alone sufficient to overcome a claim that benefits were vested where there was no affirmative indication of vesting in the plan documents); *Hughes*, 281 F.3d at 792-73 (a summary plan description's reservation of rights clause, stating that the employer intended to continue the plan indefinitely, but reserving the right to change or discontinue the plan if necessary, unambiguously reserved the employer's right to modify the plan at any time, and therefore, retiree medical benefits did not vest); *John Morrell*, 37 F.3d at 1304 (no vesting where an unambiguous reservation of rights clause existed and the plan documents lacked explicit language vesting retiree health benefits); *Anderson*, 836 F.2d at 1519 (unambiguous reservation-of-rights clause and other provisions defeated vesting argument); *see also Sprague*, 133 F.3d at

388 (allowing company to modify retiree health insurance benefits because the relevant summary

plan descriptions contained unambiguous reservation of rights language).

Pursuant to ERISA, the plan documents in this case necessarily include the Welfare

Benefit Plans, the SIA, the SPD and the Benefit Certificates. *See* 29 U.S.C. § 1102(a)(1)

(requiring written benefit plans); *Jobe v. Medical Life Ins. Co.*, 598 F.3d 478, 481 (8th Cir. 2010)

("to be sure, we have noted on more than one occasion that summary plan descriptions are part

of the written documents required by ERISA"); *Stearns*, 297 F.3d at 708 (Group Benefit Plan

was part of the controlling plan documents for purposes of ERISA); *Brubaker*, 664 F.Supp.2d at

988 (deeming benefit plans and summary plan descriptions "controlling plan documents" for

purposes of assessing whether health benefits are vested); *see also Saltzman v. Independence

Blue Cross*, 2010 U.S. App. LEXIS 11917, *14 (3d. Cir. June 10, 2010) (simply put, plan

documents are those documents that are summary plan descriptions or that govern the

administration, management or amendment of the plan); *Cotton v. Mass. Mut. Life Ins. Co.*, 402

F.3d 1267, 1275 (11th Cir. 2005) (noting that plan documents are those that, among other things,

describe the operation and administration of the plan).

The SIA expressly states that it was a "general description of the various benefit plans."

(Trial Exs. 7-17). This reference to the benefit plans necessarily incorporates the benefit plans

into the SIAs. After ERISA was enacted in 1974, and in recognition of the principles discussed

above, the Company and the Union added a provision which has appeared in each SIA since

1977 immediately following the "general description" language, which provided that the "Legal

Documents" would govern in the event of a dispute. *See* Language In The Plan Or Legal

Documents, attached as Exhibit A. This provision necessarily incorporated the plan documents,

*e.g.* the Benefit Plan and SDPs, into the CBA (to the extent they were not incorporated by operation of law or the prior sentence).[13]

The evidence at trial will confirm that several of the Plan (and Legal) Documents at issue in this case contain unambiguous reservation of rights language that reserved to the Company the right to modify the benefits provided under the health care plan, without limitation.  Specifically, the following Plan (and Legal) Documents contain such language: (1) the 1987, 1990, 1992, 1999, 2000, 2003 and 2006 SPDs; (2) the 2003 Employee Welfare Benefit Plan; and (3) the 1996, 2003 and 2005 Benefit Certificates.  *See* Exhibit A.  Notably, the Union has conceded the authenticity of the 1987, 1990, 1992, 1999, and 2000 SPDs, as well as the 2003 Employee Welfare Benefit Plan (Trial Ex. 74) and the operative language of the 2006 SPD (Trial Ex. 78). The Union also conceded that the Company distributed the 2006 SPD to Maytag hourly employees enrolled in the benefits plan.  Therefore, the reservation of right language in those documents is determinative of vesting.  *See* Docket No. 195, p. 9.

Similarly, the Hourly Retirement Benefit Summaries signed by each individual who retired between March 1989 and May 2006 (discussed *supra,* page 13) and the Group Insurance Enrollment Forms signed by each individual who retired from June 2006 to 2009, contained an unequivocal acknowledgement that the retirees' benefits were subject to change in the future. The retirees' acknowledgment of the mutable nature of the benefits on the Retirement Summaries and Group Insurance Enrollment Forms confirms that the retirees (and the Union) were aware of and accepted the fact that the retirees' health insurance benefits, including those benefits provided under the medical and prescription drug plans, could be modified after their retirement from the Company.  *See, e.g. John Morrell*, 37 F.3d at 1308 (provision in master agreement stating that "the Company and the Union reserve the right to subsequently alter,

---

[13] In point of fact, the SIA in and of itself, does not constitute a Plan document.

modify, increase or reduce the benefits and coverages provided herein, at any time" was further evidence that the Union and the Company recognized that retiree health benefits were subject to periodic modification).

The effect of the reservation of rights language is not diminished by the "during his life" language contained in the SIAs.  As an initial matter, each SIA states that a retiree will "continue coverage under the Medical and Rx Drug Plans for himself and eligible dependents during his life."  The lack of punctuation in this sentence establishes that the phrase "during his life" terminates an eligible dependent's benefits under the plan mid-contract, should the retiree die during its term.  It does not state that the retiree will receive such benefits "during his life."

Moreover, even assuming that the "during his life" language applied to retirees, Courts in and outside of this Circuit have consistently held that an employer's statement to provide benefits for a "lifetime" is not synonymous with vested benefits.  Rather, such a provision must be construed harmoniously with the other clauses permitting modification or termination of retiree benefits.  *See, e.g. Crown Cork*, 501 F.3d at 917-18 ("the cap on 'lifetime benefits' set out in the health plans is a limiting provision, hardly an intent to vest benefits"); *Olander v. State Farm Mutual Auto Ins. Co.*, 317 F.3d 807, 811 (8th Cir. 2003); *cert denied*, 540 U.S. 825 (2003) (noting that when one operative term in a contract is unambiguous, other provisions must be read so that they are consistent with the plain meaning of the operative term); *Hughes*, 134 F. Supp. 2d at 1070 (rejecting union's argument that language stating that retirees and their spouses would receive medical benefits "for your lifetime at company expense" meant that such benefits were vested and noting that such language "does not state that a retiree's medical benefit became fixed and inviolate upon retirement"); *see also Cherry*, 441 F.3d at 483 ("it is well-established that 'lifetime' benefits can be limited to the duration of a contract"); *Sprague*, 133 F.3d 388 (6th Cir.

1998) (there is "no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change.").

In short, the unequivocal and unqualified reservation of rights language contained in the Plan (and Legal) Documents are dispositive of the vesting issue. *See, e.g. Crown Cork*, 501 F.3d at 918 (a "blanket [reservation of rights provision] to Crown to unilaterally modify or terminate the retiree health plans, set forth in the Retiree Health Benefits Plan … is fatal to any vesting argument"); *Hughes*, 281 F.3d at 792-93 (reservation of rights language that does not include provision that particular benefits are vested defeats vesting claim); *Anderson*, 836 F.2d at 1514-15 (language stating that benefits "may now or hereinafter be amended, modified or supplemented in collective bargaining" is inconsistent with a finding of vested benefits); *Brubaker*, 664 F.Supp.2d at 987 (rejecting union's vesting argument due to the existence of an unambiguous reservation of rights provision in the contract). For this reason alone, and in accordance with Eighth Circuit precedent, this Court should grant judgment in favor of the Company.

**B.    The Controlling Plan And Legal Documents Are Unambiguous And Do Not Create A Vested Right To Health Insurance Benefits**

Although the reservation of rights language discussed above standing alone is legally sufficient to prove that the retirees' health insurance benefits at issue in this case were not vested, the lack of vesting language in the controlling Plan (and Legal) Documents further supports this conclusion.

More specifically, as will be proved at trial, nothing in the text of the controlling Plan (or Legal) Documents suggests that retiree health insurance benefits were fixed and irreducible into perpetuity for all individuals who retired under them. Indeed, the evidence at trial will confirm

that *none* of the relevant documents in this case contain a covenant vesting retiree health insurance benefits, or any other expression of intent by the Company to vest those benefits.  The absence of vesting language in the Plan and Legal Documents is in sharp contrast to the unambiguous reservation of rights provisions discussed above.  *See, e.g.* Section III.A, *supra*.

Relatedly, other provisions included in the controlling Plan (and Legal) Documents, discussed below, contain language that courts in this Circuit and elsewhere regularly deem inconsistent with vested benefits.

### 1.     The Durational Clauses In The SIAs Are Evidence Against Vesting

The Eighth Circuit has confirmed that durational clauses contained in benefit plans are inherently inconsistent with vesting.  *See Anderson*, 836 F.2d at 1519 ("[i]t would render the durational clause nugatory to hold that benefits continue for life even though the agreement provides the benefits expire on a certain date").  The testimony at trial will confirm that since 1961, every SIA has contained a durational clause, which provides for the termination of the agreement on a particular date, unless the parties agreed to change or modify the agreement.  *See* Exhibit A.  The evidence at trial will show that, pursuant to the durational clause contained therein, the 2004-2008 Labor Agreement and SIA were terminated upon their expiration.

Where, as here, an agreement has a specific durational clause, it is presumed that all of its provisions expire in accordance with that clause, absent explicit language stating that a provision is to survive independently of the agreement.  *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 201 (1991) ("Contractual obligations will cease, in the ordinary course, upon termination of a bargaining agreement"); *Crown Cork*, 501 F.3d at 917 (finding benefits were not vested, in part because of the existence of a durational clause in the group insurance agreements); *John Morrell*, 37 F.3d at 1307 (durational clause in master agreement was inconsistent with the intent to vest health care benefits for life); *Anderson*, 836 F.2d at 1519 (a durational clause terminates the

benefits contained therein on a certain date); *see also Des Moines Mailers Union, Teamsters Local No. 358 v. NLRB*, 381 F.3d 767, 770 (8th Cir. 2004) (there is a reason why the Supreme Court opined that contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement . . . [A] court should cast a cold eye on contentions that a contract with a fixed term actually created a perpetual obligation."); *American Fed'n of Grain Millers v. International Multifoods Corp.*, 116 F.3d 976, 981 (2d Cir. 1997) ("[p]romising to provide benefits for a certain period of time necessarily establishes that once that time period expires, the promise does as well").  The durational clause in the SIA contains no such qualifications.  Thus, the retirees' benefits expired when the SIA terminated.[14]  *See Anderson*, 836 F.2d at 1519 (because the welfare benefits were limited to the term of the SIAs negotiated between the parties, the benefits provided therein were not vested).

> **2.**    **The Coordination Of Benefits And Reopener Clauses In The SIAs Are Conclusive Of the Vesting Issue**

Coordination of benefits clauses reduce the employee's or retiree's benefits paid by the employer based on the payment of the benefits by a third party, often Medicare.  Similar to durational clauses, the Eight Circuit has held that such clauses are inconsistent with the vesting of benefits.  *See Crown Cork*, 501 F.3d at 918 ("a coordination of benefits clause … is inconsistent with vesting"); *John Morrell*, 37 F.3d at 1307 ("[coordination of benefits] provisions are also inconsistent with vesting"); *Anderson*, 836 F.2d at 1519 ("the Plan cannot be interpreted to provide vested rights for prior retirees in one provision and to take such rights away in another"); *McPeek v. Beatrice Co.*, 936 F. Supp. 618, 630 (N.D. Iowa 1996) (summary judgment

---

[14] As noted by this Court, that the durational clause at issue in this case allowed for modification and termination of the Agreement, is significant to the vesting issue.  *See* Docket No. 195, p. 16 (citing Anderson, 836 F.3d at 1519.

granted in favor of the employer where a coordination of benefits clause and a durational clause sufficiently established that the plan's prescription drug benefits were not vested).

At trial, Plaintiffs will demonstrate that the SIAs contained two coordination of benefits clauses and in addition contained a reopener clause that allowed bargaining when a comparable plan was available.  For example, each SIA since 1971 contained a coordination of benefits with Medicare clause, which provided that the medical coverage under the Plan would automatically become a supplement to Medicare at age 65 or when an individual was disabled.  *See* Exhibit A. Furthermore, each SIA since 1974 contained a Letter of Understanding ("Side Letter No. 1") between the Company and the Union, which authorized the Company to unilaterally modify the *retirees'* health insurance benefits during the term of the SIA in the event of the passage of a national health care act or other law that provided benefits that were duplicate or could be integrated with the benefits under the current Company health plans.  *See* Exhibit A.  The Eighth Circuit has expressly held that clauses coordinating benefits with Medicare are inconsistent with vested benefits.  *See Anderson*, 836 F.2d at 1519; *see also* Docket No. 195 (…"the coordination of benefits clause demonstrates that the Company intended to reduce its benefits payments as retirees became eligible for Medicare.").

In addition, each SIA since 1961 has contained a "reopener provision," which allowed for the renegotiation of benefits, even though the negotiation would occur during the contract term, in the event that benefits similar to those provided under the Insurance Plan became required by law.  *See* Exhibit A.  The difference in language between the reopener provision and the coordination of benefits clauses discussed above demonstrates that this latter clause allowed for the reduction of benefits beyond a "coordination with no diminution in levels," as both of the

former clauses permitted that already.  Unless this clause allowed for a reduction in benefits, the difference in language would be nullified.

The coordination of benefits clauses and the attendant reduction in benefits available under the benefit plan provided by the Company, standing alone or coupled with the reopener clause, confirms that the retirees' health insurance benefits were not vested.  *See Anderson*, 836 F.2d at 1519.

### 3.   The Continuation Of Prior Benefits Clause In The SIAs Demonstrate That The Retiree Health Insurance Benefits Were Not Vested

A continuation of benefits clause notifies plan participants of their eligibility to continue coverage under the employer's health benefit plans.  *John Morrell*, 37 F. 3d at 1307.  The evidence at trial will show that since 1961, each SIA has contained a continuation of benefits clause, which provides that an employee who is eligible for retirement shall continue coverage under the medical and prescription drug plan for himself and eligible dependents.  "Were there an intent to vest, [this] continuation language would not be necessary."  *Anderson*, 836 F.2d at 1519; *cf. DeGeare v. Alpha Portland Indus., Inc.*, 837 F.2d 812,816 (8th Cir. 1988) ("we hold that the continuation language in the present case does not support plaintiffs' argument that they are entitled to lifetime benefits").[15]  As discussed below in connection with the discussion of extrinsic evidence, consistent with the notion that benefits terminated when the SIAs terminated, the contract settlement Highlights contained an announcement of the continuation of retirees' health insurance benefits.  (*See* p. 36, *infra*)).  The language in the Highlights is strikingly similar to the continuation of benefits language the *John Morrell* Court found to be inconsistent with

---

[15] The "substitution of prior benefits clause" contained in the SIAs since 1961, which states that the benefits provided therein shall be in substitution for any and all other plans of the Company providing insurance benefits, provides additional evidence that the parties did not intend to vest the retiree health insurance benefits (*See* Exhibit A).

vested benefits.  *John Morrell &Co. v. UFCW*, 825 F. Supp. 1440, 1443 (Dist. S.D. 1993), *aff'd*

*John Morrell*, 37 F.3d at 1307.

In sum, the unambiguous language in the controlling Plan (and Legal) Documents

confirms that Maytag did not make any contractual promises to vest the retirees' health insurance

benefits.  The lack of any such promise, together with the existence of language to the contrary,

is dispositive of the vesting issue.  *See Stearns*, 297 F.3d at 712 (there must be an affirmative

indication of vesting in the plan documents to overcome an unambiguous reservation of rights).

**IV.  EVEN IF RECOURSE TO EXTRINSIC EVIDENCE WERE APPROPRIATE, WHICH IT IS NOT, SUCH EVIDENCE CONFIRMS THE PARTIES DID NOT INTEND FOR THE BENEFITS TO VEST**

A court should resort to extrinsic evidence to aid in the construction of the parties'

contract only if the contract language is ambiguous.  *Anderson*, 836 F.2d at 1516-17.  Although

unwarranted, a review of the extrinsic evidence, including the parties' history of negotiating

changes to the retiree health insurance benefits, various Union announcements regarding those

benefits, and the implementation and enforcement of various contract clauses, further supports

the conclusion that the retiree health insurance benefits are not vested.

**A.  The Numerous Modifications And Reductions To The Retiree Health Insurance Benefits Confirms That Those Benefits Were Not Vested**

"A 'vested right' is commonly defined as a 'right that so completely and definitely

belongs to a person that it cannot be impaired or taken away without the person's consent.'"

*Halbach v. Great-West Life & Annuity Ins. Co.,* 561 F.3d 872, 877 (8th Cir. 2009) (quoting

*Black's Law Dictionary* 1349 (8th ed. 2004); *see also John Morrell*, 37 F.3d at 1306.  To that

end, "the fact that modifications [to retiree health insurance benefits] were routinely negotiated is

fundamentally inconsistent with the notion that any retirement benefits were ever vested."  *Id*. at

1307; *Brubaker*, 664 F. Supp. 2d at 988 (weight of extrinsic evidence, including company's

history of modifying retiree health insurance benefits, established that those benefits were not vested); *see also District 29, UMW v. Royal Coal Co.*, 768 F.2d 588, 592 (4th Cir. 1985) (contract negotiators' testimony that retiree's right to healthcare benefits, were "open for negotiation every three years" established that the parties did not intend to create a right to vested benefits).

Throughout their 50-plus year relationship, the Union and the Company negotiated retiree health insurance benefits during each and every bargaining cycle. Notably, every collective bargaining cycle included proposals to change the health insurance benefits provided to active employees and current retirees. More importantly, however, during most bargaining cycles, the Union actually negotiated reductions to those benefits.[16] This fact alone eliminates any doubt that the benefits were subject to change. [17] *See, e.g. John Morrell*, 37 F.3d at 1307 (history of modifying retiree benefits was inherently inconsistent with vesting despite the fact that the union often requested, and received, improvements to retiree health insurance benefits); *Cherry*, 441 F.3d at 483 ("the parties' practice of changing the contractual terms in succeeding agreements every three years lends support to [the Company's] claim that neither party understood the benefits to be permanent or inalterable."); *Senior v. NSTAR Elec. & Gas Corp.*, 449 F.3d 206,

---

[16] As noted above, the Union often announced at the conclusion of negotiations that it had negotiated the continuation of the current retirees' health insurance benefits.

[17] Indeed, acknowledgement of the fact that retirees' benefits were subject to negotiation and reduction is apparent in the Retiree Council Meeting Minutes from February 20, 2008. Specifically, a portion of the "new business" section of the Meeting Minutes reads as follows: "Max and Lonnie are also going to talk to our International rep and explain to him what not to lose for retirees when he helps negotiate a new contract for the remaining Maytag workers at [the Newton plant] when the old contract expires in June of '08." (Trial Ex. 68).

220 (1st Cir. 2006) ("it is well-established that the parties' practice, usage and custom is of significance in interpreting their agreement.") (internal quotations omitted).[18]

### 1.   The Imposition Of The Medicare Coordination Of Benefits Clause Constituted A Reduction In Retiree Benefits

Among the changes negotiated between the Company and the Union was the agreement in 1971 to coordinate retiree health insurance benefits with Medicare upon the age of 65 or when disabled.  As a result of this modification, Maytag and the Union agreed that Maytag would no longer provide health insurance benefits to retirees or disabled workers, to the extent that such insurance was covered by Medicare.  Therefore, after 1971, current retirees who were already 65 or who were disabled for purposes of Social Security, were required to enroll in Medicare to obtain health insurance.  The evidence at trial will establish that the imposition of this Medicare coordination of benefits clause applied from its inception to both current and future retirees.

As referenced above, the Eighth Circuit has deemed the imposition of such clauses akin to "taking away" or "reducing" retirees' rights to benefits.  *See Crown Cork*, 501 F.3d at 918 ("That [coordination of benefits] provision allows for a reduction in health benefits based on eligibility for benefits under another group health insurance plan, including Medicare."); *Anderson*, 836 F.2d at 1519 ("the Plan cannot be interpreted to provide vested rights for prior retirees in one provision and to take such rights away in another"); *see also Arana v. Ochsner Health Plan*, 352 F.3d 973, 978 (5th Cir. 2003) ("Coordination of benefits occurs where a reduction of benefits takes place …").  Accordingly, the Union's agreement to reduce current

---

[18] Also as will be demonstrated at trial, despite the repeated reductions to the retirees' benefits, neither the Union, nor any retirees, ever claimed that such changes violated the retirees' vested rights.  This evidence "suggests that neither [the Company] nor the Union thought they were modifying vested benefits."  *John Morrell*, 37 F.2d at 1306, n.8.

and future retiree health insurance benefits as early as 1971 establishes that the parties did not

believe those benefits were vested.[19]

### 2. Modifications To The Prescription Drug Plan Also Decreased The Level Of Retiree Health Insurance Benefits

Numerous modifications to the prescription drug plan were also made during the course

of the collective bargaining relationship between Maytag and the Union.  First, in 1971, the

Company and the Union agreed to impose a $2 co-payment requirement for prescription drugs,

where before, plan participants were not obligated to submit co-payments for drugs (SF ¶ 89).

Thereafter, the Company and the Union negotiated increases to the current and future retirees'

prescription drug co-payments in 1977 (from $2 to $3 for all drugs) (SF ¶ 95),[20] in 1995 (from $

1 to $ 3 for generic and $3 to $5 for brand name) (SF ¶ 104),[21] and in 2001 (from $3 to $4 for

generic and $5 to $6 for brand name) (SF ¶ 109).  Similarly, during the 1992 contract

negotiations, the Union accepted the company's proposal to reduce the maximum mail order

supply for maintenance drugs from six (6) months to a ninety (90) day supply.  As a result,

---

[19] The claim the Company may nevertheless have intended that retires would continue to receive the same benefits for life regardless of who paid, is undermined by the fact that the Company and the Union repeatedly negotiated changes and reductions to those benefits, subsequent to the imposition of the coordination of benefits with Medicare clause.  *See* Sections IV.A.2-4, *infra*.

[20] Notably, the 1977 increases were implemented after the Union's initial objections thereto.  Specifically, as will be introduced at trial, the 1977 negotiation meeting minutes reflect that "the Union still wants a $2.00 deductible" (May 29) and "the $3 co-payment, is not ok …" and that the "Company is not entitled to the $3 co-payment" (May 31) (Trial Exs. 33-34).  The Union also objected to a 1983 Company proposal to increase the prescription drug co-payment from $3 to $4 (Trial Ex. 57).  While the Union succeeded in preventing an increase that year, the Union eventually agreed to increase the prescription drug co-payment in 1995.  These facts confirm that the Union was aware that it was negotiating *reductions* to the retirees' health insurance benefits.  *See, e.g. Winnet v. Caterpillar, Inc*., 609 F.3d 404, 413 (6th Cir. 2010) (rejecting plaintiffs' argument that increases in prescription drug costs are only a minor benefit change).

[21] In 1986, the parties agreed that prescription drug co-payments would be contingent on whether the prescription drug constituted a generic drug or a brand name drug.  To that end, the prescription drug co-payment under the SIA was changed to $1 for all generic drugs and $3 for all brand name drugs (SF ¶ 96).

employees and retirees who used mail order maintenance drugs experienced a doubling in the cost of those drugs.

Moreover, in 2004, the Company and the Union agreed to implement the Maytag Model Drug Plan for all active employees and current retirees, effective January 1, 2005 (Trial Exs. 69-70).  The Maytag Model Drug Plan (described in the 2003 SPD at pp. 67-72) for the first time identified three different categories of prescription drugs (generic, formulary and non-formulary) and imposed a corresponding co-payment for each type of drug.  All of the co-payments in the new drug plan were significantly higher than the required co-payments under the 2001 prescription drug plan and varied depending on whether the drugs were purchased at retail or by mail.  The new drug plan also imposed a mandatory mail order requirement for certain maintenance drugs, where before no such requirement existed.  Lonnie White and Max Tipton, former Local 997 officials and then current retirees, were two of the many retirees adversely affected by this change.  Notably, it appears that then Local Union President Pat Teed questioned whether these changes could be made and was apparently advised they could be, as the matter was dropped.

In short, the numerous reductions to the retirees' prescription drug plan compels the conclusion that the health insurance benefits were not vested.  *See, e.g. Cherry*, 441 F.3d at 483 (holding the retirees' benefits were not vested, in part because of the parties' practice of changing the contractual terms in succeeding agreements, including the alteration of prescription drug co-payments).

3.      **The Elimination Of The John Deere HMO Plan Provides Further Evidence Against Vesting**

In 1992, the Company and the Union negotiated and agreed to the introduction of a John Deere/National Heritage HMO Plan ("HMO").  An HMO provides numerous intrinsic advantages to participants.  The HMO remained in effect until, in response to a Union proposal in 2001, the parties negotiated the termination of the HMO (Trial Ex. 24).  The termination of the HMO represented a reduction in the effective choices of coverage available for then current retirees.[22]

More specifically, retirees who were enrolled in the HMO plan at the time it was terminated were required to enroll in the Blue Cross Blue Shield PPO ("PPO"), which was the only other medical plan option available under the parties' insurance agreement.  Evidence at trial will show that Richard Avery, former Local 997 President and then a current retiree, was enrolled in the HMO when it was terminated in 2001.  As a result, Avery lost his coverage under the HMO and was forced to enroll in the PPO to continue his coverage under the Company's welfare benefit plan (SF ¶ 106).[23]  Although knowledgeable of the impact on current retirees, the Union negotiated the termination of the HMO because it preferred the PPO to the HMO.   Of particular significance, the Union did not ask for the retirees' consent before it negotiated this change, nor is there any evidence that any retiree objected to the HMO's elimination (*Id.*).   The retirees' lack of consent undermines any notion of vested benefits.  *See John Morrell*, 37 F.3d at

---

[22] Among the many changes that resulted from the termination of the HMO was the limitation on preventative services available to plan participants and their dependents.  Under the HMO, plan participants and their dependents were entitled to a certain number of preventative service visits, depending on their age (Trial Ex. 15).  While the PPO offered preventative services after the termination of the HMO, it limited all visits for preventative services to one (1) visit per year, regardless of the age of the plan participant or dependent (Trial Ex. 16).

[23] Notably, the HMO included options not available in the PPO, including office calls with no co-pay, routine physicals, well baby care, immunizations, no lifetime maximums and durable medical equipment.

1306 ("[the Company's] modified retiree health benefit plans were never submitted to past retirees for approval, which suggests that neither [the Company] nor the Union thought they were modifying vested benefits.").

In sum, there can be no doubt that the elimination of the HMO constituted a reduction in the current retirees' health insurance benefits. This fact once again warrants a finding that those benefits were not vested.

>   **4.   Other Negotiated Changes To The Retiree Health Insurance Benefits Further Support The Absence Of Vested Benefits**

While the modifications and reductions discussed above prove that the parties did not consider the retiree health insurance benefits to be vested, the following additional modifications, which will be introduced at trial, further support this premise.

First, during the 1977 negotiations, the Company and the Union agreed to limit reimbursement for all health insurance benefits, for both active employees and current and future retirees, to the usual, customary and reasonable ("UCR") fee. *See* Exhibit A. Significantly, under this new provision, employees and retirees who visited doctors or physicians who did not limit their services to the UCR fee were required to pay, out of their own pocket, the costs for any fees or expenses incurred above the UCR. To that end, the imposition of the UCR requirement necessarily limited the network of providers that retirees could visit without incurring financial obligations and presumably forced at least some retirees to find new health care providers who complied with the UCR fee requirement.

In 1992, the Company and the Union negotiated a predetermination certificate requirement for all plan participants, including then current and future retirees. This requirement for the first time mandated that all plan participants obtain a predetermination certificate before hospital admission, stating whether their hospital stay was approved, and if so, for how long. *See*

*id.*  Subsequent to the implementation of this requirement, employees and retirees who failed to receive certification before a hospital stay (or who were denied approval for hospitalization but nevertheless elected hospitalization) were required to pay 20% of their hospital expenses.  *Id.*  Put differently, the predetermination certificate requirement eliminated the retirees' uninhibited choice to elect hospitalization without potential monetary penalty.

The 1992 negotiations also resulted in the implementation of a Quality Managed Care provision for mental health and substance abuse.  *Id.*[24]  The Quality Managed Care provision imposed sanctions for non-compliance.  *Id.*  As courts have routinely held, the imposition of a managed care provision necessarily represents a reduction in the effective choices of coverage available for retirees.  *See*, e.g. *Reese v. CNH America, LLC*, 574 F.3d 315, 325 (6th Cir. 2009) ("[m]anaged care plans were not popular when they were introduced because they often restricted the availability of 'discretionary or elective' services."); *Pabst Brewing Co. v. Corrao*, 161 F.3d 434,  442 (7th Cir. 1998) ("[the Company's] behavior suggests that it did not believe that it was forbidden to change benefit levels for retirees … It shifted the [benefits] package around, and it imposed various forms of managed care on the retirees."); *see also Winnet*, 609 F.3d at 413 ("the introduction of managed care is not a 'minor' benefit change").  Notably, the UAW itself opposed the imposition of managed care provisions when negotiating collective bargaining agreements with other companies.  *See Reese*, 574 F.3d at 325.

In 1995 there were additional reductions to the retiree health insurance benefits.  That year, the parties agreed to exclude working spouses whose employer offered full benefits from

---

[24] While Defendants argued in their Response to Plaintiffs' Motion for Summary Judgment that there was no proof that mental health and substance abuse was even covered under the Maytag health plan prior to 1992, Plaintiffs will produce evidence at trial, including contract proposals and Pension Board meeting minutes, confirming the existence of such coverage prior to 1992.

coverage under the Maytag Medical Plan.  *See* Exhibit A.  The parties also agreed to limit the

chemical and alcohol dependency treatment offered under the PPO to 45 days of inpatient

coverage and 35 days of outpatient coverage, where before, no such limitation existed.  *Id.*  In

essence, the parties imposed a cap on this benefit, which is in and of itself evidence that benefits

were not vested.  *See, e.g. Crown Cork*, 501 F.3d at 917-18, p. 20 *supra*.  Notably, every medical

plan since at least 1977 has placed a cap on the plan participants' lifetime benefits.  For example,

in 2000, the lifetime cap on medical benefits was $500,000 (Trial Ex. 131).  The Eighth Circuit

has explicitly held that caps on lifetime benefits is a "limiting provision" and is inconsistent with

a promise of vested benefits.  *See id*.

In sum, the Union's practice of repeatedly negotiating modifications to the current

retirees' health insurance benefits precludes any possibility that those benefits were ever

vested.[25]  *See John Morrell*, 37 F.3d at 1307.

**B.**      **The Negotiation And Implementation Of Various Clauses In The SIAs
            Mandates A Finding That The Parties Did Not Intend To Vest Retiree Health
            Insurance Benefits**

Similar to the multitude of modifications and reductions to the retiree health insurance

benefits negotiated between the Company and the Union, the parties' history of negotiating and

implementing various clauses in the controlling Plan (and Legal) Documents (all of which the

Eighth Circuit have found to be inconsistent with vested benefits) provides further evidence that

the retirees' benefits were not vested.  More specifically, the extrinsic evidence surrounding the

---

[25] Regardless of whether the above-referenced changes to the retirees' benefits in the past constituted a
reduction in benefits, such a finding would not affect the outcome in this case.  *See, e.g. Barnett v.
Ameren Corp*., 436 F.3d 830, 835 (7th Cir. 2006) (noting that "courts have rejected the argument that
health care benefits vest simply because a company has not reduced them in the past" and holding that
this conclusion is "consistent with [the court's] presumption against vesting"); *see also In re Unisys Corp.
Retiree Med. Benefit "ERISA" Litig*., 58 F.3d 896, 906 (3d Cir.1995) (affirming district court's holding
that "merely because the company had never chosen to exercise its reservations of rights prior to this

implementation and enforcement of the durational clause, the coordination of benefits clauses, the reopener clause, the continuation of benefits clause, the reservation of rights clauses, and the clauses making the level of retiree benefits coincident to the level of benefits provided to active employees, confirm that the Company and the Union did not consider the retiree health insurance benefits to be vested.

  **1.  The Agreement To And Enforcement Of The Durational Clauses In The SIAs Preclude The Vesting Of Benefits**

  As discussed above, since 1961, the Company and the Union agreed through negotiations to a limit all benefits, including retiree health insurance benefits, to the term of the relevant SIA. This negotiated agreement is reflected in the durational clauses contained therein.  At trial, Plaintiffs will introduce evidence that, in recognition of this clause, the Union sent a Notice of Termination letter to the Company upon the expiration of each SIA, which notified the Company of the Union's desire to terminate the SIA, including all appendices and supplementary agreements thereto, and to meet to negotiate a new labor contract (*See, e.g.* Trial Ex. 29). Evidence will likewise be introduced that, upon the expiration of each SIA, the parties agreed to terminate the SIA and renegotiated the benefits provided therein – a fact reflected, *inter alia*, in the Contract "Highlights."  (For example, in 1989, the Highlights announced that retired employees and their eligible dependents would *continue* to have protection under the medical and prescription drug plans) (Trial Ex. 22).  That the parties consistently enforced the terms of the durational clauses warrants a finding that the benefits were not vested.  *See John Morrell*, 37 F.3d at 1307 (durational clause expressly limiting the duration of the retirement health benefits to the duration of the Master Agreement was inconsistent with an intent to vest benefits for life); *Anderson*, 836 F.2d at 1519 (same).

---

litigation, did not mean that the company had waived its right to terminate the plans pursuant to these

2.      **The Union's Agreement To The Two Coordination Of Benefits Clauses And The Reopener Clause In the SIAs Undermines Its Position That The Retiree Health Insurance Benefits Are Vested**

The extrinsic evidence underlying the implementation of the coordination of benefits clauses discussed above provides additional proof against vesting.  As will be introduced at trial, following the implementation of the coordination of benefits with Medicare clause in 1971, retirees who retired prior to 1971, as well as those who retired after 1971, were required to obtain primary health insurance coverage from Medicare upon the attainment of age 65 or eligibility for Social Security disability.  Those retirees who failed to do so were denied benefits under the Maytag Plan.

Plaintiffs will also offer testimony at trial that Side Letter No. 1, which was re-adopted by the Union in every SIA after 1974, specifically authorized the Company to unilaterally modify its benefit plans with respect to "retired employees" upon the enactment of a national health insurance program.  The parties' agreement to modify retiree health insurance benefits, without negotiations, eliminates any suggestion that the parties intended for those benefits to vest.  *See, e.g. Anderson*, 836 F.2d at 1519.

3.      **The Union's Agreement To The Continuation Of Benefits Clause In The Relevant SIAs Undermines Its Position That The Retirees' Benefits Were Vested**

As discussed above, the SIAs negotiated between the Company and the Union contained explicit continuation of benefits language.  Such language is irreconcilable with vested benefits. *See, e.g. Anderson*, 836 F.2d at 1518-9.  As will be proved at trial, the Union agreed to and affirmed the validity and force of the continuation of benefits provisions through the "Contract

---

broad and unequivocal reservation of rights clauses.").

Highlights" provided to their membership (including retirees) summarizing their negotiated benefits following the tentative agreements between the parties.[26]

For example, the 1986, 1989, and 1992 Plan Highlights all contain language to the effect that the retired employees and eligible dependents would "continue" to have coverage and protection under the medical and prescription drug plans (Trial Exs. 21-23).  The Union's acknowledgement of the continuation of benefits from one labor agreement to the next agreement necessarily undermines any claims that it understood those benefits to be vested.  This conclusion is further supported by the fact that the Company's representation that it would "continue" to provide medical insurance benefits applied to both active employees and retirees.  Clearly, the medical insurance benefits did not vest for active employees, and therefore, the only logical conclusion is that the benefits would "continue" for only the duration of the contract for both active employees and current retirees.  *See Skinner*, 188 F.3d at 144; *see also Senn v. United Dominion Indus.*, 951 F.2d 806, 816 (7th Cir. 1992) ("the logical interpretation under our rule is that benefits "will continue" for the duration of the contract.").

4.   **The Union's Agreement To The Reservation Of Rights Language In The Controlling Legal Documents Contradicts Any Intent To Vest Retiree Health Insurance Benefits**

Since at least 1987, the Union has agreed to the implementation of provisions allowing the Company to modify and/or terminate the terms of the plan, including the retiree health insurance benefits provided therein.  The Union's acquiescence to such language is particularly telling when viewed in the context of the Company's and the Union's bargaining history and the Union's vast knowledge of the legal precedents applicable to the vesting of retiree health insurance benefits.   Specifically, despite the fact that the UAW is committed to the protection of

---

[26] A draft of the Contract Highlights were reviewed for accuracy and revised by the UAW's Area Servicing representative and by Local 997 officials and then distributed to the membership (SF ¶ 43).

retiree benefits and has filed numerous lawsuits in pursuit of this commitment, the Union never once objected to the reservation of rights clauses contained in the pertinent Plan (and Legal) Documents over the 23 years since 1987.[27]  What is more, the Union never successfully negotiated the inclusion of vesting language in any of those documents.

Accordingly, the Union's agreement to the reservation of rights clauses contained throughout the Plan (and Legal) Documents renders any claim that the Company could not modify the retirees' health insurance benefits untenable.  *See, e.g. Crown Cork & Seal*, 501 F.3d at 918 ("a "blanket [reservation of rights clause] to [the Company] to unilaterally modify or terminate the retiree health plans … is fatal to any vesting argument"); *Stearns*, 297 F.3d at 712 ("an unambiguous reservation-of-rights provision is sufficient without more to defeat a claim that retirement welfare plan benefits are vested"); *United Paperworkers Int'l Union v. Jefferson Smurfit Corp.*, 961 F.2d 1384-1385 (8th Cir. 1992) (unambiguous [reservation of rights] clause and "absolutely nothing in the plan to contradict or cloud [its] plain meaning" defeats a vesting claim).

> **5.      Because The Level Of Active Employee Health Insurance Benefits Was Coterminous To The Level Of Retiree Health Insurance Benefits, Those Benefits Were Not Vested**

The extrinsic evidence produced at trial will establish that up until 2004, each SIA expressly provided that the level of retiree health insurance benefits would be the same as the

---

[27] Of particular significance is the fact that the Union repeatedly reviewed and revised draft Plan and Legal Documents before they were disseminated to plan participants in their final form.  For example, Pat Teed, former Local 997 President, reviewed and revised draft SPDs and Benefits Certificates, but never objected to the reservation of rights language contained therein.  Also significant is that the Union consistently agreed to the reservation of rights language contained in the Hourly Retirement Benefit Summaries when its members on the Pension Committee approved each retirement application (which included completed Hourly Retirement Benefit Summaries).  Plaintiffs will also introduce evidence at trial that several former Union officials, all of whom had intimate knowledge of the parties' understandings regarding retiree health insurance benefits, actually signed the Hourly Retirement Benefit Summaries upon their retirement.

level of benefits negotiated for active employees.[28]  Put differently, during each bargaining cycle, the Union agreed that the level of retirees' health insurance benefits would be contingent on the level of benefits negotiated for active employees.  *See* Exhibit A.  UAW officials, employees and retirees understood the contingent nature of the retirees' health insurance benefits, as demonstrated by an article authored by Local 997 Communications Director, Greg Christy.  In this article regarding the 2004 strike between Maytag and the Union, Greg Christy wrote that a Maytag retiree couple's future health insurance benefits would be determined by the terms of the next contract (*i.e.* the level of benefits negotiated for the active employees) (Trial Ex. 3). Because the active employees' benefits were admittedly not vested and were modified during each cycle, it necessarily follows that the Union and retirees were aware that the retirees' health insurance benefits were likewise subject to change.  *See Skinner*, 188 F.3d at 144 (the only reasonable conclusion for a lack of material distinction in the CBA between benefits provided to active employees and retirees – "if one begins with the uncontroversial premise that benefits for active employees were not vested--is that benefits for retirees were likewise not vested.").  The Union's and retirees' acceptance of this clause confirms the parties' understanding that the retirees' health insurance benefits were not vested and could be changed in the future.

## V.    *ARGUENDO*, THE DEFENDANT RETIREES' HEALTH INSURANCE BENEFITS ARE NOT VESTED AT AN UNALTERABLE LEVEL

*Arguendo*, should the Court conclude that the retirees' health insurance benefits were in fact vested, the evidence introduced at trial will establish that (1) the *level* of benefits may nevertheless be reasonably modified; and (2) Whirlpool's modifications were reasonable.

As an initial matter, in recognition of the burden on employers to provide unchanged health insurance benefits amid the persistent rise in health care costs, at least four (4) courts have

held that "vested" retiree health insurance benefits may be reasonably modified. *See Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 309 (7th Cir. 1996) ("it is one thing to declare that the retirees are entitled to lifetime insurance benefits; it is another to decide precisely what those benefits are"); *see also Temme v. Bemis Co.*, 2010 U.S. App. LEXIS 19062, *21 (7th Cir. Sep. 13, 2010) (rejecting retirees' argument that their vested benefits under a shutdown agreement must remain exactly the same and holding that "the parties intended that [the Company] would continually provide medical coverage to retirees at a level 'substantially commensurate' with the benefits provided under the CBA, but with some freedom to impose cost-saving measures that did not substantially reduce benefits"); *Reese v. CNH America, LLC*, 574 F.3d 315, 324 (6th Cir. 2009) (expressing skepticism at the conclusion that an employer may not alter retiree health insurance benefits in any way, "particularly when the parties have a history of doing just that and when common experience suggests that health-care plans invariably change over time, if not from year to year."); *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615, 619 (7th Cir. 2006) (the most sensible interpretation of the shutdown agreement was that it required the Company to provide retiree prescription-drug benefits at a level "reasonably commensurate" with the original plan but adjusted for current economical and health care conditions). In other words, health care benefits are not akin to black and white pension benefits, which cannot be diminished once they have vested. *See Reese*, 574 F.3d at 324.

Courts have identified several factors to consider when assessing the reasonableness of an employer's modifications to vested benefits, including: (1) the parties' previous actions with respect to retiree health insurance benefits, including any changes to those benefits; (2) the level of benefits provided to current employees; (3) the benefits provided under the prior CBA; (4) benefits provided by other employers in the industry; (5) the economy; and (6) common sense.

---

[28] The parties modified this clause in 2001 to include surviving spouses.

*See, e.g.* Reese, 574 F.3d at 324; *Zielinski*, 463 F.3d at 619.  Moreover, "individual modifications should not be scrutinized in isolation … the changes must be examined in their totality for their effect upon the class of retirees as a group."  *Diehl*, 102 F.3d at 311.

The evidence at trial will show that Whirlpool's attempt to harmonize its benefit plans by placing the Newton retirees in its standard retiree plan constituted a reasonable modification.  First, as demonstrated above, and as will be further demonstrated at trial, the Company and the Union have a deep-rooted (and well documented) history of negotiating, and in some cases reducing, the retirees' health insurance benefits.  The changes to the retirees' benefits as a result of their placement in the Whirlpool retiree plan are akin to the changes that the Company and the Union negotiated during their bargaining relationship.  Furthermore, the level of benefits provided under the Whirlpool retiree plan is comparable to the level of benefits offered to other Whirlpool retirees.  Relatedly, the majority of Whirlpool's retirees, including a number of former Maytag retirees who will testify to these facts, are currently enrolled in one of the two Whirlpool retiree plans.

Common sense and the state of the economy likewise warrant a finding that the changes to the retirees' benefits were reasonable.  Indeed, holding Whirlpool "to the literal terms of [its older plans] in today's marketplace would give the retirees an insanely generous plan relative to today's norms."  *Zielinski*, 463 F.3d at 619; *see also Reese*, 574 F.3d at 326 ("medical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation") (*quoting Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1998)).

Accordingly, in the event this Court determines that the retiree health insurance benefits were vested, the Court should hold that as a matter of law, the changes the Company made to

those "vested" benefits were reasonable and therefore, lawful.  For this alternative reason, the Court should grant judgment in favor of the Company.

<u>CONCLUSION</u>

The Court should enter judgment in favor of the Company in this declaratory action.  As this Court has already held (and as will be proved again at trial, if necessary), a case or controversy by definition existed from the moment the Union notified the Company that the Union took an adverse position on the Company's ability to modify the retiree medical benefit plan.  Also, as confirmed by this Court, the Union may properly represent the retirees in this lawsuit under Federal Rule of Civil Procedure 23, as well as under its actual and apparent authority, as no conflict of interest exists to preclude such representation.

The evidence at trial will also establish that the parties did not intend to vest the Defendant retirees' health insurance benefits.  Standing alone, the SIAs contain clauses that preclude a determination that benefits were vested.  When the SIAs are combined with the controlling Plan (and Legal) Documents, all of which contain unambiguous and unqualified reservation of rights language, under Eighth Circuit precedent, this combination is lethal to any vesting argument.  The controlling Plan (and Legal) Documents likewise contain specific clauses that the Eighth Circuit has held are inherently inconsistent with vested benefits.  Moreover, although unwarranted, an examination of the extrinsic evidence at trial, including the Union's practice of negotiating modifications and reductions to the retiree health insurance benefits, and the numerous statements by the Union confirming those modifications and reductions, establishes that the Company and the Union understood that those benefits were subject to change.

Finally, should the Court determine that the benefits were vested, the benefits were not vested at an unalterable level.  Consequently, the Court should find in the alternative that the

changes made to the retirees' health insurance benefits on January 1, 2009, were reasonable.  For all of the reasons set forth above, Plaintiffs submit the Court should enter judgment in favor of Plaintiffs on all claims and award them their costs and attorneys' fees, as deemed appropriate.

Respectfully submitted,

   /s/ Douglas A. Darch
Firm ID 28
Douglas Darch
Miriam Geraghty
Baker & McKenzie LLP
130 E. Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-8933
Facsimile: (312) 698-2965
douglas.darch@bakernet.com

Gene R. La Suer
Deborah Tharnish
Davis, Brown, Koehn, Shors & Roberts, P.C.
The Davis Brown Tower
215 10th Street, Suite 1300
Des Moines, Iowa 50309-3993
GeneLaSuer@davisbrownlaw.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on November 16, 2010, he caused the foregoing document to be filed electronically with the Court.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's filing system.

Mark T. Hedberg
HEDBERG & BOULTON P.C.
100 Court Avenue, Suite 425
DES MOINES, IA  50309
515 288 4148
515 288 4149 (fax)
mthedberg@uswest.net

Robert A. Seltzer
CORNFIELD AND FELDMAN
25 E. Washington Street
Suite 1400
Chicago, IL  60602-1803
312 236 7800
312 236 6686 (fax)
rseltzer@cornfieldandfeldman.com

Barry A. Macey
Macey Swanson and Allman
445 N. Pennsylvania Street,
Suite 401
Indianapolis, Indiana  46204
(317) 637-2345
bmacey@maceylaw.com