## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| **MAYTAG CORPORATION, a subsidiary of WHIRLPOOL CORPORATION, and WHIRLPOOL CORPORATION** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 08-cv-00291-JEG-RAW** |
| | ) | |
| **v.** | ) | **Judge James E. Gritzner** |
| | ) | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al.,** | ) ) ) ) | **Magistrate Judge Walters** |
| | ) | |
| **Defendants.** | ) ) | |

## PLAINTIFFS' POST-TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.   THIS LAWSUIT PRESENTS A CLEAR CASE OR CONTROVERSY
     OVER WHICH THIS COURT HAS JURISDICTION ............................................. 2

     A.   Plaintiffs Are In Immediate Danger Of Sustaining An Injury If This
          Matter Is Not Promptly Resolved ........................................................... 3

     B.   Plaintiffs' Threatened Injury Is Fairly Traceable To The Union ........................... 5

II.  THE DEFENDANT CLASS MEMBERS ARE NOT ENTITLED TO
     VESTED RETIREE HEALTH INSURANCE BENEFITS BECAUSE THE
     CONTROLLING LEGAL DOCUMENTS RESERVE TO THE COMPANY
     THE UNQUALIFIED RIGHT TO CHANGE THOSE BENEFITS ............................. 7

     A.   The Controlling "Legal Documents" Include The Summary Plan
          Descriptions, Benefits Certificates, Welfare Benefit Plans and Insurance
          Agreements ......................................................................................... 7

     B.   The 2006 SPD Governed The Retirees' Rights To Health Insurance
          Benefits When The Company Made The Modifications At Issue In This
          Case ................................................................................................... 9

     C.   The Other Controlling "Legal Documents," Further Establish That The
          Retirees' Insurance Benefits Were Not Vested ............................................. 13

     D.   The Reservation Of Rights Language In The 2006 SPD (And The Other
          Controlling Legal Documents) Is Determinative Of The Vesting Issue ............. 16

III. THE CONTROLLING PLAN AND LEGAL DOCUMENTS ARE
     UNAMBIGUOUS AND DO NOT CREATE VESTED HEALTH BENEFITS ....... 20

     A.   The General Durational Clauses In The SIAs Are Inconsistent With
          Vesting .............................................................................................. 20

     B.   The Coordination Of Benefits And Reopener Clauses In The SIAs Suggest
          The Retiree Health Insurance Benefits Were Not Vested ................................. 22

     C.   The Continuation Of Prior Benefits Clause, Which Continued The
          Benefits Offered Under The Prior Plan, Is Incompatible With Vested
          Benefits .............................................................................................. 23

# TABLE OF CONTENTS
(continued)

Page

D.     The Specific Durational Clauses In The SIAs Do Not Suggest That The Retirees' Health Insurance Benefits Were Vested ............................................... 24

IV.     **REVIEW OF THE EXTRINSIC EVIDENCE, ALBEIT UNNECESSARY, FURTHER ESTABLISHES THAT THE RETIREES' HEALTH INSURANCE BENEFITS WERE NOT VESTED** .................................... 25

A.     The Retirees' And The Union's Acknowledgement And Acquiescence To The Language Contained In The Hourly Retirement Benefit Summaries Confirms The Parties' Understanding That The Benefits Were Not Vested ....... 25

B.     The Coterminous Relationship Between The Level Of Active Employee Health Insurance Benefits And The Level Of Retiree Health Insurance Benefits Is Further Evidence Against Vesting .................................................... 27

C.     The Numerous Negotiated Modifications And Reductions To The Retirees' Health Insurance Benefits Confirms That Those Benefits Were Not Vested .......................................................................................................... 29

      1.     The Implementation Of The Medicare Coordination of Benefits Clause Constituted A Reduction In Retiree Health Insurance Benefits ............................................................................................. 30

      2.     Modifications To The Prescription Drug Plan Likewise Resulted In A Reduction In Retiree Health Insurance Benefits................................. 31

      3.     The Termination Of The John Deere HMO Plan Further Establishes That The Retirees' Health Insurance Benefits Were Not Vested ............................................................................................ 34

      4.     Other Negotiated And Proposed Changes To The Retirees' Health Insurance Provides Additional Support For The Absence Of Vesting ............................................................................................... 35

D.     That Retiree Benefits Are A Permissive Subject Of Bargaining Provides Further Confirmation That Those Benefits Are Not Vested................................. 38

V.     **THE UNION'S CLAIM THAT THE 2004-2008 LABOR CONTRACT VESTED THE RETIREES' HEALTH INSURANCE BENEFITS IS NOT TENABLE** .................................................................................................... 38

VI.     **THE UNION'S EXTRINSIC EVIDENCE FAILED TO ESTABLISH THE EXISTENCE OF VESTED RETIREE HEALTH INSURANCE BENEFITS** ........ 42

A.     The Union's Extrinsic Evidence Is Immaterial To the Vesting Analysis ........... 42

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

B.       Additional Extrinsic Evidence Presented By The Union Is Not Credible........... 44

**VII.**     **ARGUENDO, THE DEFENDANT RETIREES' HEALTH INSURANCE BENEFITS ARE NOT VESTED AT AN UNALTERABLE LEVEL**...................... 46

**CONCLUSION** ................................................................................................................. 48

CHIDMS1/2855595.7

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*,
    404 U.S. 157 (1971) .................................................................................. 6

*Anderson v. Alpha Portland Indus.*,
    752 F.2d 1293 (8th Cir. 1985) ............................................................. passim

*Cedotal, et al. v. Whitney Nat'l Bank, et al.*,
    2007 U.S. Dist. LEXIS 56765 ................................................................... 42

*Cherry v. Auburn Gear, Inc.*,
    441 F.3d 476 (7th Cir. 2006) ......................................................... 2, 19, 33

*Diehl v. Twin Disc, Inc.*,
    102 F.3d 301 (7th Cir. 1996) .................................................................. 46, 48

*Etherington v. Bankers Life & Casualty Co.*,
    1992 U.S. App. LEXIS 17666 (7th Cir. July 31, 1992) .......................... 9

*Fibreboard Paper Prods. Corp. v. NLRB*,
    379 U.S. 203 (1964) (Stevens, J. Concurring) ...................................... 38

*Franchise Tax Bd. v. Construction Laborers Vacation Trust*,
    463 U.S. 1 (1983) ....................................................................................... 5

*Ginter v. Whirlpool Corp.*,
    Case No. 08 cv 750 (W.D. Mich. Aug. 8, 2008) .................................... 5

*Green v. AT&T, Inc.*,
    2009 U.S. Dist. LEXIS 36669 (E.D. Mo. April 29, 2009) ................... 11

*Halbach v. Great-West Life & Annuity Ins. Co.*,
    561 F.3d 872 (8th Cir. 2009) .................................................. 28, 32, 33, 38

*Horne v. Firemen's Retirement Sys.*,
    69 F.3d 233 (8th Cir. 1995) ...................................................................... 3

*IBEW Local 1 v. GKN Aerospace North American, Inc.*,
    431 F.3d 624 (8th Cir. 2005) .................................................................... 6

*John Morrell & Co., v. UFCW*,
    37 F.3d 1302 (8th Cir. 1994) ............................................................. passim

CHIDMS1/2855595.7

*Maytag Corp. v. UAW*,
  Case No. 08 cv 00291 (June 22, 2010) ("Docket No. 178").............................. 2, 6

*Maytag Corp., v. UAW*,
  Case No. 08 cv 00291 (June 24, 2009) ("Docket No. 75")................................ 2, 5

*Maytag Corp. v. UAW*,
  Case No. 08 cv 00291 (November 10, 2010) ("Docket No. 195") ...............................passim

*Maytag Corp., v. UAW*,
  Case No. 08 cv 00291, 2009 U.S. Dist. LEXIS 12869 (S.D. Iowa Feb. 11, 2009)
  ("Docket No. 63").............................................................................2, 3, 6

*Olander v. State Farm Mutual Auto Ins. Co.*,
  317 F.3d 807 (8th Cir. 2003).......................................................... 18

*Petrella, et al. v. NL Indus., Inc.*,
  529 F.Supp. 1357 (D.N.J. 1982)....................................................... 42

*Reese v. CNH America, LLC*,
  574 F.3d 315 (6th Cir. 2009).......................................... 36, 46, 47, 48

*Senn v. United Dominion Indus.*,
  951 F.2d 806 (7th Cir. 1992)........................................................... 24

*Shy v. Navistar, Int'l Corp.*,
  Case No. 92 cv 0333 (S.D. Ohio) .................................................... 2

*Sprague v. General Motors Corp.*,
  133 F.3d 388 (6th Cir. 1988) (en banc) ......................................19, 28

*Temme v. Bemis Co.*,
  2010 U.S. App. LEXIS 19062 (7th Cir. Sep. 13, 2010) ..................... 46

*UMW v. Am. Commer. Lines Transp. Servs.*,
  2010 U.S. Dist. LEXIS 126513 (E.D. Mo. Nov. 30, 2010)................. 33

*United Mine Workers, et. al. v. Brushy Creek Coal Co.*,
  505 F.3d. 764 (7th Cir. 2007)......................................................... 19

*White Farm Equip. Co.*,
  242 NLRB No. 201 (1979).............................................................. 9

*Zielinski v. Pabst Brewing Co.*,
  463 F.3d 615 (7th Cir. 2006)......................................................47, 48

## STATUTES

29 USCS § 185(c)............................................................................... 7

CHIDMS1/2855595.7

29 USCS § 1132(e)(2) ................................................................................................................ 7

CHIDMS1/2855595.7

## INTRODUCTION

Plaintiffs, Maytag Corporation and Whirlpool Corporation (collectively "Plaintiffs" or the "Company"), by their attorneys, Baker & McKenzie LLP, and pursuant to this Court's Order dated December 14, 2010, hereby submit their post-trial brief in this matter.[1]

This matter is a declaratory judgment action as to Plaintiffs' right to modify the benefits received by a class of retired former hourly employees, who are represented by the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW").  A five-day bench trial was conducted between December 6, 2010 and December 14, 2010.  During that time, the Company and Defendants, the UAW and its Local 997 ("Local 997") (collectively "the Union") presented witnesses and exhibits and cross-examined witnesses.

The evidence presented at trial established that: (1) this lawsuit presents a clear case or controversy over which this Court has jurisdiction; and (2) the relevant language of the controlling legal and plan documents (and an unnecessary review of the extrinsic evidence) confirms that the parties did not vest the retiree health benefits.  During the 2001 negotiations, the UAW proposed and the Company agreed to terminate the HMO health plan.  Moreover, during the 2004 negotiations, the UAW and the Company agreed to significant changes in the retirees' prescription drug plan.  Alternatively, even if the retirees' health benefits are deemed to have vested, which they should not, those benefits were subject to reasonable modification and the modifications made to those benefits by the Company in 2009 were reasonable.

---

[1] As its summary of the procedural facts and history of this lawsuit, as well as the legal authorities that form the basis for the Plaintiffs' arguments, Plaintiffs incorporate their Memorandum of Law in Support of Their Motion for Summary Judgment (Docket No. 143) and Plaintiffs' Pre-Trial Brief (Docket No. 202) and each of the arguments made therein.  *See also* Docket No. 195.

For the reasons set forth above and below, Defendants have failed to meet their burden of proving that the retirees' health insurance benefits were vested for life.[2]   Therefore, this Court should grant judgment in favor of the Company and against the Union, the Defendant class, and the individually named Defendants.

## ARGUMENT

**I.   THIS LAWSUIT PRESENTS A CLEAR CASE OR CONTROVERSY OVER WHICH THIS COURT HAS JURISDICTION**

Although this Court has held on three (3) occasions that Plaintiffs have established the existence of a case or controversy,[3] it has also stated that the issue of standing may be raised at any time during the proceedings.   *See* Docket No. 195, p. 5, fn. 3.   These prior rulings are unaffected by the evidence presented at trial.   Out of an abundance of caution, however, Plaintiffs submit the following argument.

---

[2] "[Retirees] have the burden of proof as to whether vesting language exists in order to confer a vested right to employee welfare benefits."   Docket No. 195, p. 6 (*quoting Hughes*, 281 F.3d at 791); *John Morrell*, 37 F.3d at 1304 (same); *see also Cherry v. Auburn Gear, Inc*., 441 F.3d 476, 481 (7th Cir. 2006) ("the presumption that healthcare benefits do not exceed the life of an agreement imposes a high burden of proof on the retirees.").

[3] *See Maytag Corp., v. UAW*, Case No. 08 cv 00291, 2009 U.S. Dist. LEXIS 12869, * 12 (S.D. Iowa Feb. 11, 2009) ("Docket No. 63") ("A controversy by definition existed from the moment [Local 997 and the UAW] notified the Company that the Union took a different, adverse position on the Company's ability to modify the retiree medical benefit plan"); *Maytag Corp., v. UAW*, Case No. 08 cv 00291 (June 24, 2009) ("Docket No. 75") (denying Union's Motion for Reconsideration of Motion to Dismiss and holding that the Company has not made improper use of the declaratory judgment statute); *Maytag Corp. v. UAW*, Case No. 08 cv 00291 (November 10, 2010) ("Docket No. 195") ("therefore, for the third time, the court concludes that the Company has standing in this declaratory action"); *see also Maytag Corp. v. UAW*, Case No. 08 cv 00291 (June 22, 2010) ("Docket No. 178") (granting class certification and noting that the Union is a proper defendant in this lawsuit); *cf. Shy v. Navistar, Int'l Corp*., Case No. 92 cv 0333 (S.D. Ohio) (Docket No. 9) (UAW acted as a members of the plaintiff class along with retirees in matter brought against Company over termination of retiree health insurance benefits).

### A.  Plaintiffs Are In Immediate Danger Of Sustaining An Injury If This Matter Is Not Promptly Resolved

In a declaratory judgment action, a case or controversy generally exists when the claimant demonstrates that it is in immediate danger of sustaining a *threatened* injury traceable to the action of the defendant. *See Horne v. Firemen's Retirement Sys.*, 69 F.3d 233, 236 (8th Cir. 1995) ("[t]he essential distinction between a declaratory judgment action and an action seeking other relief is that in the former no actual wrong need have been committed or loss have occurred in order to sustain the action") (*quoting United States v. Fisher-Otis Co.*, 496 F.2d 1146, 1151 (10th Cir. 1974)).[4]

The Union argues that no case or controversy existed as of the date the lawsuit was filed, because the Company had not proposed, and the Union had not objected to, proposed modifications to the retirees' health insurance benefits. Rather, the Union claims it was not aware of the Company's desire to reduce the retirees' health benefits until after this lawsuit was filed. The Union's argument has no merit. As proved at trial, immediately prior to and during the 2008 contract negotiations, the Union expressly objected to the modification of retiree health insurance benefits. The Union's adverse position over such modifications, together with its history of litigation over such matters, renders the existence of a case or controversy absolute.

As an initial matter, several witnesses testified that, prior to the commencement of the 2008 contract negotiations, the Union decided that it would not negotiate retiree health insurance benefits with the Company. *See* Testimony of James Reid (Whirlpool employee and Union

---

[4] Generally, to prove the existence of a case or controversy, the claimant must establish "that [it] has suffered an injury in fact, that the injury is fairly traceable to the actions of the defendant and that the injury will likely be redressed by a favorable decision." Docket No. 63, p. 5 (*quoting County of Mille Lacs v. Benjamin*, 361 F.3d 460, 463 (8th Cir. 2004)). In a declaratory judgment action, however, no actual wrong need have been committed or loss have occurred in order to sustain the action. *Horne*, 69 F.3d at 236.

member), p. 362[5]; Hoffert (Whirlpool employee and Union member) Test. 383; White (former

Local 997 President and UAW Representative) Test. 450; McInroy (UAW Representative) Test.

956 (if he had discussions with Max Tipton or Lonnie White before the 2008 negotiations, he

would have told them he was not going to bargain over retiree benefits); *see also* Trial Ex. 79, p.

1 (Union's July 1, 2008 negotiation notes wherein McInroy states: "If you think you are going to

hold these 30 people hostage to get at retiree health benefits that's not going to happen.").[6]

Consistent with the witnesses' testimony, it was confirmed at trial that after Kevin

Bradley, the Company's chief negotiator for the 2008 negotiations, notified the Union bargaining

committee of the Company's proposal to synchronize the retirees' benefits with the Whirlpool

plan,[7] Ron McInroy, the Union's chief negotiator, explicitly stated that the Union would not

discuss retiree benefits during the 2008 negotiations.  *See* Reid. Test. 361;  Hoffert Test. 382-

384; McInroy Test. 941, 966; Bradley (Whirlpool Director of Human Resources) Test. 792-793;

*see also* Trial Ex. 1.  The Union maintained this position throughout the 2008 negotiations –

---

[5] The testimony of each witness will be designated by that witness' last name and page of testimony.

[6] Also before the 2008 negotiations, upon learning of the changes that Whirlpool made to the Maytag *salaried* retirees' benefits, Max Tipton, former Local 997 President, informed Ron McInroy, the Union's chief negotiator at the 2008 negotiations, that he should not bargain over the retiree health benefits during the negotiations.  Tipton (former Local 997 President and UAW Representative) Test. 216-218. Relatedly, Ted Johnson, also a former Local 997 President, testified that it was on his mind that during the 2008 negotiations, Whirlpool might make a proposal to change the current retirees' benefits.  In anticipation of such a proposal, Johnson began collecting documents pertaining to the collective bargaining between Maytag and the Union over retiree health benefits.  Johnson Test. 296-297.

[7] The summary of the Company's economic proposals, which was passed to the Union bargaining committee at the beginning of the July 1, 2008 negotiations, provided that the Company intended to "synchronize" the retiree health insurance benefits with the Whirlpool plan.  *See* Trial Exs. 86, p. 5; 87. "Synchronize" meant that Whirlpool intended to roll the Maytag retiree health insurance benefit plan into the Whirlpool plan.  Bradley Test. 793.  Contrary to the Union's position, as of July 1, 2008, the Union was well aware that synchronization would result in a reduction of those benefits, given the changes that had been made to the salaried retirees' benefits.  Had the Union thought that Whirlpool's proposal was to increase the retiree health insurance benefits, it undoubtedly would have agreed to negotiate over that topic.  *See, e.g.* White Test. 429 (It was important to obtain changes in the health insurance benefits for current retirees).

despite the Company's repeated insistence that it had the right to modify those benefits. McInroy Test. 954; Bradley Test. 796-797; Trial Ex. 1.

Indeed, even after this lawsuit was filed – but before the expiration of the 2004-2008 labor contract – the Union continued to refuse to bargain over retiree health benefits. Reid Test. 366. Notably, McInroy agreed that, at the July 28, 2008 negotiation session, which took place two days after this lawsuit was filed, the Union could have agreed to bargain over changes to the retirees' benefits, but would not do so. *See* McInroy Test. 954-955, 969; *see also* Bradley Test. 797. That the Union refused to discuss this dispute, despite several opportunities to do so, further supports the conclusion that the Union was adverse to the changes proposed (and implemented) by the Company.[8]

In short, the evidence at trial established that the Union took an adverse position regarding the Company's changes to the retiree health benefits and had a history of litigation over such matters (*see* Plaintiffs' Trial Brief, Docket No. 202, p. 15). This combination placed the Company in immediate danger of sustaining an injury, as reasonable uncertainty existed as to whether the Company would face litigation and/or liability for its decision to modify the retiree health insurance benefits. Docket No. 75, p. 7.

## B.     Plaintiffs' Threatened Injury Is Fairly Traceable To The Union

Generally, federal jurisdiction exists over declaratory actions where the declaratory defendant would have had standing to bring a coercive action to enforce its rights. *Franchise*

---

[8] The existence of a case or controversy is further evidenced by the Newton hourly retirees' filing on August 8, 2008, of a lawsuit in the United States District Court for the Western District of Michigan, claiming that the Company's plan to modify the retiree benefit schedule effective January 1, 2009 violated the 2004-2008 Collective Bargaining Agreement between Maytag and the Union. *See Ginter v. Whirlpool Corp.*, Case No. 08 cv 750 (W.D. Mich. Aug. 8, 2008). Notably, this lawsuit was funded by the UAW.

*Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 19 (1983).  Here, if desired, the Union could establish standing to bring a suit against the Company to enforce the terms of the Collective Bargaining Agreement ("CBA").  *See* Docket No. 63, p. 8 (a party to a contract has standing to enforce that contract, even when the breach affects a third party); *see also* Docket No. 178, pp. 22-23 ("… the Court has already held that the Union suffered an injury-in-fact ... [and is] a proper defendant in this case.").

Indeed, the Eighth Circuit has held that a union has standing to enforce the terms of a CBA.  *See IBEW Local 1 v. GKN Aerospace North American, Inc.*, 431 F.3d 624, 627 n. 1 (8th Cir. 2005) (holding that the union had standing to represent retirees because the union alleged an injury in fact deriving from its right to enforce the agreement it negotiated); *Anderson v. Alpha Portland Indus.*, 752 F.2d 1293, 1296 (8th Cir. 1985) ("a union has standing to assert retirees' rights under a [CBA] to which it is a party if it chooses …"). [9]  Likewise, the Eighth Circuit has implicitly recognized the Court's jurisdiction over unions in declaratory actions related to the modification of retiree health benefits.  *See John Morrell & Co., v. UFCW*, 37 F.3d 1302 (8th Cir. 1994) (affirming judgment granting employer declaratory relief in an action to modify retiree health insurance benefits under CBAs).  Therefore, because the Union has a legitimate interest in protecting the benefits it negotiated on behalf of the retirees, the Union has standing to bring suit under both § 301 of the Labor Management Relations Act "LMRA") to enforce the terms of the CBA and § 502 of the Employee Retirement Income Security Act ("ERISA") to enforce the retirees' benefits.  To that end, the "Company's reasonable apprehension of an imminent lawsuit is fairly traceable to the union." *See* Docket No. 63, p. 8-9.[10]

---

[9] Courts elsewhere have also held that unions have standing to represent retirees.  *See* Docket No. 63, p. 8.

[10] Similarly, the retirees who are members of the Defendant class have standing to bring suit under § 301 of the LMRA to enforce the terms of the CBA and § 502 of ERISA to enforce their benefits.  *See Allied*

## II. THE DEFENDANT CLASS MEMBERS ARE NOT ENTITLED TO VESTED RETIREE HEALTH INSURANCE BENEFITS BECAUSE THE CONTROLLING LEGAL DOCUMENTS RESERVE TO THE COMPANY THE UNQUALIFIED RIGHT TO CHANGE THOSE BENEFITS

### A. The Controlling "Legal Documents" Include The Summary Plan Descriptions, Benefits Certificates, Welfare Benefit Plans and Insurance Agreements

In its Order denying Plaintiffs' Motion for Summary Judgment, this Court held that the record was inadequate at that time for the Court to discern what the phrase "legal documents" appearing in each Supplemental Insurance Agreement ("SIA") since 1977 included.[11]  *See* Docket No. 195, p. 9.  The Court continued by stating in its Order that the meaning of "legal documents" was "material because the documents contain reservation of rights language, which the Eighth Circuit has found determinative in vesting cases." *Id.*

The testimony at trial categorically established that the "legal documents" referenced in the SIAs were separate and apart from the SIAs and included the Summary Plan Descriptions ("SPD"), Benefits Certificates, Welfare Benefit Plans and Insurance Agreements.  *See, e.g.* Tipton Test. 182-184, 270; Townsend Test. 918-920 (the term "legal document" in the SIAs referred to the SPDs and Benefits Certificates).[12]  Indeed, Tipton, former Local 997 President who negotiated the 1977 (and several other) contracts between Maytag and the Union, admitted that the SIA was distinct from the "legal documents" and that in 1977, after the passage of

---

*Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971); *see also* 29 USCS § 185(c) and 29 USCS § 1132(e)(2).  Thus, this Court has jurisdiction over Plaintiffs' declaratory action.

[11] This clause, which was added following the passage of ERISA, states as follows: "The benefits outlined in this Insurance Agreement represent a general description of the various benefit plans.  However, the *legal documents* will govern in the event of a dispute."  *See*, e.g. Trial Ex. 10, p. 78 (emphasis added).

[12] It is Plaintiffs' position that the SIAs and the legal documents are unambiguous with respect to vesting.  The Court therefore need not review the extrinsic evidence in this case.  Plaintiffs discuss the extrinsic evidence throughout this brief without prejudice to its position that such a review is unnecessary.

ERISA in 1974, the parties added the "legal documents" provision to the SIAs to reference the SPDs and Benefit Plans. Tipton Test. 182-184.[13]

Likewise, several witnesses who testified at trial all conceded that one would have to look outside of the terms of the SIA to locate specific (and pertinent) information regarding the level and administration of the health benefits offered under the Maytag plan. Specifically, these witnesses collectively agreed that information pertaining to the Insurance Agreement between the Company and the insurance carrier, the beginning and end of coverage, services not covered under the medical and prescription drug plans, usual and customary rates, prescription maintenance drugs, limitations on prescription drugs, and required appeal procedures under ERISA, were not in the SIAs. *See* Tipton Test. 140, 148, 176-177, 179-180, 182, 267; White Test. 444-445; Johnson Test. 339; *see also* Testimony of Bill Townsend (Whirlpool Director of Human Resources), p. 917 (ineligible expenses and services not covered not found in SIAs); Testimony of Mark Krivoruchra (former Maytag/Whirlpool Vice President of Human Resources), p. 859-860 (Benefits Certificates were used by the Company to respond to inquiries from plan participants regarding the services covered under the medical and prescription drug plans). Rather, this information is contained in the SPDs, Benefits Certificates, Welfare Benefit Plans, and Insurance Agreements. *See, e.g.* Trial Exs. 128-131, 133, 135-136, 155-156, 163-164.

Further evidence that the legal documents were separate and apart from the SIAs is the fact that upon the commencement of each collective bargaining cycle, the Union requested from the Company a copy of the "insurance plan." *See* Tipton Test. 148; Trial Ex. 148, p. 1. Had the Union believed that the only pertinent document were the SIA, it would have had no reason to

---

[13] In line with Tipton's testimony, the 1977 Beyond Your Paycheck states: "This is the first time we've distributed such [summary plan] descriptions, which are required as a result of pension and benefit legislation." *See* Trial Ex. Z, p. 2.

request that document.[14]  Finally, as admitted by Lonnie White, former Local 997 President, the letter agreements attached to the Contract Highlights establish that the obligations of the parties was not determined solely by the terms of the SIAs, as the letter agreements were equally binding on the Company and the Union.  White Test. 432-433; *see also* Trial Ex. 23, pp. 15-16.

In sum, there can be no doubt that the controlling legal documents in this matter include the SPDs, Benefits Certificates, Welfare Benefit Plans, and Insurance Agreements.  Accordingly, the Court should give controlling weight to the reservation of rights language appearing in these legal documents and conclude that the retiree health insurance benefits were not vested.

B.   **The 2006 SPD Governed The Retirees' Rights To Health Insurance Benefits When The Company Made The Modifications At Issue In This Case**

The 2006 SPD governed the retirees' rights to health benefits when the Company announced and implemented changes to those benefits in 2008 and 2009, respectively.  As established at trial, and as is evident from the document itself, the 2006 SPD contains unequivocal reservation of rights language, which allows the Company to modify, amend or terminate retiree health benefits.[15]  *See* Trial Ex. 133, p. 186.  This language demonstrates conclusively that the retirees' benefits were not vested.  *See* Docket No. 195, p. 9.

---

[14] If the Company had not complied with the Union's information request, the Union could have filed an unfair labor practice charge with the National Labor Relations Board, compelling the Company to produce the requested documents.  *See, e.g. White Farm Equip. Co.*, 242 NLRB No. 201 (1979) (Company's failure to provide requested insurance plans and agreements to Union constituted an unfair labor practice within the meaning of the National Labor Relations Act).  According to Teed, however, the Union never filed such a charge.  *See* Teed Test. 626.  Therefore, it is evident that the Company complied with these requests and the Union was privy to the information contained in the insurance plan.

[15] In this same vein, the 2006 SPD also states that it describes the benefits applicable to eligible Newton Laundry Product Union hourly retirees *during the term* of the CBA.  *See* Trial Ex. 133, p. 163 (emphasis added); *see also* Johnson Test. 344.  The 2006 SPD further states that "coverage ends on the earliest of the following . . . "the date the plan(s) terminates or is amended so that you are no longer covered."  *See* Trial Ex. 133, p. 10.  Courts have uniformly held that the right to terminate a plan includes the lesser change – a modification to the plan.  *Etherington v. Bankers Life & Casualty Co.*, 1992 U.S. App. LEXIS 17666, *9 (7th Cir. July 31, 1992) (affirming district court's reasoning that plan documents that expressly

The evidence at trial further established that: (1) the Union received and reviewed several drafts of the 2006 SPD before it was finalized; (2) after accommodating the Union's proposals for modifications in language, the Company adopted the 2006 SPD; and (3) the 2006 SPD was mass distributed, or at a minimum, the Union and the membership (including retirees) had access to the 2006 SPD, and were therefore on notice of the Company's right to modify the retirees' health insurance benefits.

As an initial matter, consistent with the parties' history of negotiating over contract terms, Ted Johnson, Local 997 President from 2005-2007, admitted that he reviewed several drafts of the 2006 SPD, which were provided to him by the Company, before it was put into final form. Johnson Test. 283, 288. Johnson confirmed that he met with the Company on more than one occasion to review the contents of the draft 2006 SPDs, as well as the Union bargaining committee's proposed changes to those drafts (including verbiage in the section covering retiree health benefits and various typos). Johnson Test. 289-290, 343. Among the contents reviewed by the bargaining committee was the "General Information" section, which contained the reservation of rights clause allowing the Company to modify or terminate the retiree health benefits. *See* Johnson Test. 340-341; *see also* Trial Ex. 133, p. 186. There is no evidence that Johnson ever protested the existence of this language to the Company.[16] Nor did the Union file a grievance or lawsuit contesting the contents of the SPD (or maintaining that the Company unlawfully changed the terms of the labor contract) upon its dissemination, as it did in 2010 over

---

permit termination of the entire plan must also include the lesser alternative of plan changes such as increased contribution requirements).

[16] Notably, Johnson testified that it was easy to convince the Company to make his proposed changes to the 2006 SPD, but does not recall whether he ever asked the Company to revise the reservation of rights language contained therein. Johnson Test. 345-347. Johnson further testified that he forwarded a draft 2006 SPD to the UAW, but that he did not receive any response from that entity, much less one advising him to object to the reservation of rights language. *Id*.

the Summary of Material Modifications ("SMM")[17] distributed to employees containing changes to the pension plan.  Johnson Test. 340-345, 347; Trial Ex. 150.

The testimony at trial also confirmed that, after negotiation by the Union, the final version of the 2006 SPD was adopted by the Company and thereafter disseminated to employees (and made available to employees and retirees upon their request).  Kriv. Test. 856-857.  Specifically, Mark Krivoruchra, who was the Vice President of Human Resources for Whirlpool in 2006, confirmed that a sub-committee of the Company's ERISA Executive Committee, which was responsible for the preparation and adoption of the SPDs, adopted the 2006 SPD.[18]  Kriv. Test. 856-857, 894.  Krivoruchra also confirmed that the Company consolidated the Whirlpool and Maytag benefit plans in December 2007, after the Maytag acquisition.  *See* Kriv. Test. 855-856; Trial Ex. 88.  The 2006 SPD was among the documents incorporated into the Whirlpool Group Benefit Plan.  *See id.*, p. 2.

The record is also clear that the final version of the 2006 SPD was distributed to the Newton hourly employees.  Johnson admitted that he received a copy of the final version of the 2006 SPD from the Company, along with a cover letter explaining its contents.  *See* Johnson Test. 284; Trial Ex. 95.  This cover letter was addressed to "all Newton Hourly Employees."  *See*

---

[17] An SMM is a document designed to report changes in the ERISA plan and, along with annual reports and SPDs, to keep participants notified of their rights and benefits.  *Green v. AT&T, Inc.*, 2009 U.S. Dist. LEXIS 36669, * 26 (E.D. Mo. April 29, 2009).

[18] The Maytag ERISA Executive Committee, which was composed of the Chairman and CEO, Vice President and CFO, Vice President of Human Resources and Senior Vice President and General Counsel, was responsible for the approval, adoption and amendment of all employee benefit plans.  *See* Trial Ex. 103, p. 6.  The ERISA Executive Committee delegated specific tasks and responsibilities, including the adoption and distribution of SPDs, to sub-committees.  *See id.*, p. 8; Kriv. Test. 830-831, 894.

Trial Ex. 95.  Likewise, Krivoruchra testified that he was familiar with the SPDs (including the 2006 SPD) and made sure that they were distributed to all employees.  Kriv. Test. 861.[19]

The trial record further established that the hourly retirees who retired prior to the dissemination of the 2006 SPD had access to (and were on notice that they had access to) that document.  Specifically, the Hourly Retirement Benefit Summaries signed by each hourly employee who retired from Maytag or Whirlpool from 1999 to 2007 contained the following language: "a Summary Plan Description of your chosen medical plan is available to provide details of your coverage."  *See, e.g.*, Trial Exs. 48-56, p. 2.  Upon signing his Hourly Retirement Benefit Summary, Richard Avery, former Local 997 President, was aware that an SPD would be available to him during his retirement if he requested one and that he should do so by contacting the Company's benefits department.  Avery Test. 529, 558-559.  Likewise, Lonnie White, also a former Local 997 President, stated that after he retired, he knew to contact the Company if he needed a copy of his SPD.  White Test. 403-404; 478.  He also admitted that Maytag operated both a benefits office where plan participants could obtain copies of the plan documents and a call center where plan participants could call to ask questions about their benefits.  *Id*. Tipton agreed that, upon signing his Benefits Summary, he would have known that an SPD was available to him and that the SPD described what his benefits were.  Tipton Test. 168-169.[20]

---

[19] Krivoruchra further testified that the 2006 SPD was prepared, among other reasons, to reflect the changes to the prescription drug plan made during the 2004 contract negotiations.  Kriv. Test. 856.

[20] At trial, the Union appeared to suggest that even if retirees actually received a copy of the 2006 SPD, that SPD was not effective and their benefits were vested.  That argument is fatally flawed.  Even if the 2006 SPD were not effective as to the employees who retired before that date, those individuals were nevertheless on notice of the Company's right to change their health insurance benefits, as the operative SPDs they received when they were active employees all contained unequivocal reservation of rights language.  For example, Avery admitted that he received the 1999 John Deere HMO SPD upon his retirement, which likewise contained unequivocal reservation of rights language.  Trial Ex. 130, pp. 1, 34; Avery Test. 530-532.  White, Tipton and Teed also received several SPDs during their employment, which contained similar reservation of rights language.

In sum, the testimony and exhibits presented at trial established that the Company adopted (after negotiation by the Union) and distributed the 2006 SPD to its employees and the Union.   The testimony further established that the retirees had access to, and were aware that they had access to, the 2006 SPD.   Thus, there can be no dispute that, in 2008, the Union and its membership were informed of the Company's authority to modify and/or terminate the retirees' health insurance benefits.   *Cf.* Trial Ex. 68, p. 2 (retiree council meeting minutes reflecting statement that Tipton and White would tell McInroy what "not to lose" for retirees during the 2008 negotiations).   For these reasons, the Court should give dispositive weight to the language of the 2006 SPD – particularly the reservation of rights provision contained therein – and conclude that the retirees' health insurance benefits were not vested.

### C.    The Other Controlling "Legal Documents," Further Establish That The Retirees' Insurance Benefits Were Not Vested

Although unnecessary in light of the dispositive nature of the 2006 SPD, review of the evidence pertaining to the other "legal documents" further establishes that they were adopted by the Company and were distributed and/or made available to the Union and its membership, including the retirees.

As an initial matter, the testimony at trial established that the 1977, 1980, 1987, 1990 and 1992 Beyond Your Paychecks (which contained SPDs with unequivocal reservation of rights language) and the 1999 John Deere HMO SPD, were mass distributed to Newton hourly employees.[21]   *See* Teed Test. 618; White Test. 407-408, 423, 454; Avery Test. 529; *see also* Trial Exs. 84 and 155 (cover letters to "all Newton Hourly Employees," enclosing 1987 and 1992

---

[21] Defendants admitted that the following documents were true, accurate and complete copies: the 1987 Beyond Your Paycheck (Trial Ex. 127), 1990 Beyond Your Paycheck (Trial Ex. 128 and 128(a)), the 1992 Beyond Your Paycheck (Trial Ex. 155), the 1999 HMO SPD (Trial Ex. 130), and the 2000 Beyond Your Paycheck (Trial Ex. 131).   *See* Trial Ex. 75, ¶¶ 23-27.

Beyond Your Paychecks, respectively). Furthermore, White, Avery, Tipton, Reid, Hoffert and Teed all admitted that they received SPDs while employed at Maytag. *See, e.g.* Tipton Test. 149-150; Reid Test. 372; Hoffert Test. 388-389; White Test. 406-410, 422-423. 454; Teed Test. 575-577; Avery Test. 529. Relatedly, Teed, former Local 997 President, agreed that, in 1996, the Company was still distributing the 1992 SPD to new hires and employees. Teed Test. 675-676. Notably, in 1996, the 1992 SPD continued to govern the employees' and retirees' rights to health benefits, as Maytag and the Union did not negotiate a new contract between 1992 and 2001. Teed Test. 569-570; Townsend Test. 911-912.[22] As with the 2006 SPD, none of the above-referenced individuals objected to (or received objections from the membership about) the reservation of rights language in the SPDs. *See, e.g.* Avery Test. 532; White Test. 422.[23]

The evidence at trial further established that the Union and its membership had access to the Blue Cross Blue Shield ("BCBS") Benefits Certificates, which also contained reservation of rights language, and had sufficient opportunity to discuss and ask questions about their benefits with representatives from BCBS. For example, Johnson admitted that Benefits Certificates were maintained in the Local 997 records at the Union hall. Johnson Test. 323. Similarly, Teed admitted that he received the 1996 Benefits Certificate and that all of the Union committeemen received the draft 2005 Benefits Certificate (*i.e.* Trial Ex. 139). Teed Test. 591, 593-594.

---

[22] Consistent with this testimony, Bill Townsend confirmed that during new hire orientation, the Company's benefits administrator provided new hires with an SPD. Townsend Test. 910-911. The SPDs that were distributed to the new hires were the same SPDs that were given to all other plan participants. Townsend Test. 927. The Company also offered insurance to newly hired employees during new hire orientation. If the new hires, whose benefits admittedly were not vested, did not sign up for benefits, the Company referred to that as "waiving the coverage." Townsend Test. 909-911.

[23] According to White, the only objections that he ever received from the membership pertaining to the contents of the Beyond Your Paychecks dealt with calculations of costs contained therein and he was not aware of any other objections pertaining to any other provisions in those documents. White Test. 422.

Furthermore, both Tipton and White conceded that if plan participants had questions about their benefits or wanted copies of the relevant plan documents, they could retrieve those documents from the Maytag benefits office.  White Test. 403-404, 478; Tipton Test. 171-172.  Moreover, the Union and its membership, including the retirees, had ample opportunity to ask questions about their benefits and review the relevant plan documents during frequently scheduled visits to the Union hall by the BCBS representative.  Tipton Test. 142.

The 2003 Employee Welfare Benefit Plan provides additional evidence that the retirees' health insurance benefits were not vested.[24]  More specifically, this Plan, which was officially adopted by the Company and made effective January 1, 2003, explicitly states that the Company "reserves the discretionary right to modify or amend [the] Plan and/or Component Plans, in whole or in part, as applicable to Employees, Retirees or Dependents, in any respect, at any time … retroactively or otherwise."  Trial Ex. 135, p. 39; Kriv. Test. 833, 876.[25]  In practice, according to Krivoruchra, the Company could change the level of the benefits during the contract term due to changes in health care laws or under other various circumstances, notwithstanding that the parties were bound by a CBA.  Kriv. 877-878, 890.  Upon the expiration of a contract, however, the reservation of rights language in the Employee Welfare Benefit Plan granted to the Company the unilateral right to modify and/or terminate retiree health insurance benefits.  According to Krivoruchra, although the Company retained the right to terminate those benefits

---

[24] Defendants admitted the authenticity of the 2003 Employee Welfare Benefit Plan.  *See* Trial Ex. 75, ¶ 20.

[25] As clarified at trial, the 2003 Employee Welfare Benefit Plan contained two references to the Newton laundry hourly workforce: one pertaining to the Newton hourly employees and retirees under age 65 and the other pertaining to the Newton hourly retirees over age 65 (who received their primary coverage through Medicare rather than the Company).  Kriv. Test. 889.

unilaterally, the Company refrained from doing so because it would be poor labor relations practice not to engage the Union in bargaining over benefit changes for retirees. Kriv. Test. 884.

Finally, similar to the 2006 SPD, the evidence at trial confirmed that Maytag and the Union had a history of negotiating over the language in the SPDs and other legal documents. For example, Teed confirmed that the Company asked the Union to review a copy of the 2000 SPD, which required amendments in light of the 2001 negotiations. Teed Test. 586-587; *see also* Trial Ex. 134.[26] Teed also confirmed that he had in his possession two different drafts of the 2005 BCBS Benefits Certificate that he removed from the Local 997 Union Hall. *See* Teed Test. 593-594, 601; *see also* Trial Exs. 113 and 139.

In sum, the other legal documents, which were reviewed by the Union, adopted by the Company and distributed and/or made available to plan participants, demonstrate that the retirees' health insurance benefits were not vested.[27]

> **D.    The Reservation Of Rights Language In The 2006 SPD (And The Other Controlling Legal Documents) Is Determinative Of The Vesting Issue**

As this Court has acknowledged, it is settled law in this Circuit that where the plan documents unambiguously and unqualifiedly reserve to a company the right to terminate, modify, and/or amend a health insurance benefit plan, that alone is sufficient to defeat a claim

---

[26] Teed became President of Local 997 in 1999, succeeding Avery. While Teed's testimony confirmed that the Local Union received and revised the 2000 SPD (Trial Ex. 134), Teed claims that he discovered the marked-up copy of the 2000 SPD in the Union hall after he succeeded Avery. This is impossible. The date on the 2000 SPD is well after he became President and the revisions contained therein reflect changes made to the SIA in 2001. *See id.,* pp. 11-14 (crossing out references to the HMO, which was eliminated during the 2001 negotiations). Thus, Avery could not have marked up the 2000 SPD, as he was not in office at that time. The Court should therefore discredit Teed's testimony that Avery made the changes in the 2000 SPD and that the 2000 SPD was never distributed.

[27] It is important to note that, in 2008, the records of the Local 997 Union hall were in disarray. McInroy Test. 965. Moreover, Teed admitted that, upon his retirement in 2005, he removed several rather large Tupperware containers of documents from the Local 997 Union hall (approximately 5,482 pages), including negotiation notes, bulletins, SPDs, correspondence from the Company to employees and correspondence between himself and various Union officials. Teed Test. 570-573.

that the benefits in that plan are vested and may not be modified.  *See* Docket No. 195, p. 9; *see also* Plaintiffs' Trial Brief, Docket No. 202, p. 25 (citing cases).

As was confirmed at trial, the 2006 SPD, which governed the retirees' rights to health insurance benefits when the Company synchronized those benefits with the Whirlpool plan, contained an unequivocal reservation of rights provision that allowed the Company to unilaterally modify, amend and/or terminate the retirees' health insurance benefits.  *See* Trial Ex. 133, pp. 10, 186.  Likewise, several of the other controlling legal documents at issue in this case contain similar unqualified reservation of rights language.  Specifically, the following legal documents contain such language: (1) the 1987, 1990, 1992, 1999, 2000 and 2003 SPDs; (2) the 2003 Employee Welfare Benefit Plan; and (3) the 1996 Benefit Certificate.  *See* Trial Exs. 127, p. 4; 128, p. 2; 130, p. 5; 131, p. 3; 132, p. 149; and 155, p. 4.  Furthermore, the introductions to the 1977, 1980 and 1983 Beyond Your Paychecks, explicitly state that the SPDs will be updated when changes are made in the programs.  *See* Trial Exs. Z, p. 2; AA, p. 2; BB, p. 4.  Tipton conceded that, at face value, the language "when changes are made" means that those plans are not set in stone and that they may be changed.  Tipton Test. 152.  Consistent with this reservation of rights language, the Hourly Retirement Benefit Summaries signed by each and every hourly retiree from 1989 onward, including retiring Local 997 officials, contained an acknowledgement that the retirees' benefits were "subject to change."  *See, e.g.* Trial Ex. 48, p. 5.

The effect of the reservation of rights language in the pertinent legal documents is not diminished by the "during his life" language contained in the SIAs.  As an initial matter, each SIA states that a retiree will "continue coverage under the Medical and Rx Drug Plans for himself and eligible dependents during his life."  That this phrase states "during his life" rather than "during their life" establishes that the Dependent's coverage expired on the death of the

retiree and did not continue for the Dependent's life.  This phrase does not state that the retiree

will receive such benefits "during his life."  This interpretation is corroborated by Teed's own

testimony that, prior to the 1983 negotiations, the Union bargaining committee proposed deleting

the "during his life" language, as it limited the dependents' benefits to the life of the retiree.  *See*

Trial Ex. 147; Teed Test. 701.[28]  More importantly, though, despite the "during his life" language

in the SIAs, the Company and the Union agreed to modify (and reduce) retiree health insurance

benefits during most rounds of collective bargaining (*see* Section IV.C below).[29]  Indeed, former

Local 997 President Johnson agreed at trial that – apparently – the "during his life" language in

the SIAs was not an impediment to change.  Johnson Test. 341.

     Furthermore, even assuming that the "during his life" language applied to retirees, Courts

in and outside this Circuit have consistently held that an employer's statement to provide benefits

for "lifetime" is not synonymous with vested benefits.  Rather, such a provision must be

construed harmoniously with the other clauses permitting modification or termination of retiree

benefits.  *See, e.g.*, *Crown Cork*, 501 F.3d at 917-18 ("the cap on 'lifetime benefits' set out in the

health plans is a limiting provision, hardly an intent to vest benefits"); *Olander v. State Farm*

*Mutual Auto Ins. Co.*, 317 F.3d 807, 811 (8th Cir. 2003); *cert denied*, 540 U.S. 825 (2003)

(noting that when one operative term in a contract is unambiguous, other provisions must be read

so that they are consistent with the plain meaning of the operative term); *Hughes*, 134 F. Supp.

2d at 1070 (language stating that retirees and their spouses would receive medical benefits "for

your lifetime at company expense" did not mean that such benefits were vested and noting that

such language "does not state that a retiree's medical benefit became fixed and inviolate upon

---

[28] Had the UAW Social Security Department not advised against deleting this provision, the Union would have proposed its deletion during negotiations with the Company.  Tipton Test. 229-230.

[29] Indeed, in 2004, the Company definitively changed the retirees' drug plan.  *See* Trial Ex. 69.

retirement"); *see also United Mine Workers, et. al. v. Brushy Creek Coal Co.*, 505 F.3d. 764 (7th Cir. 2007) ("As long as the health plan is in effect, the retirees are entitled to benefits until they die … [i]f the plan did not create benefits 'for life,' it would be unclear when the benefits ended. Terminable benefits for life are benefits that go on regardless of the age of the worker or how long ago he retired, *but that cease if the plan conferring those benefits ends*.") (emphasis added); *Cherry*, 441 F.3d at 483 ("it is well-established that 'lifetime' benefits can be limited to the duration of a contract"); *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1988) (en banc) (there is "no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change.").

In short, the unequivocal and unqualified reservation of rights language contained in the controlling legal documents is dispositive of the vesting issue. *See, e.g. Crown Cork*, 501 F.3d at 918 (a "blanket [reservation of rights provision] to Crown to unilaterally modify or terminate the retiree health plans … is fatal to any vesting argument"); *Hughes*, 281 F.3d at 792-93 (reservation of rights language that does not include provision that particular benefits are vested defeats vesting claim); *Anderson*, 836 F.2d at 1514-15 (language stating that benefits "may now or hereinafter be amended, modified or supplemented in collective bargaining" is inconsistent with vested benefits); *Brubaker*, 664 F.Supp.2d at 987 (rejecting union's vesting argument due to the existence of an unambiguous reservation of rights provision in the contract). For this reason alone, and in accordance with Eighth Circuit precedent, this Court should grant judgment in favor of the Company. *See* Docket No. 195, p. 9.[30]

---

[30] The testimony of the hourly Maytag retirees that they believed they had health benefits for life is both immaterial and is not credible in light of the explicit reservation of rights language in the controlling legal documents (and Hourly Retirement Benefit Summaries) and the parties' practice of repeatedly negotiating changes, including reductions, to the retirees' benefits.

III.     **THE CONTROLLING PLAN AND LEGAL DOCUMENTS ARE
         UNAMBIGUOUS AND DO NOT CREATE VESTED HEALTH BENEFITS**

In its Order denying Plaintiffs' Motion for Summary Judgment, the Court noted that it is

undisputed that it should consider the language in the SIAs in its vesting analysis. *See* Docket

No. 195, p. 20. The Court ultimately determined, however, that material disputed facts remained

as to the effect the clauses in the SIAs had in determining whether the parties intended to vest the

retirees' health benefits. *Id*. The evidence introduced at trial established that the relevant clauses

in the SIAs did not vest the retirees' benefits, but rather, are inconsistent with an intent to vest.

A.     **The General Durational Clauses In The SIAs Are Inconsistent With Vesting**

Since 1961, every SIA has contained a durational clause, which provides for the

termination of the SIA on a particular date, unless the parties agreed to modify the agreement.[31]

Pursuant to this clause, the 2004-2008 SIA terminated upon its expiration. In its Summary

Judgment Order, this Court acknowledged the significance of a durational clause in a vesting

analysis, but ultimately held that a review of the extrinsic evidence and witness credibility was

needed to determine the relative weight to be given to that clause. *See* Docket No. 195, p. 18.

The evidence presented at trial established that the Court should give the

termination/durational clause dispositive weight in its vesting analysis. Specifically, the trial

testimony confirmed that, in accordance with the durational clause, it was customary for the

Union to provide contract termination letters to the Company upon the expiration of a labor

contract and that the purpose of such letters was to provide notice to the Company of the Union's

---

[31] Specifically, the durational clause states: "This Agreement shall become effective as of [date], and remain in effect until [date], and thereafter from year to year, unless either party notifies the other, in writing, at least sixty (60) days prior to any expiration date, of a desire to change, modify or terminate this agreement on the expiration date." *See, e.g.* Trial Exs. 8, p. 63; 9, p. 58; 10, p. 79; 11, p. 85, 12, p. 86; 13, p. 95; 14, p. 96; 15, p. 120; 16, p. 102; 17, p. 120.

desire to terminate the existing agreements (including the SIAs) and renegotiate the rights under those agreements.  Tipton Test. 145; Walker Test. 485-486; Avery Test. 540; *see also* Trial Exs. 29-31, 157.  Indeed, Tipton agreed that the mantra of the Local 997 bargaining committee was that when the contract ended, *all of the terms* of the contract were up in the air and had to be renegotiated.  Tipton Test. 146.  Consistent with Tipton's testimony, Larry Shaver, former bargaining committee member and current chairman of the Local 997 retiree committee, testified that when the durational clause in the SIA is invoked, and the SIA is terminated, changes can be made to the parties' agreement.  Shaver Test. 783.  Likewise, according to James Reid, who was a member of the 2008 Union bargaining committee, when the labor contract was terminated, everything in the contract was over, unless the Union negotiated the terminated provisions back into the new agreement.  Reid Test. 357.  Finally, not only did the Union provide the Company with notice of its intent to renegotiate the contract, it actually renegotiated the benefits provided under the contract – including retiree health insurance benefits – during every collective bargaining session with the Company, *see, e.g.* White Test. 425-426; Teed Test. 763-764, 767, a fact reflected in Contract Highlights advising Union members that retiree health insurance benefits would continue.  *See* Trial Exs, 21, p. 5; 22, p. 1; 23, p. 1.

Moreover, as this Court has noted, the durational clause at issue in this case is almost identical to the durational clause at issue in *Anderson*.  *See* Docket No. 195, p. 16.  Notably, the *Anderson* Court concluded that the durational clauses at issue in that case evidenced an intent to limit the retiree health insurance benefits to the term of the agreement, although the plans at issue indicated that retirees would received medical benefits "until the death of the retirees" or "for the remainder of your life."  *See Anderson*, 836 F.3d at 1514-15.  The *Anderson* Court stated that it would render the durational clauses nugatory to hold that benefits continue for life even though

the agreement which provides the benefits expires on a certain date. *Id*. at 1519. The *Anderson* Court's holding is controlling precedent in this Circuit. *See, e.g. Crown Cork*, 501 F.3d at 917 (finding that benefits were not vested, in part, because of the existence of a durational clause in the group insurance agreements); *John Morrell*, 37 F.3d at 1307 (durational clause in master agreement was inconsistent with an intent to vest health care benefits for life).

Accordingly, in light of the evidence introduced at trial, the Court should give dispositive weight to the durational clauses contained in the SIAs, which pursuant to controlling legal precedent, demonstrate that the retirees' health insurance benefits were not vested, or in any event, are inconsistent with an intent to vest retiree health insurance benefits.

**B.      The Coordination Of Benefits And Reopener Clauses In The SIAs Suggest The Retiree Health Insurance Benefits Were Not Vested**

The Order denying Plaintiffs' Motion for Summary Judgment stated that while the Medicare Coordination of Benefits Clause contained in the SIAs demonstrated that the Company intended to reduce its benefits payments as retirees became eligible for Medicare, it did not necessarily follow that the Company intended that the benefits would not vest. Docket No. 195, p. 19. Rather, according to the Court, the Company may have intended that retirees would continue to receive the same benefits for life regardless of who paid. *Id*. The testimony at trial proved otherwise. As will be discussed in more detail in Section IV.C below, there can be no doubt that the retirees' health insurance benefits were not vested. Neither the Company nor the Union intended for the retirees to receive the same benefits for life, as the parties consistently proposed, negotiated and implemented modifications and reductions to those benefits.

Furthermore, each SIA since 1974 contained a Letter of Understanding ("Side Letter No. 1") between the Company and the Union, which authorized the Company to unilaterally modify the *retirees'* health insurance benefits during the term of the SIA in the event of the passage of a

national health care act or other law that provided benefits that were duplicate or could be integrated with the benefits under the current Company health plans.  In addition, each SIA since 1961 contained a "reopener provision," which allowed for the renegotiation of benefits (even though the negotiation would occur during the contract term), in the event that benefits similar to those provided under the Insurance Plan became required by law.

Accordingly, the coordination of benefits clauses and the attendant reduction in benefits available under the benefit plan provided by the Company, confirm that the retirees' health insurance benefits were not vested.  *See Anderson*, 836 F.2d at 1519; *see also Crown Cork*, 501 F.3d at 918 ("a coordination of benefits clause … is inconsistent with vesting"); *John Morrell*, 37 F.3d at 1307 ("[coordination of benefits] provisions are also inconsistent with vesting").

C.     **The Continuation Of Prior Benefits Clause, Which Continued The Benefits Offered Under The Prior Plan, Is Incompatible With Vested Benefits**

Since 1961, each SIA has contained a continuation of benefits clause, which provides that an employee who is eligible for retirement shall "continue" coverage under the medical and prescription drug plan for himself and eligible dependents.  *See, e.g.* Trial Ex. 15, p. 72.  Where an agreement provides for the continuation of benefits from the previous plan, an intent to vest should not be found.  *See, e.g. Anderson*, 836 F.2d at 1519 ("Were there an intent to vest, [this] continuation language would not be necessary."); *John Morrell*, 37 F.3d at 1307 ("The provision in the 1973 Master Agreement that continued health benefits for past retirees is evidence that prior benefits were not vested.").  In its Summary Judgment Order, this Court concluded that ambiguity remained as to the effect of the continuation of benefits clause, because it did not clearly tie the continued coverage to previous agreements that would obviate an intent to vest under Eighth Circuit precedent.  *See* Docket No. 195, p. 13.

The evidence presented at trial established that the continuation of prior benefits clauses contained in the SIAs intended to continue the existence of retiree coverage from previous agreements. Specifically, the 1986, 1989, and 1992 Plan Highlights, all contain language to the effect that the retired employees and eligible dependents would "continue" to have coverage and protection under the medical and prescription drug plans. *See* Trial Exs. 21, p. 5; 22, p. 1; 23. p. 1.[32] The Union's acknowledgement of the continuation of benefits from one labor agreement to the next agreement necessarily undermines any claims that it understood those benefits to be vested. Moreover, White admitted that if the Union were not in a position to negotiate the continuation of the benefits during contract negotiations, the membership (including the retirees) would lose those benefits. White Test. 441. This testimony confirms that the continuation of benefits clause in the SIAs tied the continued retiree health coverage to previous agreements.

This conclusion is further supported by the fact that the Company's representation that it would "continue" to provide medical insurance benefits was made to both active employees and retirees. Clearly, the medical insurance benefits did not vest for active employees, and therefore, the only logical conclusion is that the benefits would "continue" only for the duration of the contract for both active employees and current retirees. *See Skinner*, 188 F.3d at 144; *see also Senn v. United Dominion Indus.*, 951 F.2d 806, 816 (7th Cir. 1992) ("the logical interpretation under our rule is that benefits "will continue" for the duration of the contract.").

### D.   The Specific Durational Clauses In The SIAs Do Not Suggest That The Retirees' Health Insurance Benefits Were Vested

In its Summary Judgment Order, this Court held that determination of the intent behind the specific durational clauses contained in the SIAs required further record and resolution of

---

[32] The Contract Highlights were negotiated between the Company and the Union during each collective bargaining cycle. *See, e.g.* Tipton Test. 193; Avery Test. 541; *see also* Trial Exs. 26-28.

material fact.  *See* Docket No. 195, p. 20.  The Union failed to present any credible testimony at trial suggesting that the specific durational clauses establish the existence of vested retiree health benefits.  Further, there is no evidence that the parties implemented the extended coverage provisions so that the benefits provided could extend beyond the expiration of the contract.  Rather, the specific durational clauses allowed benefits to extend for a designated period of time to account for contingencies occurring during the term of the SIA.

In short, the intent behind the specific durational clauses does not suggest that the parties understood the retirees' health insurance benefits to be vested.  Therefore, the Court should not give these clauses any weight in its vesting analysis.

## IV.   REVIEW OF THE EXTRINSIC EVIDENCE, ALBEIT UNNECESSARY, FURTHER ESTABLISHES THAT THE RETIREES' HEALTH INSURANCE BENEFITS WERE NOT VESTED

Although unnecessary, a review of the extrinsic evidence presented at trial, including: (1) the coterminous relationship between the level of retirees' and active employees' health benefits; (2) the Union's and retirees' agreement, or at least acquiescence, to reservation of rights language in the Hourly Retirement Benefit Summaries; (3) the parties' history of proposing and negotiating changes to the retiree health benefits; (4) the failure to vest retiree health insurance benefits during the 2004-2008 contract negotiations; (5) and the permissive nature of retiree benefits, further compels the conclusion that the retirees' health benefits are not vested.

### A.   The Retirees' And The Union's Acknowledgement And Acquiescence To The Language Contained In The Hourly Retirement Benefit Summaries Confirms The Parties' Understanding That The Benefits Were Not Vested

As confirmed at trial, the Hourly Retirement Benefit Summaries signed by each Newton hourly employee who retired between March 1989 and the fall of 2007 contained an unequivocal acknowledgement that the retirees' benefits were a product of negotiations between the

Company and the Union and that they were subject to change in the future.[33]  *See, e.g.* Trial Exs. 38-44, p. 4; 45-56, 143, p. 5; Strickland Test. 898.  The Maytag/Local 997 Joint Pension Board reviewed and approved the form itself (*see* Trial Ex. 58) and then on a monthly basis, approved the Benefit Summaries for each hourly employee who retired during that time period.  Johnson Test. 315-317; Strickland Test. 896-897; *see also* Trial Ex. 144.  Despite the periodic review of the Benefit Summaries, the Union failed to present any evidence at trial suggesting that the Union officials on the Joint Pension Board (or anyone else for that matter) ever objected to the reservations of rights language contained therein.

It was also confirmed at trial that several former Local 997 and/or UAW officials, including Paul Doran (Auditor for the UAW),[34] Tipton, White, Avery and Teed, completed, reviewed and signed the Benefit Summaries upon their retirement, yet failed to voice any concerns or objections to the reservation of rights language.  *See e.g.*, Trial Exs. 42, 48, 49, 54, 55; Tipton Test. 170; Avery Test. 526-528, Teed Test. 684.  Indeed, in 2005, following the 2004 negotiations, Teed crossed out lines in his Benefits Summary before he signed the document, but left the reservation of rights language intact.[35]  *See* Trial Ex. 55, pp. 2, 5; Teed Test. 627-628.

---

[33] Both White and Avery admitted that, consistent with this language, their health insurance benefits were modified by the Company subsequent to their retirement.  White Test. 419; Avery Test. 528-529.  Tipton further admitted that the word "change" in the acknowledgment clause was the same word that appeared in the introductions to the 1977 and 1980 Beyond Your Paychecks.  Tipton Test. 170.

[34] Under the terms of the basic agreement, employees could take an indefinite leave of absence to serve as a Union official.  While on the leave of absence, the employee retained his seniority and continued to accumulate seniority credits for retirement.  Among those who served as Union officials were Doran, Tipton, White, Avery and Teed.

[35] Teed's testimony at trial that he objected to proposed "non-vesting" language in a different version of the Hourly Retirement Benefits Summary (*see* Trial Ex. DD) is of no import, as he ultimately acknowledged the Company's right to change the retirees' benefits when he signed his Benefits Summary.  *See* Trial Ex. 55, p. 5.  Furthermore, Exhibit DD should not be afforded any weight, as it is an incomplete document, was not produced until the first day of trial and was admittedly stolen from Maytag management.  *See* Teed Test. 657.  As this Court noted with respect to this document: "there is no question that there's some pretty peculiar behavior here on the part of somebody …"  Trial Transcript, p.

This apparently occurred after Teed contacted the UAW to question the changes in the retirees' prescription drug plan made during the 2004 contract negotiations in the face of the "for life" provision in the SIA. *See* Trial Ex. 64, pp. 1-3; Teed Test. 631.

The retirees' (and Union's) express acknowledgment of the mutable nature of their benefits confirms that the retirees (and the Union) were aware of and accepted the fact that the retirees' health insurance benefits, including those benefits provided under the medical and prescription drug plans, could be modified after their retirement from the Company. *See, e.g. John Morrell*, 37 F.3d at 1308 (provision in master agreement stating that "the Company and the Union reserve the right to subsequently alter, modify, increase or reduce the benefits and coverages provided herein, at any time" was further evidence that the Union and the Company recognized that retiree health benefits were subject to periodic modification).

### B.     The Coterminous Relationship Between The Level Of Active Employee Health Insurance Benefits And The Level Of Retiree Health Insurance Benefits Is Further Evidence Against Vesting

Until 2004, each SIA provided that the level of retiree health benefits would be the same as the level of benefits negotiated for active employees.[36]   The extrinsic evidence at trial confirmed that, consistent with this language, the Union agreed that the level of retirees' health benefits was contingent upon the level of benefits negotiated for active employees.  For example, Tipton testified that the Union always negotiated the benefits of the active employees, and that by virtue of the language in the SIAs, the retirees received the same medical and drug benefits as

---

674, lines 5-7.  Oddly, no other Benefits Summary that duplicated the verbiage of Teed's was introduced at trial, even though copies were produced for each year between 1989 and 2007.

[36] Specifically, this clause stated: "Retired employees and eligible dependents under age 65 will continue to have the same coverage as active employees."  A similar clause existed for retirees over age 65, but referenced Medicare. *See, e.g.*, Trial Ex. 16, pp. 82-83.  The parties modified this clause in 2001 to include surviving spouses.

the actives.  Tipton Test. 157, 166, 170.  Several former (and current) Union officials confirmed Tipton's testimony.  *See* White Test. 426-427; Johnson Test. 281-282, 312-313; Avery Test. 524-525; Walker Test. 496-498; Williams Test. 72-73. Notably, Teed testified that this clause, which he called the "escalator clause," meant the Union "pulled the past retirees' [benefits up]" with the actives' benefits and "[gave] them the same insurance as [the actives]," regardless of what contract they retired under.  Teed Test. 730, lines 1-5.

It is significant that the level of the retirees' health benefits were dependant on the level of benefits negotiated for active employees.  As the testimony at trial confirmed, the benefits for active employees were not vested and were changed from contract to contract.  Avery Test. 524; White Test. 425-426; Teed Test. 676, 767.  Moreover, these changes often resulted in a reduction of benefits (*see* Section IV.C below).  For example, Johnson testified that there was no guarantee at the beginning of negotiations that there would be an improvement in the health benefits and that, in theory, the negotiations could have resulted in a reduction in benefits.  Johnson Test. 313. Likewise, Teed admitted that the contract did not provide that the active employees' and retirees' health insurance could only increase.  Teed Test. 749.  In fact, Teed testified that the Union proposed to take the escalator clause out of the contract in 2004 because the benefits were "going down" and "starting to deescalate instead of taking our people up the ladder."  Teed Test. 749, lines 15-17.  Vested benefits, by definition, cannot "deescalate."  *See Halbach v. Great-West Life & Annuity Ins. Co.,* 561 F.3d 872, 877 (8th Cir. 2009); *see also Sprague*, 133 F.3d at 400 ("To vest benefits is to render them forever unalterable.").[37]

---

[37] Further evidence that the Union officials, employees and retirees understood the conditional nature of the retirees' health benefits is the article by Local 997 Communications Director, Greg Christy.  *See* Trial Ex. 3, p. 1.  In this article about the 2004 strike between Maytag and the Union, Christy wrote that a Maytag retiree couple's future health benefits would be determined by the terms of the next contract (*i.e.* the level of benefits negotiated for the active employees).  *See id.*; *see also* Trial Ex. 62 (minutes from a 2003 retiree council meeting stating, "Health care is #1 issue at Maytag.  We have good benefits here in

In sum, because the active employees' benefits were admittedly not vested and were modified during each collective bargaining cycle, it necessarily follows that the Union and retirees understood and agreed that the retirees' health insurance benefits were likewise subject to change. *See Skinner*, 188 F.3d at 144 (the only reasonable conclusion for a lack of material distinction in the CBA between benefits provided to active employees and retirees – "if one begins with the uncontroversial premise that benefits for active employees were not vested--is that benefits for retirees were likewise not vested."). The Union's and retirees' acceptance of, and engagement in, this course of dealing confirms the parties' understanding that the retirees' health insurance benefits were not vested and could be changed in the future.

### C.    The Numerous Negotiated Modifications And Reductions To The Retirees' Health Insurance Benefits Confirms That Those Benefits Were Not Vested

Although the trial testimony of the former Union officials was less than candid at times, they all agreed that, consistent with both the disclaimer in the Hourly Retirement Benefit Summaries and the language in the SIAs tying the level of the retirees' health benefits to the level of the active employees' health benefits, Maytag and the Union repeatedly negotiated and implemented modifications to the current retirees' health insurance benefits. Many of these changes were adverse. Indeed, White could not recall a time when he was involved in negotiations where Local 997 did not make a proposal to change the then current retirees' health insurance benefits. White Test. 425-426; *see also* Teed Test. 763-764, 767 (admitting that in virtually every contract negotiation between 1980 and 2004, there were changes made to the benefits provided to retirees and that his retiree benefits were negotiated during collective bargaining); Johnson Test. 318 (the Union met with the Company and negotiated retirees' health

---

Newton but for how long"); Trial Ex. 63, p. 2 (minutes from a 2004 retiree council meeting stating: "Pat also said next 4 years are going to be rough all around … [r]etirees pay their health care …").

insurance benefits).  White further conceded that it was important for him as Local 997 President to obtain changes for the current retirees.  White Test. 429.  There was never a guarantee before negotiations, however, that there would be an improvement in retiree benefits.  Tipton Test. 158.[38]  "[T]hat modifications [to retiree health insurance benefits] were routinely negotiated is fundamentally inconsistent with the notion that any retirement benefits were ever vested," and eliminates any doubt that they were subject to change.  *John Morrell*, 37 F.3d at 1307.[39]

1.    **The Implementation Of The Medicare Coordination of Benefits Clause Constituted A Reduction In Retiree Health Insurance Benefits**

The evidence presented at trial confirmed that the decision in 1971 to coordinate retiree health benefits with Medicare upon the age of 65 (or when disabled) applied to both current and future retirees.  Tipton Test. 172-173 (the contract was changed to provide for Medicare for those retirees over the age of 65).  Indeed, the document entitled "Items Negotiated Not in 1971 Contract," explicitly states that a Medicare Premium will be applied for both **current** and future pensioners upon the attainment of age 65.  *See* Trial Ex. 32, p. 1 (bolding added).

As referenced above, the Eighth Circuit has deemed the imposition of such clauses akin to "taking away" or "reducing" retirees' rights to benefits.  *See Crown Cork*, 501 F.3d at 918 ("That [coordination of benefits] provision allows for a reduction in health benefits based on eligibility for benefits under another group health insurance plan, including Medicare."); *Anderson*, 836 F.2d at 1519 ("the Plan cannot be interpreted to provide vested rights for prior

---

[38] Tipton was not aware of the retirees objecting to the Union negotiating on their behalf.  Tipton Test. 158.  Indeed, in 1989, when the Company informed the Union that it would not bargain over the retirees' health insurance benefits and pensions, the Union stated that it could not go back to the membership without bargaining for the retirees.  In the following days, the retirees picketed outside of the Company until it agreed to negotiate their benefits.  *See* Townsend Test. 913-915; *see also* Tipton Test. 153.

[39] As stated by Dennis Walker, former UAW Regional Director who assisted in the negotiations of the 2001 and 2004 contracts, you know whether benefits are vested through past practice.  Walker Test. 513.

retirees in one provision and to take such rights away in another"). Accordingly, the Union's agreement to reduce current and future retiree health insurance benefits as early as 1971 establishes that the parties did not believe those benefits were vested.[40]

### 2. Modifications To The Prescription Drug Plan Likewise Resulted In A Reduction In Retiree Health Insurance Benefits

The Union conceded at trial that, over the years, it repeatedly agreed to increase the prescription drug co-payments for current retirees, regardless of the contract under which they arose. *See* Tipton Test. 143, 202; White Test. 419; Avery Test. 545; Teed Test. 739-740. The Union ultimately agreed to these changes over the initial opposition from the Union bargaining committee. *See* Tipton Test. 180; *see also* Trial Exs. 33, p. 4; 34, p. 4; 36, p. 24 (reflecting Union's initial objections to increased co-payments in 1977); Trial Ex. 57 (reflecting Union's objections to increased co-payments in 1983). Specifically, the Company and the Union negotiated increases to the current and future retirees' prescription drug co-payments in 1977 (from $2 to $3 for all drugs) (*see* Trial Exs. 10, p. 72 and 18, p. 6), in 1995 (from $1 to $3 for generic and $3 to $5 for brand name) (*see* Trial Exs. 15, p. 102 and 23, p. 6),[41] and in 2001 (from $3 to $4 for generic and $5 to $6 for brand name) (*see* Trial Exs. 16, p. 87 and 24, p. 3).

Moreover, in 2004, the Company and the Union agreed to implement the Maytag Model Drug Plan, by name, for all active employees and current retirees, effective January 1, 2005. *See*

---

[40] The Union's claim, which the Court acknowledged in its Summary Judgment Order, that the Company may have intended that retirees would continue to receive the same benefits for life regardless of who paid (*see* Docket No. 195, p. 19) is undermined by the testimony at trial that the Company successfully negotiated several adverse changes to the retiree health insurance benefits throughout its bargaining relationship with the Union. *See* Section IV.C.

[41] In addition to increases in co-payments, the parties also negotiated a reduction to the mail order supply for prescription drugs in 1992 from 180 days to 90 days. *Compare* Trial Ex. 14, p. 89 to Trial Ex. 15, p. 102. This reduction caused retirees to incur additional costs (in fact their costs doubled) when purchasing prescription drugs through the mail order option. *See* Tipton Test. 194-195.

Trial Ex. 69.   The Maytag Model Drug Plan[42] for the first time identified three different categories of prescription drugs (generic, formulary and non-formulary) and imposed a corresponding co-payment for each type of drug.   *Id.*   All of the co-payments in the Maytag Model Plan were significantly higher than the required co-payments under the 2001 drug plan. *Id.*   The co-payments also varied depending on whether the drugs were purchased at retail or by mail.   *Id.*   The Maytag Model Plan also imposed a mandatory mail order requirement for certain maintenance drugs, where no such requirement previously existed.   *Id.*   As acknowledged by Avery, the increases in the drug co-payments, standing alone, constituted a decrease in retiree health benefits.   Avery Test. 562-563.   Upon the implementation of the drug plan in 2004, the Company issued SMMs to retirees and held meetings for retirees to discuss the changes to their benefits.   *See, e.g.* Trial Exs. 69-70, 99-101; White Test. 472; Tipton Test. 208-209; Kriv. Test. 850-851.   Also, the 2004 Contract Highlights, which identified these changes, were approved by the membership at the 2004 ratification meeting.   Walker Test. 505; *see also* Trial Ex. 25, p. 2.

Notably, the increases to the prescription drug co-payments were made without with the retirees' contemporaneous consent[43] and there is no evidence that the retirees objected to the changes.   Indeed, Tipton was enrolled in the drug plan as a retiree in 2001 when the Union agreed to increase the drug co-payment and did not take the position that the Union did not have the authority to negotiate the increase, nor did anyone express such a belief to him.   Tipton Test.

---

[42] The Maytag Model Drug Plan contained a reservation of rights clause.  See Trial Ex. 132, pp. 71, 149.

[43] The Eighth Circuit has held that retirees' lack of *contemporaneous* consent to modifications negotiated on their behalf (as opposed to possible prior consent) is dispositive of the vesting issue. *See, e.g.*, Halbach, 561 F.3d at 877 (a vested right is commonly defined as a right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent); *John Morrell*, 37 F.3d at 1306 ("[the Company's] modified retiree health benefit plans were never submitted to past retirees for approval, which suggests that neither [the Company] nor the Union thought they were modifying vested benefits.").

202.   Similarly, White testified that, as a retiree in 2004, he was covered by the new Maytag Model Drug Plan.  White Test. p. 418-419, 451.  As a result, the value of his benefit was decreased, as he had to pay more for prescription drugs.  *Id.*  Like Tipton, White did not object to the decrease in his benefits.  *See* White Test. 420; *see also* Tipton Test. 211 (not aware of anyone objecting to the changes to the prescription drug plan in 2004); Johnson Test. 341 (implementation of the 2004 prescription drug plan was effected without a lawsuit or grievance because the parties had negotiated a change and that was permissible); Avery Test. 547 (did not file an objection or a claim against members of the bargaining committee upon notification of the changes to his prescription drug benefits in 2004); Kriv. Test. 851 (to his knowledge, there were no grievances, lawsuits or protests to the changes to the drug plan in 2004).  The retirees' lack of contemporaneous consent to the changes in the drug plan is significant, as a "vested right" cannot be taken way without the person's cotemporaneous consent.  *See Halbach*, 561 F.3d at 877.

In short, the fact that the Union repeatedly negotiated and agreed, without the retirees' contemporaneous consent or objections, to the increases in the retirees' prescription drug co-payments "suggests that neither [the Company] nor the Union thought they were modifying vested benefits."  *John Morrell*, 37 F.2d at 1306, n.8; *see also Cherry*, 441 F.3d at 483 (holding the retirees' benefits were not vested, in part because of the parties' practice of changing the contractual terms in succeeding agreements, including the alteration of prescription drug co-payments); *UMW v. Am. Commer. Lines Transp. Servs*., 2010 U.S. Dist. LEXIS 126513, * 52 (E.D. Mo. Nov. 30, 2010) ("The fact remains that retiree medical benefits have been changed in the past and this fact further lends credence to the argument that said benefits are not vested.").

### 3.   The Termination Of The John Deere HMO Plan Further Establishes That The Retirees' Health Insurance Benefits Were Not Vested

The evidence at trial conclusively established that, in 2001, the Company and the Union negotiated and agreed to the termination of the John Deere/National Heritage HMO Plan ("HMO").  Several retirees, including two former Local 997 Presidents, Tipton and Avery, were enrolled in the HMO when it was terminated.  Tipton Test. 203; Avery Test. 533.  As a result, both Tipton and Avery, along with every other hourly retiree who was enrolled in the HMO, were forced to enroll in the Blue Cross Blue Shield PPO ("PPO").  *Id.*

The elimination of the HMO represented a significant modification and reduction in the benefits of those retirees enrolled in that plan.  For example, under the HMO, plan participants had been reimbursed 100% when they visited out-of-network providers, as long as they received a written and approved referral form from the participating provider.  *See* Trial Ex. 16, p. 95. Under the PPO, however, out-of-network service provider visits only were reimbursed at the rate of 80%, regardless of whether the plan participant received a referral.  *See* Trial Ex. 16, p. 80; Avery Test. p. 537-539, 560-561.[44]  Furthermore, the termination of the HMO limited the number of preventive services available to retirees and their dependents enrolled in the HMO. Under the HMO, plan participants and their dependents had been entitled to a certain number of preventive service visits, depending on their age.  *See* Trial Ex. 15, pp. 92-93.  Although the PPO offered preventive services after the termination of the HMO, it limited visits for those services to one (1) visit per year, regardless of the age of the plan participant/dependent.  *See* Trial Ex. 16, p. 80.  Moreover, the HMO included other options not available under the PPO, including office

---

[44] Avery admitted that a 100 % reimbursement plan would be a more attractive benefit to the membership than an 80% reimbursement plan.  Avery Test. 525.

calls with no co-pay, routine physicals, well baby care, immunizations, no lifetime maximums and durable medical equipment.  *See* Trial Ex. 23, p. 6.

The elimination of an entire insurance plan option constitutes a considerable modification, and in this instance, a reduction, to the plan participants' benefits.  Nevertheless, similar to the increase in prescription drug co-payments, the Union did not obtain the retirees' contemporaneous consent before it proposed to terminate, and then actually terminated, the HMO.  Avery Test. 533.  Nor did the Union present any evidence that the retirees objected to the termination of that plan.  *See, e.g.* Tipton Test. 204; Avery Test. 536-537.  Once again, the retirees' lack of contemporaneous consent undermines any notion of vested benefits.  *See John Morrell*, 37 F.3d at 1306 ("[the Company's] modified retiree health benefit plans were never submitted to past retirees for approval, which suggests that neither [the Company] nor the Union thought they were modifying vested benefits.").[45]

### 4. Other Negotiated And Proposed Changes To The Retirees' Health Insurance Provides Additional Support For The Absence Of Vesting

Although the modifications and reductions discussed above, which were implemented without the retirees' contemporaneous consent or objection, prove that the parties considered their benefits mutable, the following evidence presented at trial further supports this premise. First, as confirmed at trial, during the 1977 negotiations, the Company and the Union agreed to limit reimbursement for all health insurance benefits, for both active employees and current and future retirees, to the usual, customary and reasonable ("UCR") fee.  *See* Trial Ex 10, p. 64. Pursuant to this requirement, employees and retirees who visited service providers that did not limit their services to the UCR fee were required to pay, out of their own pocket, the costs for

---

[45] Indeed, had the Union believed that the Company did not have the right to take away benefits from retirees, which it did not, it knew to follow the grievance procedure identified in the CBA to protest the change.  Johnson Test. 342-343; *see also* Trial Ex. 161, pp. 19-20.

any fees or expenses incurred above the UCR.  This requirement effectively limited the network of providers that retirees could visit without incurring financial obligations.

Second, the parties further limited the retirees' level of health benefits in 1992 when they negotiated the implementation of the predetermination certificate requirement into the medical plan.   This requirement for the first time mandated that all plan participants obtain a predetermination certificate, stating whether their hospital stay was approved, and if so, for how long, before hospital admission.  As conceded by White and Avery, after 1992, plan participants, including current retirees, were subjected to monetary penalties for failure to comply with this requirement – where before there had no been such limitations on hospital admission.   White Test. 430, Avery Test. 543.   As with the increased prescription drug co-payments, when the Company first proposed a predetermination requirement during the 1989 negotiations, the Union attempted to reject its proposal.  Townsend Test. 914-915.

Third, quality managed care provisions for mental health and substance abuse, which imposed sanctions for noncompliance, were also added to the medical plan after the 1992 negotiations.[46]   The imposition of such provisions represented an additional reduction in the effective choices of medical coverage available for retirees.   *See, e.g. Reese v. CNH America, LLC*, 574 F.3d 315, 325 (6th Cir. 2009) ("[m]anaged care plans were not popular when they were introduced because they often restricted the availability of 'discretionary or elective' services.").

Fourth, the Company's proposed changes to the retirees' health insurance benefits during the 2004 contract negotiations further established that the Company did not consider those

---

[46] The Blue Cross Blue Shield PPO provided coverage for mental health and substance abuse since at least 1988.  *See, e.g.* Trial Ex. 59 (attaching a list of mental health and substance abuse admissions for the period of July 1, 1988 to July 1, 1989); *see also* Trial Ex. 60 (expressing concern for level of outpatient coverage for mental health expenses under the BCBS Plan).

benefits to be vested. Significantly, upon the commencement of the 2004 negotiations in April, Maytag proposed to modify both the current retirees' medical and prescription drug benefits. *See* Trial Ex. 159, pp. 5-7, 19; Krivoruchra Test. 838; Teed Test. 613-615, 681.[47] These proposals remained "on the table" until the Union went on strike in late June 2004. Kriv. Test. 839-842, 892. Indeed, they remained on the table until the final sessions of the negotiations, when the Union agreed to the Company's proposal to change the retirees' prescription drug plan and the Company dropped (withdrew) its proposal to change the retirees' medical plan. Kriv. Test. 841-842, 844-845. Had the Union believed that the retirees' benefits were vested, it would not have met and bargained with the Company for nearly three months over a proposal which included modifications to retiree health insurance benefits. *Cf.* Trial Ex. 3, p. 1 (noting that the retirees' benefits were at stake during the negotiations). Similarly, the Union would not have bargained over changes to these plans. In sum, the parties' practice of repeatedly proposing and negotiating modifications (and reductions) to the current retirees' health benefits precludes any possibility that those benefits were ever vested. *See John Morrell*, 37 F.3d at 1307.[48]

---

[47] Trial Ex. 159 (pp. 5-7) contains four columns with various plans. The fourth column of the proposals contains a summary of the plan that was in effect upon the commencement of the 2004 negotiations. When Maytag presented a proposal to the Union that required a complicated review of documents, it was customary for the Company to compare the proposal with the existing plan. Thus, the fourth column was not a proposal – it was the current plan in place and it was put there to show a comparison of the proposed plans with the existing plan. In other words, on April 7, 2004, the Company was **not** proposing that the hourly workforce and current retirees would continue under their current plan. Kriv. Test. 893-894.

[48] Acknowledgement that the retirees' benefits were subject to negotiation and reduction is apparent in the Retiree Council Meeting Minutes from February 20, 2008. Specifically, a portion of the "new business" section of the Meeting Minutes reads as follows: "Max [Tipton] and Lonnie [White] are also going to talk to our International rep and explain to him what not to lose for retirees when he helps negotiate a new contract for the remaining Maytag workers at [the Newton plant] when the old contract expires in June of '08." *See* Trial Ex. 68, p. 2. At trial, White agreed that the plan going into the 2008 negotiations was, for the first time in history, not to make a proposal on the current retirees' health insurance benefits in order to prelude that topic from coming up in negotiations. White Test. 450. White further testified that he believed advising the Company that the retiree benefits were a permissive subject of bargaining was the "safest course of action" in 2008. White Test. 463. Had the retirees' health insurance benefits been vested, the Union would not have needed a "safe course of action."

### D.   That Retiree Benefits Are A Permissive Subject Of Bargaining Provides Further Confirmation That Those Benefits Are Not Vested

Throughout trial, several Union witnesses declared that retiree health insurance benefits are a permissive subject of bargaining.  *See*, e.g. Williams Test. 82-83; White Test. 448-449; McInroy Test. 941, 954-955.   A permissive subject of bargaining is distinguishable from a mandatory subject of bargaining.   By labeling retiree health insurance benefits a permissive subject of bargaining, the UAW's various representatives necessarily conceded that those benefits could be negotiated.   As McInroy admitted, once the parties agree to negotiate permissive benefits, the benefits may go up, down or stay the same.  McInroy Test. 954-955; *see also Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 222 (1964) (Stevens, J. Concurring) (*citing NLRB   v. Wooster Div. of Borg-Warner Corp*., 356 U.S. 342 (1958) (" … to exclude subjects from the ambit of compulsory collective bargaining does not preclude the parties from seeking negotiations about them on a permissive basis").   Describing health benefits as a permissive subject of bargaining is the antithesis of treating them as vested.   Quite simply, a vested benefit cannot be taken away through bargaining.  *See, e.g.*, *Halbach*, 561 F.3d at 877 (8th Cir. 2009); *John Morrell*, 37 F.3d at 1307.   Thus, by their nature, benefits that are a permissive subject of bargaining – such as the retirees' health insurance benefits involved herein – are not vested.

## V.   THE UNION'S CLAIM THAT THE 2004-2008 LABOR CONTRACT VESTED THE RETIREES' HEALTH INSURANCE BENEFITS IS NOT TENABLE

Apparently recognizing that their argument that the retirees' health insurance benefits were vested based on the SIAs and conduct prior to 2004 would fail, the Union also argues that the 2004 contract negotiations vested the retirees' health insurance benefits.  This argument, however, is based on hearsay and  is contradicted by the testimony of the only Union

representative directly involved in the resolution of the 2004 contract negotiations – Dennis Williams.   Indeed, both McInroy and Teed admitted that their knowledge of what occurred during the conclusion of the 2004 contract negotiations was third hand.   *See* Teed Test. 634 (Williams reported what happened during negotiations with Krivoruchra to Dennis Kinard who reported that information to Teed); McInroy Test. 934, 959 (was not involved in the 2004 contract negotiations and he never spoke with Williams or Krivoruchra about the agreement they reached in 2004 – he had heard about it from Johnson who was not even in Rosemont for the negotiations).   To that end, Williams' testimony that he did not negotiate the changes to the prescription drug plan in 2004 (*see* Williams Test. 69-70) is not credible.   In fact, several witnesses confirmed that Williams and Krivoruchra, the chief negotiators for the Company and the Union, negotiated the final 2004 agreement in one-on-one meetings, which no one else from either bargaining committee attended.   *See* Teed Test. 634-635; Kriv. Test. 844-846. [49]

Quite simply, the 2004 negotiations did not change the mutable nature of the retirees' health insurance benefits.   The testimony presented at trial was straightforward on this issue.   At the beginning of the 2004 contract negotiations, the Company presented a package of concessions to the Union, which contained two proposals: one regarding changes to the active and retirees' medical plan and one regarding changes to the active and retirees' prescription drug plan.   Consistent with its concession package, during the negotiations conducted on April 7,

---

[49] The 2004 contract negotiations commenced in Newton, Iowa.  Kriv Test. 837.  The parties were unable to reach an agreement by the date the 2001-2004 contract expired and therefore, extended the contract through June 10, 2004.  *Id.* at 840.  Upon the deadline of the extension, the parties still had not reached an agreement and the Union went on strike.  The parties met in Des Moines, Iowa on June 17, 2004 and when the meetings were unsuccessful, the contract negotiations resumed on June 20, 2004 in Rosemont, Illinois.  *Id.* at 843-844.  The Company's bargaining committee consisted of Krivoruchra, Greg Irwin and Randy Clausen and the Union's bargaining committee consisted of Williams, Teed and Dennis Kinard. *Id.* at 844.  The parties did not meet in a formal setting – rather – the negotiations were conducted between Williams and Krivoruchra in one-on-one meetings.  *Id.*; *see also* Teed Test. 634-635.

2004, the Company distributed the 2003 SPD for salaried employees, which contained the Maytag Model Drug Plan – the prescription drug plan the Company proposed to introduce for the hourly employees and retirees.  *See* Trial Ex. 156, p. 67; Teed Test. 617.

After lengthy negotiations and a strike, the Company agreed to "break the benefits apart" (*i.e.* withdraw its proposal to change the retirees' medical plan in exchange for the Union's agreement to make changes to the retirees' prescription drug plan) in an effort to end the strike and conclude the negotiations.  In other words, the Union eventually accepted the Company's package of concessions, with the exception of the proposed changes to the retiree medical plan (which the Local 997 representatives referred to as the "carve-out").  The Company, however, always maintained its right to change the retirees' benefits in the future (Kriv. Test. 847-848).[50] Indeed, Krivoruchra confirmed that that the Maytag ERISA Executive Committee, which was responsible for adopting and implementing all plan amendments and modifications, did not amend the Welfare Benefit Plan after the 2004 negotiations to provide for vested retiree health benefits.  Kriv Test. 830-831, 854.  Moreover, both Krivoruchra and Williams testified that the 2004-2008 agreement *did not change the current retirees' rights* to health benefits (Williams Test. 92; Kriv Test. 848).  According to Krivoruchra, during the 2004 contract negotiations, Williams never took the position that the rights of the current retirees were inviolate and could not be altered.  Kriv. 845-846.[51]

---

[50] Notably, the 2003 SPD for salaried employees, which was incorporated into the parties' agreement by nature of the Maytag Model Drug Plan, contained an explicit and unequivocal reservation of rights clause, allowing the Company to modify, amend and/or terminate the health insurance benefits provided therein at any time.  *See* Trial Ex. 132, p. 149.

[51] To the extent there is a credibility conflict in the testimony of Williams, Teed and Krivoruchra, Krivoruchra's testimony should be credited, as it was substantiated by supporting evidence.  Krivoruchra is a disinterested witness, as he no longer works for Maytag or Whirlpool and had no reason to be anything but honest during his testimony at trial.  Krivoruchra' interests stand in contrast to Williams' and Teed's, as Williams is currently the Secretary Treasurer of the UAW and Teed is a Maytag hourly retiree.

Consistent with this testimony, Williams testified that, following the 2004 negotiations, retirees' health benefits "rose and fell" on the rights that they had under the 2001-2004 agreement. Williams Test. 93-94. This concession is significant, because, under the terms of the 2001 SIA, the level of the retirees' health benefits were inextricably linked to the level of benefits negotiated for the active employees. *See* Trial Ex. 16, pp. 82-83; Williams Test. 72-73; Kriv. Test. 847-848. As confirmed at trial, the ***active*** employees' health benefits were not vested and could be changed from contract to contract. Avery Test. 524; White Test. 425-426; Teed Test. 676, 767; Townsend Test. 910. It necessarily follows, therefore, that the status of the retirees' benefits under the 2001 contract (which governed the retirees' rights to benefits after the 2004 negotiations) was that they were subject to change – case in point – the modifications made to the retirees' prescription drug plan in 2004. *See* Johnson Test. 340-341 (even though the parties agreed in 2004 that the retirees would have the same medical benefits as under the 2001 contract, the drug plan changed during the 2004 negotiations).

Further evidence that the parties understood that the 2004 negotiations did not vest the retirees' health insurance benefits is found in the Union's failure to file a grievance over the

---

Moreover, Krivoruchra's testimony is supported by contract proposals (*see* Trial Ex. 156), by ERISA Executive Committee Meeting Notes (*see* Trial Ex. 103), by a Union newsletter issued at the time of the 2004 negotiations stating that the retirees' health insurance benefits were at stake during the 2004 negotiations (*see* Trial Ex. 3, p. 2), and by notes from a retiree committee meeting in 2008, wherein it is stated that Tipton and White would discuss with the UAW representative (McInroy) what "not to lose" for retirees during the 2008 negotiations (*see* Trial Ex. 68, p. 2). In contrast, Teed's and Williams' testimony was plainly wrong. Teed denied negotiating changes in the retirees' drug plan. Teed Test. 634-635. Similarly, Williams denied negotiating changes in the retirees' drug plan. Williams Test. 70. Yet, plainly the parties negotiated and agreed to changes in the drug plan, which the membership ratified and are reflected in the 2004-2008 Agreement. *See* Trial Ex. 17, pp. 79, 103-104; Trial Ex. 132, p. 72. Williams' testimony that Krivoruchra had agreed to withdraw the Company's proposal to modify the retirees' medical plan before the strike began and before the negotiations resumed in Rosemont was flatly contradicted by Teed, who was present during the negotiations in Newton and Des Moines. Teed testified he learned Krivoruchra had withdrawn this proposal in Rosemont from Kinard, who was reporting the status of negotiations to the other Union bargaining committee members. Teed Test. 634-635. In short, only Krivoruchra's testimony was substantiated by contemporaneous documents created by both the Union and the Company and his testimony should be credited.

September 2004 SMM (Trial Ex. 69), which explained the changes to the retirees' prescription drug program. The Union's failure to do so stands in stark contrast to the grievance it filed in July 2010 regarding Whirlpool's implementation of an appeal procedure with respect to disability and pension benefits. *See* Trial Exs. 149-150. Finally, Defendants ignore that, subsequent to the 2004 negotiations, the Union reviewed several drafts of the 2006 SPD, which was ultimately distributed to the Union and its membership. As discussed above in Section II.B and D, this SPD contained explicit reservation of rights language allowing the Company to modify and/or terminate the retirees' health benefits. The Union's failure to object to this language provides additional proof that the 2004 negotiations did not vest the retirees' health benefits. Accordingly, because the 2004-2008 contract did not change the retirees' rights to health insurance benefits, those benefits remained subject to change in the future (*i.e.* not vested).

## VI.   THE UNION'S EXTRINSIC EVIDENCE FAILED TO ESTABLISH THE EXISTENCE OF VESTED RETIREE HEALTH INSURANCE BENEFITS

### A.   The Union's Extrinsic Evidence Is Immaterial To the Vesting Analysis

The evidence presented by the Union at trial is both immaterial and irrelevant to this Court's vesting analysis and should not be afforded any weight. Given that the Union and the Defendant Class had the burden of proof on the issue of vesting, their failure to sustain that burden requires that the Court grant judgment in favor of Plaintiffs.

For example, the Union argued that the retirees' eligibility for health insurance benefits was tied to their eligibility for pension benefits. This relationship is of no import. The Union fails to recognize that some ancillary pension benefits are forfeitable, including early retirement, level income option, and pre-retirement death benefits. *See, e.g., Cedotal, et al. v. Whitney Nat'l Bank, et al.*, 2007 U.S. Dist. LEXIS 56765, **22-23 (E.D. La. Aug. 3, 2007); *Petrella, et al. v. NL Indus., Inc.*, 529 F. Supp. 1357 (D.N.J. 1982); *see also* H.R. No. 93-807 (1974) ("[t]o require

the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to prove retirement income"). Moreover, the effect of this relationship is overshadowed by the fact that until 2004, the retirees' health insurance benefit levels were inextricably linked to those received by active employees, and that the actives employees' benefits levels terminated (even after 2004) upon the expiration of each CBA (*see* Section IV.C). Thus, interpreting the relationship between retiree health benefits and pension eligibility so as to vest retiree health benefits is illogical and is not supported by the evidence.

Furthermore, that the Company did not terminate the retirees' health benefits during the strike in 2004 is irrelevant to the vesting analysis. *See, e.g. John Morrell*, 37 F.3d at 1305 (retirees' health benefits were not vested, despite the Company continuing to pay those benefits during two union strikes). Moreover, the evidence at trial established that the strike occurred in mid-June and was over before the first week of July. When the strike began, the Company terminated the insurance for active employees and at least initially did not terminate the health insurance benefits for the laid off employees when subsequent negotiations between the parties failed to resolve the strike. The Company eventually recalled the laid off workers and when they did not return to work, the Company terminated their health insurance. Before the Company could take action with respect to the retirees' health insurance, the Union settled the strike. *See, e.g.*, Johnson Test. 337; Teed Test. 744. In addition, as was established at trial, the Company believed (and communicated to the Union during negotiations) that if there were a strike, retiree health care could (and would) be terminated. Teed Test. 752-754; *see also* Trial Exs. 160, 162.

The Union also erroneously suggested at trial that the Company's failure to terminate retiree health insurance benefits, particularly after the passage of the new Financial Accounting Standards Board ("FASB") regulations in 1992, is indicative of vesting. The Union is wrong.

The Union's argument is undermined by the fact that FASB applied to all employees, regardless of whether they were salaried or hourly or had vested or non-vested benefits. Alpert Test. 989-990. As was confirmed at trial, the active employees' benefits were not vested. *See* Avery Test. 524; White Test. 425-426; Teed Test. 676, 767. Therefore, after the passage of the new FASB standards, the Company could have terminated the active employees' health insurance benefits, but chose not to do so. Therefore, the Company's failure to terminate the retiree health insurance benefits after the implementation of FASB does not demonstrate vesting.

Finally, the Union's position that its rejection during collective bargaining of various Company proposals to change retiree health insurance benefits evidences an understanding that the benefits were vested, likewise fails. Indeed, the Union conceded at trial that a rejection of a contract proposal does not mean that the opposite of the proposal was included in the contract. *See* Williams Test. 55. Moreover, the Company continued to make proposals to modify (and reduce) the retirees' health benefits (which the Union periodically accepted) after the proposals in question were rejected by the Union. In sum, the extrinsic evidence introduced by the Union at trial failed to establish the existence of vested retiree health benefits. For this reason, as well as the reasons discussed above, judgment should be entered in favor of the Company.

**B.      Additional Extrinsic Evidence Presented By The Union Is Not Credible**

Separate and apart from the fact that the Union's extrinsic evidence does not establish that the retirees' benefits were vested, the Union's evidence is also not credible.

For example, Teed testified that in 1980, the Company agreed to change the "during his life clause" in the SIA from "may to shall" and that Wayne Creagan, the Company's bargaining representative, assured the Union that the hourly retirees had benefits for life. Teed Test. 698-701. Teed's testimony is both unsubstantiated and inconsistent with the parties' practices subsequent to the 1980 negotiations. As an initial matter, despite the fact that Teed boasted

about his maintenance of all of negotiation notes and other bargaining-related documents throughout his tenure on the bargaining committee (*see* Teed Test. 571-572), the Union did not produce any negotiation notes from the 1980 negotiations suggesting that the Company agreed to vest the retirees' health insurance benefits (or that this issue was even discussed during the 1980 negotiations). Moreover, it is undisputed that: (1) the Union negotiated and agreed to modifications, including reductions, to retirees' health insurance benefits on several occasions subsequent to the 1980 contract negotiations (*see* Section IV.C); and (2) the Union repeatedly agreed to reservation of rights language in the SPDs and Retirement Benefit Summaries that were distributed thereafter. Therefore, Teed's testimony on this point should not be credited.

The Union's argument that its rejection of the Company's proposed vesting language during the 1983 negotiations evidences vested retiree benefits likewise fails, as it is belied by later events and lacks legal support. First, the Union's rejection of a Company proposal to add non-vesting language is of no import. While it is conclusively established that an intent to vest benefits must be clearly expressed, there is no similar requirement for an intent *not* to vest benefits. Silence on duration of benefits may not be interpreted as an agreement by the Company to vest retiree benefits. *See Anderson*, 836 F.2d at 1519 ("question before us is not whether any specific words appear, but whether the parties intended the benefits to vest"). Second, the Union ignores the fact that subsequent to the Company's 1983 proposal, the Union representatives on the Joint Pension Board agreed to language in the Hourly Retirement Benefit Summaries that tracks the language of the Company's 1983 proposal (*i.e.* the benefits were a product of negotiations between the Company and the Union and were subject to change in the future). *See, e.g.*, Trial Ex. 48, p. 5. Finally, as the Union expressly admitted at trial, the Company and the Union negotiated several modifications and reductions to the retirees' health

benefits subsequent to the 1983 negotiations.  Therefore, contrary to the Union's claim, that the Company's proposed language was not included in the 1983 contract does not reveal an intent to vest the retirees' health benefits.

In short, because the Union's extrinsic evidence was immaterial, not credible, unsubstantiated, and based on a legal assumption contrary to existing law, Defendants failed to satisfy their very difficult burden of proving that the retirees' health benefits were vested for life.

## VII.   *ARGUENDO*, THE DEFENDANT RETIREES' HEALTH INSURANCE BENEFITS ARE NOT VESTED AT AN UNALTERABLE LEVEL

*Arguendo*, should the Court conclude that the retirees' health benefits are somehow vested, which they are not, the evidence introduced at trial established that the synchronization of the retirees' health benefits with the Whirlpool plan was a reasonable modification.   In recognition of the burden on employers to provide unchanged health benefits amid the persistent rise in health care costs, several courts have held that "vested" retiree health benefits may be reasonably modified.  *See, e.g.*, *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 309 (7th Cir. 1996) ("it is one thing to declare that the retirees are entitled to lifetime insurance benefits; it is another to decide precisely what those benefits are"); *see also Temme v. Bemis Co.*, 2010 U.S. App. LEXIS 19062, *21 (7th Cir. Sep. 13, 2010) (rejecting retirees' argument that their vested benefits under a shutdown agreement must remain exactly the same and holding that "the parties intended that [the Company] would continually provide medical coverage to retirees at a level 'substantially commensurate' with the benefits provided under the CBA, but with some freedom to impose cost-saving measures that did not substantially reduce benefits"); *Reese*, 574 F.3d at 324 (expressing skepticism at the conclusion that an employer may not alter retiree health benefits in any way, "particularly when the parties have a history of doing just that and when common experience suggests that health-care plans invariably change over time, if not from year to

year."); *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615, 619 (7th Cir. 2006) (most sensible interpretation of the shutdown agreement was it required the Company to provide retiree drug benefits at a level "reasonably commensurate" with the original plan but adjusted for current economic and health care conditions).

Courts have identified several factors to consider when assessing the reasonableness of an employer's modifications to vested benefits, including: (1) the parties' previous actions with respect to retiree health benefits, including any changes to those benefits; (2) the level of benefits provided to current employees; (3) the benefits provided under the prior CBA; (4) benefits provided by other employers in the industry; (5) the economy; and (6) common sense. *See, e.g.*, *Reese*, 574 F.3d at 324; *Zielinski*, 463 F.3d at 619.

As discussed in detail above, during every contract negotiation, the parties negotiated and modified the retirees' health benefits.   The parties' substantial history of negotiating and modifying (and often reducing) retiree health benefits suggests that Whirlpool's placement of the retirees' in its standard retiree medical plan constituted a reasonable modification.   Indeed, the changes made to the retirees' benefits as a result of their placement in the Whirlpool plan are akin to the changes negotiated between the parties during their bargaining relationship.   *See* Trial Exs. 71, 81-82.   Notably, the retirees did not lose an entire plan option as they did after the termination of the HMO in 2001.   Further, while the retirees were moved from a 100% to an 80/20 % reimbursement plan in 2009, this is no different than the plan that was in effect from at least 1977 to 2001 – it was only in 2001 that the parties agreed to a 100% reimbursement plan for the active employees and retirees (*see* Teed Test. 755).[52]

---

[52] Categorizing the 2001 Plan as a 100 % reimbursement is a bit of an exaggeration, as the Plan contained UCR and predetermination certificate requirements, as well as caps on lifetime benefits.  *See* Trial Exs. 16, pp. 77, 81; Trial Ex. 133, p. 24.

Moreover, the level of benefits provided to the retirees under the Whirlpool plan are commensurate with the level of benefits provided to other Whirlpool hourly employees and retirees. As Kevin Bradley testified at trial, the retirees of Whirlpool's (formerly Maytag's) Galesburg and Herrin plants are all enrolled in the same Whirlpool plan which was offered to the Newton retirees, beginning January 1, 2009.  Bradley Test. 788-789.

Common sense and the state of the economy likewise warrant a finding that the changes to the retirees' benefits were reasonable.  Indeed, holding Whirlpool "to the literal terms of [its older plans] in today's marketplace would give the retirees an insanely generous plan relative to today's norms." *Zielinski*, 463 F.3d at 619; *see also Reese*, 574 F.3d at 326 ("medical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation") (*quoting Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1998)).  Finally, this Court should not give weight to the individual testimony of the Union officials regarding the personal impact that they have felt as a result of the modifications to their insurance, as "individual modifications should not be scrutinized in isolation … the changes must be examined in their totality for their effect upon the class of retirees as a group." *Diehl*, 102 F.3d at 311.  Accordingly, in the unlikely event this Court determines that the retiree health benefits were vested, the Court should nonetheless hold, as a matter of law, that the changes the Company made to those benefits were reasonable and lawful. For this alternative reason, the Court should grant judgment in favor of the Company.

## **CONCLUSION**

The Court should enter judgment in favor of the Company in this declaratory action.  As this Court previously has held (and as was confirmed at trial), a case or controversy by definition existed from the moment the Union notified the Company that the Union took an adverse position on the Company's ability to modify the retiree medical benefit plan.

Not only did the Union fail to sustain its burden of proof to establish that the retirees' benefits were vested – to the contrary – the evidence at trial proved that those benefits were *not* vested.  The controlling legal documents contain unambiguous and unqualified reservation of rights language, which under Eighth Circuit law, is lethal to any vesting argument.  Furthermore, the SIAs contain clauses that preclude a finding of vested benefits.  Moreover, the extrinsic evidence presented at trial, including the Union's and the retirees' acquiescence to and acknowledgement of reservation of rights language, the relationship between the level of the active employees' and retirees' health benefits, and the Union's practice of negotiating modifications and reductions to the retiree benefits (without the retirees' cotemporaneous consent), proved the Company and the Union understood those benefits were subject to change.  Finally, should the Court determine that the benefits were vested, the benefits were not vested at an unalterable level and the modifications made to those benefits in 2009 were reasonable.  For all of the reasons set forth above, Plaintiffs submit the Court should enter judgment in favor of Plaintiffs on all claims and award them their costs and attorneys' fees, as deemed appropriate.

Respectfully submitted,

   /s/ Douglas A. Darch   
ARDC # 03127888
Douglas Darch
Miriam Geraghty
Baker & McKenzie LLP
130 E. Randolph Drive
Chicago, IL 60601
douglas.darch@bakermckenzie.com

Gene R. La Suer
Deborah Tharnish
Davis, Brown, Koehn, Shors & Roberts, P.C.
The Davis Brown Tower
215 10th Street, Suite 1300
Des Moines, Iowa 50309-3993
GeneLaSuer@davisbrownlaw.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on March 15, 2011, he caused the foregoing document to be filed electronically with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's filing system.

Mark T. Hedberg
HEDBERG & BOULTON P.C.
100 Court Avenue, Suite 425
DES MOINES, IA  50309
515 288 4148
515 288 4149 (fax)
mthedberg@uswest.net

Robert A. Seltzer
CORNFIELD AND FELDMAN
25 E. Washington Street
Suite 1400
Chicago, IL  60602-1803
312 236 7800
312 236 6686 (fax)
rseltzer@cornfieldandfeldman.com

Barry A. Macey
Macey Swanson and Allman
445 N. Pennsylvania Street,
Suite 401
Indianapolis, Indiana  46204
(317) 637-2345
bmacey@maceylaw.com

CHIDMS1/2855595.7