IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MAYTAG CORPORATION, et al., | |
| Plaintiffs, | |
| vs. | No. 4:08-cv-00291 – JEG |
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al., | **O R D E R** |
| Defendants. | |

The matter before the Court for decision is a declaratory judgment, class action brought by Plaintiffs Maytag Corporation (Maytag) and Whirlpool Corporation (Whirlpool) (collectively, the Company) against Defendants and Class Representatives International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the UAW) and UAW Local 997 (Local 997) (collectively, the Union) and the Certified Class.

On December 6, 2010, the Court commenced a bench trial on the Complaint. The trial concluded on December 14, 2010. Douglas Darch, Deborah Tharnish, Miriam Geraghty, and Meagan LeGear represented the Company. Robert Seltzer, Barry Macey, and Mark Hedberg represented the Union. During the trial, the Union moved for judgment on partial findings, and the Court reserved ruling on the motion. On December 15, 2010, the Union filed a written Rule 52(c) Motion for Judgment on Partial Findings.

On March 15, 2011, the parties submitted their post-trial briefs in lieu of closing arguments. The Court finds the matter fully submitted and ready for disposition. This order constitutes the Court's findings of fact and conclusions of law. Fed. R. Civ. P. 52(a) (''In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.'').

## I.    JURISDICTION

The Company initiated this litigation by seeking a declaratory judgment, 28 U.S.C. § 2201 (a court may declare the rights of parties in a case of actual controversy within the court's jurisdiction), under the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141-88, and the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, that it had the right to change retiree medical benefits under the collective bargaining agreements (CBA) between the Union and the Company.  Thus, the Court has jurisdiction over this class action as a civil action arising under the law of the United States pursuant to 28 U.S.C. § 1331.

## II.    FINDINGS OF FACT

The following findings of facts are based on the parties' stipulations, the trial exhibits, and the testimony of trial witnesses.

Until March 2006, Maytag operated a manufacturing facility in Newton, Iowa.  The Union represented Maytag's Newton employees for purposes of collective bargaining and entered into a series of CBAs with Maytag that governed the terms and conditions of employment at the Newton facility.  The CBAs each consisted of at least a main agreement, a supplemental insurance agreement (SIA), and various other supplemental agreements covering pensions and unemployment benefits.  Under the CBAs and SIAs, Maytag provided medical benefits for retirees of Maytag's Newton facility (the Newton retirees).

### A.  1961-2001 SIAs

Beginning in 1961, Maytag and the Union periodically negotiated SIAs that covered the medical benefits available to active employees and retirees pursuant to an "employee welfare benefit plan" as that term is defined in 29 U.S.C. §§ 1002(1), 1003(a).

2

From 1961 through 2001, each SIA included an "Extended Coverage" subsection in the "Termination of Coverage for Employees" provision.  The 1961 extended coverage clause stated,

> Employees who are retired on or after January 1, 1962 and who are eligible for Retirement Benefits under the Retirement Plan may continue coverage for Blue Cross-Blue Shield for himself and his dependents during his life if he makes his monthly contribution in the same amount as set forth in the Contribution Table for employees on the active payroll, if the applicable plan so provides.

Trial Ex. A at 6-7.  The analogous provision in the 1964 SIA changed the retirement date, replaced "his dependents" with "eligible dependents," and dropped the final conditional clause, "if the applicable plan so provides."  Trial Ex. B at 6.  The 1967 SIA changed the retirement date, replaced "Blue Cross-Blue Shield" with "Medical Plan," and dropped all language following the clause, "during his life."  Trial Ex. C at 5.  The 1971 extended coverage clause was the same as the 1967 clause but for the retirement date.  The 1974 SIA replaced "Medical Plan" with "Medical and Drug Plans."  Trial Ex. 8 at 54; Trial Ex. 9 at 50.  The 1977 SIA included the following extended coverage clause, which added a provision for coordination of medical benefits with Medicare:

> Employees who retire on or after June 1, 1977 and who are eligible for Retirement Benefits under the Retirement Plan may continue coverage under the Medical and Rx Drug Plans for himself and eligible dependents during his life. The Medical coverage will be a supplement to Medicare at age 65.

Trial Ex. 10 at 61.  The 1980 extended coverage clause changed the retirement date and replaced "may continue coverage" with "shall continue coverage."  Trial Ex. 11 at 62.  In 1983, the "who retire on or after [date] and" language was dropped, and no other changes were made to the extended coverage clauses in the 1986, 1989, 1995, and 2001 SIAs.  Trial Exs. 12 at 63; 13 at 71; 14 at 71; 15 at 72; 16 at 67.  The 2004 SIA changed the language to the following:

> Employees who are eligible for Retirement Benefits under the Retirement Plan and who retire on or prior to January 1, 2008 shall continue coverage under the Medical and Rx Drug Plans for himself and eligible dependents during his life.

3

> The Medical coverage will be a supplement to Medicare at age 65. The coverage for retirees retiring on or before January 1, 2008, shall be the plan that existed prior to January 1, 2005.

Trial Ex. 17 at 77-78. All of the SIAs included a subsection in the "Termination of Coverage for Employees" section that provided that welfare plan benefits would "terminate at the end of the extended coverage periods set forth above." E.g., Trial Ex. 17 at 82.

Each 1961-2001 SIA included the following general term provision:

> This Agreement shall become effective as of [date], and remain in effect until [date], and thereafter from year to year, unless either party notifies the other, in writing, at least sixty (60) days prior to any expiration date, of a desire to change, modify or terminate this Agreement on the expiration date.

E.g., Trial Exs. A at 10; 17 at 120.

Between 1977 and 2001, under the "Medical Plan" section, the SIAs provided that retired employees "will continue to have the same coverage as active employees." E.g., Trial Exs. 10 at 67; 16 at 82.

After at least 1961, the SIAs also included clauses relating to benefits for employees laid-off or on leave, setting out duration limitations for extended medical benefit coverage. For example, under the 2001 SIA, laid-off employees were eligible for up to eighteen months of medical and drug coverage after a layoff, while employees on leave were eligible for up to five years of medical and drug coverage during an approved leave.

Beginning in 1974, a letter of understanding was included with each SIA and provided that if a national health insurance act covering hospital, surgical, medical, or prescription drug benefits were enacted that duplicated any benefits provided for in the SIA, the Company's benefits plans "shall be modified in whole" or in part to integrate or eliminate any duplication of benefits. E.g., Trial Exs. 9 at 60; 16 at 104.

The SIAs provided that the level of retiree medical benefits would be the same the level of medical benefits for active employees.

4

Initially, the SIAs did not outline the level of benefits the medical plan provided.  The 1974 SIA described the medical plan as follows:  "Employees shall, upon commencement of coverage, be eligible for hospitalization, surgical, and medical benefits as provided in the insurance contract or contracts between the Company and the insurance carrier.  Upon attainment of age 65, the coverage will be adjusted to supplement medicare."  Trial Ex. 9 at 53.

When the prescription drug program was instituted in the 1974 SIA, it included a $2.00 co-pay for drugs dispensed by a participating provider or a non-participating provider outside the local area and would reimburse 75 percent of the actual cost of a prescription less $2.00 for drugs dispensed by non-participating providers in the local area.  Trial Ex. 9 at 56.  In the 2001 SIA, the prescription drug program included a $6.00 co-pay, however, for certain generic drugs or certain mail order maintenance drugs the co-pay was $4.00.  Trial Ex. 16 at 87.

The level of benefits provided by the medical plan was first outlined in the 1977 SIA and included a $200.00 maximum family deductible per year, paid 80 percent of the first $2000.00, and 100 percent thereafter up to $250,000.00 for medical expenses not otherwise covered in the medical plan.  Trial Ex. 10 at 65.  The 1983 SIA increased the maximum coverage to $500,000.00.  Trial Ex. 12 at 72.

The 1995 SIA included three options for medical plans.  One option was a Blue Cross/Blue Shield option that was similar to the medical plans included in previous SIAs, albeit with added mental health, alcohol and drug abuse treatment, increased prescription drug co-pays, and a predetermination certificate requirement.  Trial Ex.15 at 83-92.  Another option was a Heritage National Health Plan, referred to as the "John Deere HMO," which covered 100 percent of services provided by participating providers and did not cover services provided by non-participating providers without written preauthorization.  Trial Ex. 15 at 92.  The Newton

retirees had the ability to elect either option during an annual re-opener period during the term of the 1995 SIA.  Trial Ex. 15 at 96-97.[1]

In 2001, the John Deere HMO was eliminated as an option, and the 2001 SIA only outlined a single medical plan.  Trial Ex. 16 at 76-83.  The medical plan increased prescription drugs co-pays, did not include deductibles, imposed a $400.00 out-of-pocket maximum for services of a non-participating provider, and required 20 percent payment up to $1,500.00 per family for hospitalization after a predetermination denial.  Trial Ex. 16 at 80-81.

Each change to retiree medical benefits affected current as well as future retirees.  In practice, the Newton retirees were eligible for whatever medical benefits were available under the most current CBA and SIA, rather than continuing coverage under the medical and drug plan in place at the time of each of the Newton retirees' respective retirement.

### B.  1977-2003 Summary Plan Descriptions, Welfare Plans, and Benefits Certificates

In 1977, the parties added language to the SIA integration clause which stated, "[t]he bene-fits outlined in the [SIA] represent a general description of the various benefit plans.  However, the legal documents will govern in the event of a dispute."  Trial Ex. 10 at 78.  At the bench trial, Max Tipton (Tipton), a retired Maytag employee, Union official, and member of the Union bargaining committee from 1971 through 1999, testified that the new language in the 1977 SIA integration clause referenced documents outside the SIAs, including summary plan descriptions (SPD) and "benefits plans."  Tr. 182-84.  Other witnesses credibly testified that a retiree would have to look outside of the SIAs to determine specific retiree medical benefits.  William Townsend (Townsend), a Whirlpool director of human resources and former manager of employee benefits at Maytag's Newton facility who participated in the 1989 through 2001

---

[1]The third option is not outlined in the 1995 SIA; however, the 2000 Beyond Your Paycheck prepared during the term of the 1995 SIA outlines "Option 3 – Wellmark Blue Cross/Blue Shield Comprehensive 80/20 Medical Plan."  Trial Ex. 131 at 15.

collective bargaining negotiations, testified that he understood the "legal documents" to be the benefits certificates and SPDs.  Mark Krivoruchka (Krivoruchka), former Maytag vice president of human resources and member of the Maytag ERISA board involved in collective bargaining, testified that the Company used the benefits certificates to respond to inquiries about medical plan benefits.

To comply with ERISA requirements that companies provide SPDs, after 1977 the Company prepared booklets entitled "Beyond Your Paycheck."  The introduction to each Beyond Your Paycheck indicated that the SPD was not part of Maytag's benefits plans but alerted the plan beneficiaries that "[t]he provisions of the Plans may be revised or terminated."  Trial Ex. 128 at 2; Trial Ex. 155 at 4; Trial Ex. 131 at 3.  The Medical Plan and the Prescription Drug Program sections of the 1990 Beyond Your Paycheck included as a possible reason for loss of medical benefits "[r]evision or termination of the Medical Care Plan."  Trial Ex. 128 at 13, 24. The 1992 and 2000 Beyond Your Paycheck also included an identical provision indicating that the revision or termination of the medical or dental plans could cause a loss of benefits.

A 1996 Benefits Certificate outlined benefits for the 1995 SIA Blue Cross/Blue Shield option and included the following provision authorizing termination, amendment, or modification of the Blue Cross/Blue Shield option: "[Maytag] has the authority to terminate, amend or modify the coverage described in the certificate at any time.  Any amendment or modification will be in writing and will be as binding as this certificate.  If your contract is terminated, you may not receive benefits."  Trial Ex. 136 at 40.  The Union had relevant benefits certificates at its offices, including a copy of the 1996 Benefits Certificate.

The foreword to the 1999 SPD for the John Deere HMO states that the plan will govern any inconsistencies between the SPD and the SIA or any questions about the plan, and then provides,

> The Plan gives Maytag the sole right at any time to modify, amend or terminate the Plan described in this booklet.  If the Plan should be modified, amended or

7

terminated while you are covered by the Plan, you will be notified of the effect of such change on your Plan benefits or coverage.  No consent of any employee {retiree} or any other persons will be necessary for Maytag to modify, amend or terminate the Plan described in this booklet.  In the event of Plan termination, the rights of individuals covered by the Plan at that time will be limited to benefit claims incurred as of the date of Plan termination.

Trial Ex. 130 at 5.  It also precludes vesting and provides that "[r]etirement does not give any retired person any vested right to continue Plan benefits."  Trial Ex. 130 at 38.

A draft of the 2000 Beyond Your Paycheck was in the possession of Patrick Teed (Teed), former president of Local 997 and a member of the Union bargaining committee that negotiated the 1980 through 2004 labor agreements and had been removed from the Union hall.  Teed testified that he looked at the document when the Company sent it to him but that he would not approve it, telling a Company representative, "it's your document."  Tr. 589.

Beginning in at least 1999, retirees received and signed an Hourly Retirement Benefits Summary that summarized, inter alia, that retiree medical benefits would be continued under the plan in which the retiree was enrolled at retirement and that SPDs were available to provide coverage details.  By signing an Hourly Retirement Benefits Summary, the retiree certified "that explanations of the Hourly Retirement Benefits has been provided.  I understand the benefits available to me.  I further understand that the benefits outlined above have been negotiated between the Company and the Union and may be subject to change in the future."  Exs. 48-56 at 5.[2]  The Hourly Retirement Benefits Summaries were periodically reviewed by a joint pension board, which included both Union and Company representatives.

In 2003, Maytag prepared an SPD covering medical benefits for all active employees. Employees who retired after January 1, 2003, were eligible for retiree medical benefits under the plan but were responsible for paying for the full cost of coverage.  The 2003 SPD did not cover

---

[2]Similar language has been included in hourly retirement benefits summaries since at least 1989.  Trial Exs. 38-44 at 4.

retirees who had retired before January 1, 2003; rather, separate SPDs covering retiree medical benefits were available from Maytag.  The 2003 SPD included an express reservation of rights clause giving Maytag the right to modify, suspend, or terminate the plan and precluding vesting.

### C.  1961-2001 Collective Bargaining History

Before each collective bargaining session, the previous CBA, including all attendant SIAs, were terminated by a letter sent by one of the parties notifying the other party of its intent to terminate the CBA for purposes of renegotiating the CBAs and SIAs.  Upon termination, the parties considered all of the terms in the CBAs and SIAs open for renegotiation.

When retiree medical benefits were first negotiated in 1961, the Company made the following proposal:

> The present benefit provisions of the Blue Cross-Blue Shield, Life, and Accident & Sickness Insurance will continue at their same level for the duration of this three year Agreement.  The Company and the employees will continue, as at present, to divide the insurance premium costs on a precise fifty-fifty basis.  The Company will, however, assume certain additional cost by extending the provisions of these Insurance Agreements as follows:
>
> . . .
>
> The Company will permit employees, who retire on and after January 1, 1962 to continue Blue Cross-Blue Shield, but not Life or Accident & Sickness Insurance, on the pensioner and his spouse, only, during the remainder of the pensioner's life, provided he pays his precise share (50%) of the premium costs.

Trial Ex. E at 2.

The record reflects the heart of the controversy that throughout the collective bargaining history between the parties, Union bargainers believed that retiree medical benefits were vested, but could not uniformly identify how those benefits were vested, while Company bargainers believed that retiree medical benefits could be changed.

Tipton testified that during the 1983 negotiations, although members of the Union bargaining committee wanted to remove the "during his life" language, "I just felt in my mind, for

some reason, that the language should stay . . . ."  Tr. 252.  A Union Social Security consultant advised the bargaining committee to avoid deleting "during his life" because the words were "extremely valuable.  Their significance rests on the facts that the coverage would continue after the expiration of any agreement between Maytag and UAW.  The UAW has been in court on innumerable occasions on precisely that issue, and, believe me, those words would help a great deal."  Trial Ex. 147 at 1.  Tipton also testified that during the time he was on the bargaining committee from 1971 through 1999, he understood that retiree medical benefits were lifetime benefits.

Ted Johnson (Johnson), former president of Local 997 and a member of the 2001 and 2004 bargaining committees, testified that he understood that retiree medical benefits were vested because "[i]t was clearly spelled out in the supplemental agreement.  Articles and sections I can't quote you today."  Tr. 324.

Lonnie White (White), former president of Local 997, former UAW representative, and member of the bargaining committees for the 1983 through 1992 CBAs, testified that the nego-tiated contract language provided that the retiree medical benefits were the same as whatever benefits were negotiated for the active employees.  White also testified that the Union member-ship would lose benefits unless the Union could negotiate a continuation of those benefits, except retirees.  Although White testified that he understood retiree medical benefits to be "for the employee's life and the spouse's life," Tr. 459, the SIAs do not provide for medical benefits for spouses beyond the life of the retiree.

Dennis Walker, a former UAW area representative and member of the committee that bargained the 2001 and 2004 CBAs, testified that "traditionally, I don't negotiate benefits for retirees.  I mean, I just don't.  They're there and they're locked in at what they're at."  Tr. 426.  During his testimony, White similarly acknowledged that benefits "could not have gone down [but] could have only gone up," Tr. 507, that retirees receive the same medical benefits as the

active employees under the 2001 SIA, and that he knew that insurance benefits were vested based on "[p]ast practice, believe it to be."  Tr. 513.

Richard Avery (Avery), a former Local 997 official and member of the 1986 through 1995 bargaining teams who retired in 1999, testified that he had to change from the John Deere HMO to the Blue Cross/Blue Shield plan in 2001 or 2002.  Avery agreed that an increase in prescription-drug co-pays, standing alone, could constitute a reduction of benefits.  He also stated that he believed that despite the change, he had vested benefits based on the supplemental agreement.

Teed testified that retiree medical benefits did not vest until an employee retired and that "I knew that when I retired, I would be vested, you know, that's my baseline.  When I retire, whatever insurance I had is my baseline, and that's the benefit level that I'm going out with."  Tr. 659.  Teed based his belief that retiree medical benefits were vested on the termination of benefits extended coverage clause.  He further explained that the 2001 SIA provision providing that retirees "will continue to have the same coverage as active employees," Trial Ex. 16 at 82, meant that

> when you retire, you retire with certain amount of benefits, and then as you go into different contracts, usually things get better.  So that's kind of our escalator clause.  We pull the past retirees up with us.  We don't go in and negotiate for the past retirees under health care.  It's just an automatic that's in the language.  So they just – the company just gives them the same insurance as we have . . . as an active worker.

Tr. 729-30.

In an April 11, 2002, letter to the UAW following an April 4, 2002, pension meeting with Maytag, Teed wrote that "[t]he Company [] commented that they believed our retirees could waive health benefits and that the Company and Union could negotiate a cheaper plan for the past retirees."  Trial Ex. 158 at 2.  Teed testified that he did not have any recollection about the conversation recorded in the letter.

No Union official testified of any negotiations during collective bargaining sessions wherein the issue of vesting was explicitly discussed.

Krivoruchka, a former Company officer, denied that retiree medical benefits were vested and would survive the expiration of the CBAs.

The CBAs establish that retiree medical benefits were tied to active employees' benefits, which were renegotiated during every contract and could have been reduced.

The collective bargaining history shows that each party tried to strengthen its position during negotiation sessions, but neither side succeeded, and consequently no explicit vesting or non-vesting language was included in the CBAs or SIAs. For example, in 1980, the Company agreed to change "may" to "shall" in the termination of benefits extended coverage clause, but as Teed testified, the Company did not consider the change in language necessary. In 1983, the Union resisted the Company's proposal to include explicit non-vesting language. Teed testified that a Company spokesperson told him that if the Company's proposal were accepted, retiree medical benefits would end in the event of a strike and that the Company withdrew the proposal.

In 1989, the Company proposed, and the Union rejected, that future retirees contribute toward their retiree medical benefits. The proposal stated that "[c]urrent retirees as well as those who retire not later than December 31, 1989 will not be affected by the proposed change." Trial Ex. I at 1.

In 1992, the Financial Accounting Standards Board (FASB) implemented Financial Accounting Standards No. 106 (FAS 106), which required companies to change their reporting of retiree medical benefits from a cash basis to an accrual basis. The Company was concerned about rising retiree medical benefits costs and how FAS 106 would affect reported earnings. A May 25, 1989, document discussing the Company's concerns stated,

> New rules from [FASB] will require us to expense the projected cost of medical benefits for current and future retirees like we now do for pension costs. . . . This dramatic change in accounting practices would have lowered the Company's

> earnings by 12-15% if it had been in effect for 1988.  Companies alarmed at this
> staggering increase in retiree medical costs are taking steps to control future
> retiree medical liabilities.  Companies are reducing long term costs as a result of
> FASB by capping plan benefits, imposing stricter eligibility standards, increasing
> post-retirement deductibles and co-insurance, or, increasing post-retirement
> employee contributions.

Trial Ex. J.

During the 1992 collective bargaining negotiations, the Company proposed, and the Union

rejected, a cap on the Company's liability for retiree medical benefits for employees who retired

after January 1993.  The proposal, if accepted, would have reduced the Company's liability

under FAS 106.  Ultimately, the parties agreed to language that would reduce the Company's

liability under FAS 106 by not accounting for retiree medical benefits until the employee became

eligible for retirement.  See Trial Exs. D at 10; L at 3.

During the 2001 negotiations when the parties agreed to terminate the John Deere HMO, at

least one retiree was enrolled in that plan, thus losing his John Deere HMO coverage and being

forced to enroll in the Blue Cross/Blue Shield plan.  However, the Union did not seek or obtain

the Newton retirees' consent before it negotiated the termination of the John Deere HMO.

In addition, to inform Union members about the results of collective bargaining sessions,

beginning in 1977, the parties negotiated the information to be included in an employee

brochure, entitled "Highlights."  Tr. 186, 193, 540-41; Trial Exs. 18-24, 26, 27.  The 1986

Highlights stated that "[t]he current level of Medical benefits remain in effect . . . ."  Trial Ex. 21

at 5.  The 1989 Highlights provided,

> Maytag employees and their families will continue, for the term of the agreement,
> to be protected under the current health care plans without any reduction in
> benefits or employee contributions.  These plans include the Blue Cross/Blue
> Shield medical plan, prescription drug plan, dental and vision plans.  Retired
> employees and eligible dependents including surviving spouses will also continue
> to have protection under the medical, prescription drug, and vision plans.

Trial Ex. 22 at 1.  Similarly, the 1992 Highlights indicated that "[r]etired employees and eligible dependents over age 65 will continue to have the same coverage as in the past, without contributions."  Trial Ex. 23 at 1.  The 1992 Highlights informed the Newton retirees that they would have the option to voluntarily elect one of the medical plans and specified four re-opener periods in which to change their election during the term of the 1992 CBA.  Trial Ex. 23 at 1.

### D.  2004 Collective Bargaining History

The 2001 agreement was set to expire on June 1, 2004, as a result of a termination letter the Union sent to the Company on March 9, 2004.  The termination letter stated that the Union desired to terminate the 2001 CBA, "including all appendices thereto and all agreements and memoranda supplementary thereto or amendatory thereof."  Trial Ex. 30 at 1.  As a result of the termination letter, the parties met "for the purpose of negotiating a new collective bargaining agreement."  Trial Ex. 30 at 1.  During negotiations, the Company proposed a change to medical benefits for active union employees and current retirees and further changes to retiree medical benefits for employees who retired after January 1, 2005.  The parties were unable to reach an agreement before the expiration of the 2001 CBA and a ten-day extension was negotiated.

When the negotiators failed to reach an agreement by the end of the extension, the Union went on strike on June 10, 2004.  During the strike, the Company terminated the striking employees' medical benefits.  Although the Company initially continued medical benefits for laid-off employees, when the Company recalled the laid-off employees, who reported and then joined the strike, the Company terminated those medical benefits as well.  The Company provided retiree medical benefits throughout the strike.  The strike lasted for three weeks.

Talks resumed on June 23, 2004, and the final negotiations were one-on-one meetings between Dennis Williams (Williams), then the Regional Director of Region 4 for the UAW, and Krivoruchka, Maytag's lead negotiator.  Williams and Krivoruchka credibly testified that the 2004 negotiations did not alter the rights of the Newton retirees or the Company with respect to

retiree medical benefits.  Krivoruchka also testified that he and Williams never discussed whether retirees had vested benefits, that they negotiated changes to the retirees' drug benefits, and that the 2004 SIA did not amend previous agreements to provide vested benefits for the Newton retirees.  White testified that as a result of the 2004 negotiations, the Newton retirees lost "[v]ery minimal benefits."  Tr. 451.

### E.   2004 SIA

The 2004 SIA termination of benefits extended coverage provision for retirees provided as follows:

> Employees who are eligible for Retirement Benefits under the Retirement Plan and who retire on or prior to January 1, 2008 shall continue coverage under the Medical and Rx Drug Plans for himself and eligible dependents during his life. The Medical coverage will be a supplement to Medicare at age 65.  The coverage for retirees retiring on or before January 1, 2008, shall be the plan that existed prior to January 1, 2005.

Trial Ex. 17 at 78.  After detailing extended coverage periods for employees on layoff, leave, or disability, the 2004 SIA also included a provision that stated that "Benefit Plan coverages shall terminate at the end of the coverage periods set forth above."  Trial Ex. 17 at 82.  The termination of benefits extended coverage provision for surviving spouses and dependents of a retirement-eligible active employee who dies as a result of employment provided for continuation of medical benefits until the death of the surviving spouse.  Trial Ex. 17 at 81.  The provision further provided that "[a]ll Benefits Plan coverages, except coverage for surviving spouses and eligible dependents will terminate at the end of the month in which a pensioner or a disabled former employee dies."  Trial Ex. 17 at 82.

The 2004 SIA also introduced the Maytag Model Drug Program applicable to the Newton retirees.  The drug plan identified three different types of prescription drugs and imposed a corresponding co-payment for each type of drug.  The 2004 SIA changed retiree medical benefits by requiring the Newton retirees to buy their prescriptions by mail order after the initial fill and

two refills.  The co-pays for generic drugs were set at $5.00 for retail and $10.00 for mail order drugs; co-pays for the newly established category of formulary brand drugs were $10.00 for retail and $20.00 for mail order; and the co-pays for non-formulary brand drugs were $15.00 for retail and $30 for mail order.

The 2004 SIA term clause provided,

> This Agreement shall become effective as of July 5, 2004, and remain in effect until 12:01 a.m., July 31, 2008, and thereafter from year to year, unless either party notifies the other, in writing, at least sixty (60) days prior to any expiration date, of a desire to change, modify or terminate this Agreement on the expiration date.

Trial Ex. 17 at 120.

## F.  2006 SPD

Maytag issued an SPD dated January 1, 2006, disclosing the benefits available under the 2004 Maytag CBA and SIA.  Regarding retiree medical coverage, the 2006 SPD indicated that it described the benefits applicable to "retirees during the term of the current collective bargaining agreement."  Trial Ex. 133 at 163.  The 2006 SPD further provided that retiree medical benefits would end on "the date the plan(s) terminates or is amended so that you are no longer covered."  Trial Ex. 133 at 166.  Under the "General Information" section of the 2006 SPD was the following "Plan amendment and termination" clause:

> This booklet describes the welfare benefits that have been negotiated with the union and that are currently in effect.  The benefits described in this booklet are not vested benefits and Maytag reserves the right to modify, suspend or terminate the plan or any component or successor plan, in whole or in part, at any time and for any reason, except to the extent that the federal labor laws require it to bargain any such changes with the union.

Trial Ex. 133 at 186.  Krivoruchka credibly testified that the Company adopted the 2006 SPD and distributed it to employees.

16

### G.  Acquisition of Maytag by Whirlpool and 2008 Collective Bargaining Negotiations

In 2006, Whirlpool acquired Maytag, assumed Maytag's collective bargaining obligations and began administering medical benefits to the Newton retirees under the then-effective CBA (the 2004 Maytag CBA).

By letter dated May 16, 2008, the Union notified the Company of its intent to terminate the 2004 Maytag CBA, including the 2004 SIA, with the expiration date being August 1, 2008.  The letter indicated that the Union desired to negotiate a new CBA rather than modify the existing CBA.

The Union's position on retiree health care benefits during the 2008 collective bargaining negotiations was that current retiree health insurance benefits were vested. When the parties met for collective bargaining on July 1, 2008, the Company presented a proposal that would have synchronized Maytag retiree health care benefits with Whirlpool retiree health care benefits; however, Ron McInroy (McInroy), the Union's chief spokesperson during the 2008 negotiations, stated that the Union was not going to bargain over retiree health care.  The Company prepared a letter dated July 15, 2008, to confirm with the Union the Union's position that the Union did not intend to bargain over retiree health care.  After seeing the letter, McInroy confirmed that the Union would not bargain over retiree health care.  Williams also testified that he took the position that retiree medical benefits were vested and that the Company did not argue with him on the issue.

## III.  PROCEDURAL BACKGROUND

On July 24, 2008, the Company filed this class action declaratory judgment complaint against the Union and three individual Maytag retirees in anticipation of its modification to the retiree medical benefits for the Newton retirees.  Members of the putative class included the UAW, Local 997, and all of the Newton retirees, their surviving spouses, and dependents.

By letter dated August 1, 2008, the Company advised the Newton retirees that as of January 1, 2009, it would terminate retiree medical benefits under the Maytag Group Health Plan (the Maytag Plan) and enroll the Newton retirees in the Whirlpool Corporation Group Benefit Plan (the Whirlpool Plan).

On August 8, 2008, five plaintiffs filed a mirror-image lawsuit in the United States District Court for the Western District of Michigan, captioned Ginter v. Whirlpool Corp., No. 1:08-cv-750, seeking to represent a class of Newton retirees and former employees or survivors of employees who worked at a Whirlpool facility in Mt. Sterling, Kentucky, that closed in 1991. Like the Company here, the Ginter plaintiffs sought a declaration concerning the Company's right to modify the retiree medical benefits under the CBAs between the UAW and the Company.

The Company filed a motion to certify class in this action on August 22, 2008.  On August 26, 2008, in the Ginter case, the Company filed a motion to transfer Ginter to this Court, arguing that the case should be heard in this Court due to the first-filed rule.  The Union then filed a motion to dismiss or transfer in the present case, arguing that the first-filed rule did not apply under the circumstances of this case.  In Ginter, the Honorable Gordon J. Quist denied in part the Company's motion to transfer, deferring to this Court the application of the first-filed rule. Ginter, No. 1:08-cv-750 (W.D. Mich. Oct. 2, 2008).

While this Court was considering the Union's motion to dismiss or transfer, the Ginter plaintiffs filed a motion to certify class.  On January 23, 2009, Judge Quist certified a class in Ginter that included all of the Newton retirees.  Ginter, 2009 WL 198746, at *3.  On February 11, 2009, this Court denied the Union's motion to dismiss or transfer, finding that the Company had standing and that the first-filed rule applied.  Order, Feb. 11, 2009, ECF No. 63.

Judge Quist issued an order transferring Ginter to the Southern District of Iowa on July 1, 2009; however, the transfer was stayed pending a decision by the Sixth Circuit Court of Appeals

on a writ of mandamus seeking to vacate the transfer order.  On October 7, 2009, the Sixth

Circuit denied the petition for writ of mandamus.  Ginter, et al., No. 09-1981 (6th Cir. Oct. 7,

2009).  Ginter was then transferred to the Southern District of Iowa and assigned to the

Honorable Robert W. Pratt, Chief Judge for the U.S. District Court for the Southern District of

Iowa.  Ginter v. Whirlpool Corp., 671 F. Supp. 2d 1040, 1046 (S.D. Iowa 2009).  On October 26,

2009, the Ginter plaintiffs filed a voluntary motion to dismiss, which Chief Judge Pratt granted

on December 3, 2009.  Id. at 1046. The Company then filed a motion for summary judgment in

the present case.

      With the issues regarding venue and possible consolidation resolved, this Court certified a

class on June 22, 2010.  Maytag Corp., 271 F.R.D. 504, 505-06 (S.D. Iowa 2010).  The Court

defined the class as

> The International Union, United Automobile, Aerospace, and Agricultural Imple-
> ment Workers of America, AFL–CIO, its Local 997 (collectively, the Union), and
> all persons who: (1) are or were employee participants, dependents or partici-
> pants, or spouses of participants in the Maytag employee benefit plans that
> provided for retiree medical benefits; (2) who worked at the Newton, Iowa, plants
> and as to whom the Union had been the participants' collective bargaining
> representative at the time of and prior to their retirement from Maytag and/or
> Whirlpool; (3) who retired from Maytag and/or Whirlpool before July 31, 2008,
> or, in the case of dependents or surviving spouses, who received benefits by
> virtue of retirees from Maytag and/or Whirlpool on or before July 31, 2008; and
> (4) who are living and thus affected by Plaintiffs' modification to retiree
> medical benefits.

Id.  The Court defined the issues to be resolved in this declaratory class action as

> (1) whether the retiree medical benefits schedule provided for in the July 5, 2004,
> collective bargaining agreement entered into by the Company and the Union
> expired on July 31, 2008; (2) whether the Company has the unilateral right to
> enroll class members in the Whirlpool Corporation Group Benefit Plan; and
> (3) whether the Company is entitled to costs and attorney's fees.

Id. at 506.

      On November 10, 2010, the Court denied the Company's motion for summary judgment,

finding that the evidence in the record was insufficient to determine the parties' intent to vest

retiree medical benefits.  Order, Nov. 10, 2010, ECF No. 195.  Specifically, the Court deter-

mined that the language in the controlling documents, the SIAs, was ambiguous regarding

vesting and the issue of vesting could not be decided without extrinsic evidence.  Id.  This bench

trial followed.

## IV.   CONCLUSIONS OF LAW

### A. Justiciability

The Union yet again challenges the justiciability of the Company's declaratory action,

arguing that no case or controversy existed at the commencement of this lawsuit.  The Court is

limited to deciding actual cases or controversies and is thereby prohibited from issuing advisory

opinions.  U.S. Const. art. III, § 2, cl.2; Pub. Water Supply Dist. No. 8 of Clay Cnty. v. City of

Kearney, Mo., 401 F.3d 930, 932 (8th Cir. 2005).  Relief under the Declaratory Judgment Act,

28 U.S.C. § 2201(a), is permissible so long as there is an actual controversy.  United Food &

Commercial Workers Int'l Union v. IBP, Inc., 857 F.2d 422, 426 (8th Cir. 1988).  The Declara-

tory Judgment Act does not alter federal jurisdiction requirements and the statutory actual

controversy inquiry is coextensive with the constitutional inquiry of justiciability.  Id.  When a

court determines that there is an actual controversy, it may declare the rights and legal

obligations of the parties.  28 U.S.C. § 2201(a); see also Royal Indem. Co. v. Apex Oil Co., 511

F.3d 788, 792-93 (8th Cir. 2008) (noting that the Declaratory Judgment Act is an enabling act

"which confers a discretion on the courts rather than an absolute right upon the litigant" (quoting

Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1985)).  "A 'case or controversy' is presented

when the 'conflicting contentions of the parties . . . present a real, substantial controversy

between parties having adverse legal interests, a dispute definite and concrete, not hypothetical

or abstract'" and must be determined by reviewing the unique facts of the case.  IBP, Inc., 857

F.2d at 426 (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

The Court addressed these issues in its February, 11, 2009, Order (ECF No. 63) on the Union's motion to dismiss, based in part on an alleged lack of standing; in its June 24, 2009, Order (ECF No. 75) on the Union's motion to reconsider, and in its November 10, 2010, Order (ECF No. 195) on the Company's motion for summary judgment.  In considering the Union's current argument, the Court finds that evidence presented at trial did not change the material facts upon which the Court relied in its prior rulings on justiciability and standing.  Thus, the Court hereby incorporates by reference its prior orders with the holdings regarding justiciability and standing in those orders and concludes that justiciability requirements are satisfied in this case.  To the extent required by the evolution of the Union's justiciability argument during and post trial, the Court finds a case or controversy did exist at the commencement of the lawsuit.

### B.  Union's Rule 52(c) Motion for Judgment on Partial Findings

Pursuant to Federal Rule of Civil Procedure 52(c), the Court declines to enter any judgment on partial findings.  As is apparent in the remainder of this Order, this case is properly resolved on the entire record.  Accordingly, the Court denies Defendants' Rule 52(c) Motion for Judgment on Partial Findings.

### C.  Expiration of Retiree Medical Benefits

While the Company asserts that it had the right to unilaterally modify the retiree medical benefits, the Union argues that the termination of benefits extended coverage clauses provide strong evidence of the Company's intent to vest retiree medical benefits and that the extrinsic evidence proves the parties' intent to vest.

#### 1.  ERISA Requirements

Congress enacted ERISA with a central goal "to enable plan beneficiaries to learn their rights and obligations at any time."  Jobe v. Med. Life Ins. Co., 598 F.3d 484, 485 (8th Cir. 2010); see also Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 743 (2004) ("There is no

doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them.").

> Nothing in ERISA requires employers to establish employee benefits plans.  Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan.  ERISA does, however, seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits. . . .  [W]hen Congress enacted ERISA, it 'wanted to . . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement – and if he has fulfilled whatever conditions are required to obtain a vested benefit-he actually will receive it.'

Heinz, 541 U.S. at 743 (alterations in original) (quoting Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996) (quoting Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 375 (1980))).

"ERISA categorizes employment benefits as either welfare benefits or pension benefits." Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d 872, 877 (8th Cir. 2009) (citing 29 U.S.C. § 1002(1)-(2) (defining welfare benefits and pension benefits)).  "While ERISA mandates vested pension benefits, Congress did not mandate vesting for employee welfare benefit plans, like the health care plan at issue here."  Id. (citing 29 U.S.C. §§ 1051(1), 1053; Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995) ("ERISA [does not] establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans.")).  The retiree benefits at issue in this case are welfare benefits, which, under ERISA, do not require vesting.

Because of "the importance of disclosure to the [ERISA] statutory regime," Jobe, 598 F.3d at 483, "ERISA requires firms to establish their plans in writing, to provide participants with written summary plan descriptions, and to furnish the full text of the plans on request," Frahm v. Equitable Life Assur. Soc. of U.S., 137 F.3d 955, 960 (7th Cir. 1998).  See also Barker v. Ceridian Corp., 122 F.3d 628, 633 (8th Cir. 1997) (holding that employee benefit plans must be established by a written instrument).  As the Seventh Circuit Court of Appeals has observed regarding the importance of written instruments,

All of these provisions suppose that the written terms are the effective terms. Havoc would ensue if plans meant different things for different participants, depending on what someone said to them years earlier. Memory is weak compared to the written word, and there is a substantial risk that participants will not correctly recall what was said, will exaggerate (in their favor) what they heard, or will simply prevaricate in order to improve their position. Employers could do little to protect themselves against such claims – which is why ERISA calls for writings, and why we concluded above that a rule akin to the statute of frauds applies to all claims based on bilateral contracts. If it is hard now to administer plans that apply to all participants, it is impossible to see how any employer could administer a plan that meant something different for each participant, where the difference was not committed to writing. What is more (and perhaps worse), binding the plan's sponsor to the oral advice of its benefits staff might lead the employer to discontinue giving advice, telling participants to read the documents and draw their own conclusions. That step would protect employers, but it very likely would increase the level of misunderstanding among participants.

Frahm, 137 F.3d at 960)); see also Brubaker v. Deere & Co., 664 F. Supp. 2d 972, 987 (S.D. Iowa 2009) (concluding that despite the employees' contrary expectations and in the absence of any written provision, the employer did not guarantee its "retirees would have medical benefits throughout their life with no change . . . .").

"A 'vested right' is commonly defined as a 'right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent.'" Newspaper Guild of St. Louis, Local 36047 v. St. Louis Post Dispatch, LLC, 641 F.3d 263, 266 (8th Cir. 2011) (quoting Halbach, 561 F.3d at 877 (quoting Black's Law Dictionary 1349 (8th ed. 2004))); see also Sprague v. Gen. Motors Corp., 133 F.3d 388, 400 (6th Cir. 1998) ("To vest benefits is to render them forever unalterable."); Hughes v. 3M Retiree Med. Plan, 134 F. Supp. 2d 1062, 1070 (D. Minn. 2001) (concluding that relevant language did not establish that "retiree's medical benefits became fixed and inviolate upon retirement" and thus plaintiff could not satisfy burden of showing that benefits vested").

Welfare plan beneficiaries "have the burden of proof as to whether vesting language exists in order to confer a vested right to employee welfare benefits." Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 790 (8th Cir. 2002); see also Newspaper Guild, 641 F.3d at 267 ("[T]he

23

burden is on the plaintiffs [(representing the retirees)] to show that the parties intended retirees' benefits would be vested and not tied to the agreement which created them." (quoting <u>Local Union No. 150-A, United Food & Commercial Workers Int'l Union v. Dubuque Packing Co.</u>, 756 F.2d 66, 69-70 (8th Cir. 1985))); <u>Halbach</u>, 561 F.3d at 877 (concluding that plaintiff, as the party seeking judicial determination of vested benefits, had the burden of proof on the issue); <u>Stearns v. NCR Corp.</u>, 297 F.3d 706, 712 (8th Cir. 2002) (same).  Vesting is not presumed, and welfare plan beneficiaries must prove by a preponderance of the evidence that the employer agreed to vesting.  <u>Hughes</u>, 134 F. Supp. 2d at 1069; <u>see also</u> <u>Anderson v. Alpha Portland Indus., Inc.</u>, 836 F.2d 1512, 1517 (8th Cir. 1988) (holding that there is no inference of an intent to vest, stating that "it is not at all inconsistent with labor policy to require [welfare plan beneficiaries] to prove their case without the aid of gratuitous inferences").  To show that the Company agreed to vest the Newton retirees' medical benefits "there must be a specific, if not written, expression of the employer's intent to be bound."  <u>Alpha Portland</u>, 836 F.2d at 1517 (quotation marks omitted); <u>see also</u> <u>Halbach</u>, 561 F.3d at 877 ("It is possible for welfare benefits to vest, however, if a promise to provide vested benefits is incorporated in some fashion into the formal written ERISA plan.").

Here, the Newton retirees' right to medical benefits vested,

> if the benefit was fixed under the terms of the [2004 Maytag CBA] such that [the Company] could not change the benefit post-expiration.  That is to say, the right vested only if the [2004 Maytag CBA] promised [retiree medical benefits] for the lifetime of each [Newton retiree] rather merely for the period during which the [2004 Maytag CBA] was in force.

<u>Newspaper Guild</u>, 641 F.3d at 267.  "Similarly, the right can only have survived the expiration of the [2004 Maytag CBA] in the [2004 Maytag CBA] promised a lifetime benefit."  <u>Id.</u>

**2.   Circuit Precedent**

In this case, Eighth Circuit authority controls the issue of vesting of retiree medical benefits.[3]

In <u>Crown Cork & Seal Co., Inc. v. International Ass'n of Machinist & Aerospace Workers</u>, 501 F.3d 912, 918 (8th Cir. 2007), the court considered several provisions contained in the master agreement and provisions incorporated by reference in the revised agreement between the company and the union and held that retiree medical benefits were not vested.  The Court noted that while the union asserted that the language of the master agreement showed the parties' intent for benefits to vest, it had "directed us to no terms in the Master Agreements that explicitly vest retiree health benefits," despite the following provision in the master agreement between the company and union:

> Your personal coverage continues until your death.  Your Dependent spouse's coverage continues after your death until the earlier of his or her death or remarriage.  Your Dependent children's coverages continue after your death until the earlier of the date any such child is no longer a Dependent as defined or the date your Dependent spouse's coverage stops.

<u>Id.</u>  The court concluded that several provisions in the master agreement precluded vesting, including a provision limiting benefits to the duration of the master agreement, a coordination of benefits clause, and a blanket reservation of rights clause found in a document incorporated into the master agreement that allowed the company to unilaterally modify or terminate the retirees' health plan.  <u>Id.</u> at 917-18.  Furthermore, the court noted that a cap on lifetime benefits, as provided in the health plans, "is a limiting provision, hardly an intent to vest benefits for life." <u>Id.</u> at 918.

---

[3]Because binding Eighth Circuit precedent definitively addresses the issues in this case, the Court need not consider or distinguish the non-binding authority extensively cited by the parties.

The court rejected the union's argument that the termination of coverage provision showed an intent to vest, reasoning that the provision did not contain explicit vesting language and it was inconsistent with the reservation of rights provision, which was controlling. Id. The court also dismissed the union's argument that the reservation of rights provision was ambiguous, stating that even if a reservation of rights clause was ambiguous, the union would still have to show an intent to vest, which it could not do "when the relevant documents [we]re considered as a whole." Id. at 919. The court determined that because retiree medical benefits were not vested, the company had acted within its right to unilaterally modify those benefits. Id. at 919-20.

In Stearns v. NCR Corp., 297 F.3d at 711-12, the Eighth Circuit similarly concluded that enhanced retiree medical benefits were not vested by looking to the inclusion of a reservation of rights clause in the plan documents. In Stearns, the documents the company had distributed in offering the enhanced retiree medical benefits program, which did not contain a reservation of rights clause, alone were insufficient to explain the program without reference to the existing benefits plan, which did include a reservation of rights clause. Id. The court determined that the enhanced retiree medical benefits plan was an amendment to the existing plan, and thus the plan documents relevant to determining whether the enhanced retiree medical benefits were vested included the reservation of rights provision. Id. The court emphasized that "not even the ERISA-mandated summary plan description need disclose that welfare benefits are not vested." Id. at 712. The court concluded that "there must be an affirmative indication of vesting in the plan documents to overcome an unambiguous reservation of rights" and that the intent to vest may not be implied where the plan documents do not address vesting or cross-reference the reservation of rights provision. Id. The court noted that other circuits similarly require clear expressions of an intent to vest. Id. at 712 n.3 (collecting cases).

Likewise, the Hughes v. 3M Retiree Medical Plan court looked to a reservation of rights clause found in an SPD to determine that retiree medical benefits were not vested. Hughes, 281

F.3d at 792.  In <u>Hughes</u>, the court first had to determine which documents constituted the SPDs and were thus part of the formal written ERISA plan.  <u>Id.</u>  The court dismissed the retirees' argument that the relevant SPD was the "Your Benefits" booklet, reasoning that while the Your Benefits booklet "served as the relevant summary plan description as to medical benefits for active employees and retirees under the age of 65, it clearly referenced the reader to another booklet to gain information about retirement benefits for those 65 or over."  <u>Id.</u> at 791.  The court found that the "Med-Supp" benefits booklet given to employees upon retirement, which described plan eligibility, what and how benefits were paid, what was covered under the plan, and how coverage was limited, constituted the plan SPD because it met "the content require-ments of ERISA" and was "sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan."  <u>Id.</u> (citing 29 C.F.R. § 2520.104b-2(a)(1)).

In determining the vesting issue, the court first noted that the Med-Supp booklet contained no vesting language, but that it did contain a reservation of rights clause, which stated that "[t]he Company fully intends to continue this Plan indefinitely, but reserves the right to change or discontinue it if necessary.  Such action would be taken only after the most careful considera-tion."  <u>Id.</u> at 792.  The court reasoned, "[i]t is plain and unambiguous that the word 'intends' does not indicate finality.  To hold otherwise would render the words 'reserves the right to change or discontinue it if necessary' meaningless."  <u>Id.</u> at 792-93.  The court concluded that "[t]he Med-Supp booklet, devoid of vesting language, explicitly reserves the right to modify the retiree medical benefit plan at any time," and therefore the plaintiffs had "not met the burden of proving vesting language."[4]

---

[4]On a closing side note, the <u>Hughes</u> court commented that because the relevant SPD language was unambiguous, it did not examine extrinsic evidence.  <u>Hughes</u>, 281 F.3d at 793.

In contrast, the court in <u>Jensen v. SIPCO, Inc.</u>, 38 F.3d 945, 953 (8th Cir. 1995), found that retiree medical benefits for salaried employees had vested.  The <u>Jensen</u> court first looked at a termination of benefits clause contained in the relevant SPD that "stated that benefits *will* be provided until the retiree dies," and distinguished that while "this type of provision supports an argument that retiree benefits are vested," such "termination-of-coverage clauses are at most an ambiguous expression of an intent to vest retiree benefits . . . ."  <u>Id.</u> at 950.  The court next con-sidered a reservation of rights provision that was included in the plan documents but absent from the SPDs given to the retirees.  The court reasoned that the reservation of rights provision, which permitted the company to amend, modify, or terminate the plan, was not "so unambiguous as to make unnecessary any reference to other Plan provisions and extrinsic evidence."  <u>Id.</u>

The court noted that the company relied entirely upon the reservation of rights provision, failing to even supply the complete plan document, leaving the court unable to "study the entire document for evidence of the settlor's intent."  <u>Id.</u> at 950.  The court reasoned that, conversely, the retiree class presented a "wealth of extrinsic evidence supporting their contention that [the company] intended that [retiree] medical benefits would vest when a Class member retired . . . ."  <u>Id.</u> at 950-51.  The extrinsic evidence included (1) the company intended to continue a prede-cessor company's policy of providing vested retirement benefits to its salaried employees; (2) the retiree medical benefits plans were closely related to vested pension plans with identical eligibility requirements; (3) unilateral company changes to retiree medical benefits had been prospective only – the company did not change the benefits of prior retirees; (4) the company's former CEO testified that the SPDs did not have a reservation of rights clause because "it wasn't our policy"; (5) the company's former employee relations manager testified that he considered retiree medical benefits and earned benefits and employees eligible for pensions would also receive medical benefits for the rest of their lives; (6) the company intentionally declined to include a reservation of rights clause in the SPDs it prepared; and (7) an outside actuarial opined

28

that it would be nearly impossible for the company to unilaterally reduce medical benefits for those already retired.  Id. at 951.  The Jensen court concluded that the reservation of rights language only allowed the company to change retiree medical benefits for employees who had yet to retire and that the retiree class had proven the company's intent to provide vested medical benefits upon retirement.  Id. at 951-52.

In John Morrell & Co. v. United Food & Commercial Workers Int'l Union, 37 F.3d 1302, 1308 (8th Cir. 1994), the court concluded that the company did not intend for retiree medical benefits to vest.  There, the court noted that consistent with ERISA's pension plan requirements, the supplemental pension agreement contained explicit vesting language, while the SIA covering retiree medical benefits did not.  Id. at 1304.  The court stated that

> [t]he Union argues that an intent to confer vested benefits may nonetheless be derived from ambiguous language in [the SIA] construed in light of the parties' lengthy collective bargaining history.  The Union shoulders a difficult, though not impossible, burden of persuasion with this argument, since courts are reluctant to read more benefits into an ERISA plan than its plain language confers."

Id. (citing Wise v. El Paso Natural Gas Co., 986 F.2d 929, 937 (5th Cir. 1993)).  The court detailed the parties' collective bargaining history, noting that the fact that modifications that both increased and decreased the level of retiree medical benefits were not objected to by the union and "the fact that modifications were routinely negotiated is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested."  Id. at 1306-07.  The CBAs also contained multiple provisions reflecting an intent to confer non-vested retiree medical benefits, and the court ruled that survivor clauses and other CBA language the union relied on provided "relatively little" evidence to the contrary.  Id.  Thus, both the ordinary meaning of the CBAs and the extrinsic evidence showed non-vested retiree medical benefits, and the company had the right to unilaterally modify those benefits.  Id. at 1308.

In Alpha Portland, the court concluded that retiree medical benefits were not vested.  Alpha Portland, 836 F.2d at 1520.  In reaching that conclusion, the Alpha Portland court considered the

plan documents and the collective bargaining history.  Id.  The medical plan documents in Alpha Portland contained specific duration clauses and provisions providing retiree medical benefits "until the death of the retiree" and "for the remainder of your life."  Id. at 1514-15.  In affirming the district court, the Eighth Circuit agreed that the CBAs reflected an intent to limit benefits to the duration of each CBA because each agreement: "1) state[d] that benefits previously provided would be continued; 2) provide[d] that its terms are subject to amendment, modification, or supplementation at later bargaining sessions; 3) ha[d] an explicit duration clause limiting its duration; and 4) contain[ed] a coordination of benefits clause which is inconsistent with a theory of vesting."  Id. at 1518.  The court held that "[i]t would render the durational clauses nugatory to hold that benefits continue for life even though the agreement which provides the benefits expires on a certain date."  Id. at 1519.[5]

In Dubuque Packing, the court affirmed a district court's affirmation of an arbitrator's award providing for lifetime retiree medical benefits.  Dubuque Packing, 756 F.2d at 67-69.  In reaching its decision, the Dubuque Packing court stated,

> Both parties agree benefits can outlast the collective bargaining agreement under which they arose, if the parties so intended.  We must examine the intent of the parties to determine whether the health and welfare benefits terminated at the expiration of each agreement.  There is no language in the 1973 and 1976 agreements specifically limiting retirees' benefits.  There is limiting language regarding the benefits of employees – benefits are contingent on continued employment.  Even the Company, in its brief, admits there is language "which could be interpreted to promise continued welfare benefits to the eligible survivors of certain retirees for periods extending beyond the expiration of the [Health and Welfare] Plan."  The burden is on the plaintiffs to show that the

_____

[5]The Alpha Portland court explicitly disagreed with the Sixth Circuit's decision in International Union, UAW v. Yard-Man, Inc., 716 F.2d 1476, 1479 (6th Cir. 1983), wherein it recognized an inference of an intent to vest.  Alpha Portland, 836 F.2d at 1517 ("Congress explicitly exempted welfare benefits from ERISA's vesting requirements.  It, therefore, seems illogical to infer an intent to vest welfare benefits in every situation where an employee is eligible to receive them on the day he retires . . . .  We believe that it is not at all inconsistent with labor policy to require plaintiffs to prove their case without the aid of gratuitous inferences.").

parties intended retirees' benefits would be vested and not tied to the agreement which created them.

> While the agreements are not unambiguous, we believe plaintiffs have carried their burden of proof.  As noted previously, there are many indications in the agreements and course of dealing that the parties intended the right to benefits would vest upon retirement.  The right to receive health and welfare benefits arises from the retiree's status as a past employee.  It is not dependent on a con-tinued or current relationship with the Company.  The status of a retiree cannot be affected by future negotiations or agreements between the Company and the Union; neither can act on behalf of retirees.  There is simply no evidence that the Company and the Union did not intend to vest the right to benefits in the retirees.  There is, on the other hand, evidence that the parties implicitly intended to pro-vide lifetime benefits to retirees.

Id. at 69.

Thus, in this Circuit, absent explicit vesting language or a clearly incorporated, unambigu-ous reservation of rights clause, this Court must evaluate all available evidence to ascertain the parties' intent to vest retiree medical benefits.  Here, as the Court concluded in denying the Company's motion for summary judgment, the plan documents do not contain explicit vesting language or unambiguous reservation of rights clauses clearly incorporated into the controlling documents, and therefore the Court must weigh all available evidence to ascertain whether the Company contractually agreed to provide vested retiree medical benefits.

### 3.  Welfare Plan Documents

"ERISA requires that employee benefit plans be established by written instrument."  Hughes, 281 F.3d at 790 (citing 29 U.S.C. § 1102(a)(1)).  Whether the retiree medical benefits were vested is a matter of contractual intent, Newspaper Guild, 641 F.3d at 267, and the Court's inquiry begins with the written welfare plan documents, Halbach, 561 F.3d at 877; Hughes, 281 F.3d at 790.  In reviewing welfare plan documents to determine vesting, the Court gives "the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean."  Halbach, 561

31

F.3d at 877 (alteration in original) (quoting <u>Hughes</u>, 281 F.3d at 790). Extrinsic evidence will only be considered if the relevant plan provisions are ambiguous. <u>Hughes</u>, 281 F.3d at 790; <u>Stearns</u>, 297 F.3d at 712.

> When interpreting ERISA plan documents, the Supreme Court has referred the court to, and explicated, the law of trusts:
>
>> The terms of trusts created by written instruments are "determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible."
>
> <u>Firestone [Tire & Rubber Co. v. Bruch]</u>, 489 U.S. [101,] 112, 109 S.Ct. 948 [(1989)] (quoting Restatement (Second) of Trusts § 4 cmt. d (1959)). The question of what "other evidence" is admissible turns on the relative ambiguity of the plan provision being construed:
>
>> That intent [of the settlor] is first sought by careful examination of the trust clause in question, giving the words in that clause their ordinary meanings. If the construction question cannot be resolved by reference to the clause alone, the court will examine the entire trust instrument to determine the creator's intent and purposes . . . . The third step becomes necessary when the intent or meaning of the settlor . . . cannot be determined by reference to the provisions of the trust instrument itself. [At that point e]xtrinsic evidence will be admitted by the court to assist it in determining the meaning and effect of the particular clause.
>
> George G. Bogert, et al., <u>The Law of Trusts & Trustees</u> § 182 (rev. 2d ed. 1979) (footnotes omitted).

<u>Halbach</u>, 561 F.3d at 877-78 (fourth and fifth alterations in original).

Because disclosure is an important objective of ERISA, ERISA also requires that SPDs be furnished to participants and beneficiaries of employee benefit plans. <u>Id.</u>; 29 U.S.C. § 1022(a). Thus, "[s]ummary plan descriptions are considered part of the ERISA plan document." <u>Hughes</u>, 281 F.3d at 790 (citing <u>Jensen</u>, 38 F.3d at 949).

> Under ERISA, a summary plan description "shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan." 29 C.F.R. § 2520.102-2(a). The contents of a summary plan description must "describe the plan's provisions relating to eligibility to participate in the plan" and a "description or summary of the benefits." 20 C.F.R.

§ 2520.102-2(j) and (j)(2).  Further, for employee welfare benefit plans that are group health plans, a summary plan description must include a description of the following:

> any cost-sharing provisions, including premiums, deductibles, coinsurance, and copayment amounts for which the participant or beneficiary will be responsible; any annual or lifetime caps or other limits on benefits under the plan; the extent to which preventive services are covered under the plan; whether, and under what circumstances, existing and new drugs are covered under the plan; whether, and under what circumstances, coverage is provided for medical tests, devices and procedures; provisions governing the use of network providers, the composition of the provider network, and whether, and under what circumstances, coverage is provided for out-of-network services; any conditions or limits on the selection of primary care providers or providers of specialty medical care; any conditions or limits applicable to obtaining emergency medical care; and any provisions requiring preauthorizations or utilization review as a condition to obtaining a benefit or service under the plan.

> 29 C.F.R. § 2520.102-3(j)(3).  ERISA further requires summary plan descriptions to include "a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reduction, or recovery . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits . . . ." 29 C.F.R. § 2520.102-3(k)(1).

Id. at 791.

### a.  SIAs

The Union asserts that each SIA contains language that constitutes a strong expression of an intent to vest retiree medical benefits.  The Company counters by arguing that the SIAs contain provisions that are inconsistent with an intent to vest.  Because the Court has already determined that the language of the SIAs, given its common and ordinary meaning, is ambiguous and not dispositive on the question of vesting, see November 10, 2010, Order at 20, ECF No. 195, the Court will consider extrinsic evidence presented at trial bearing on the weight to be accorded and the meaning of each provision.

### (1) Termination of Benefits Extended Coverage Provision

The Union relies on the termination of benefits extended coverage provision for retiree medical benefits to show that the Company agreed to vest those benefits for the Newton retirees.

33

In addition, the Union avers that provisions providing for surviving spouse and disability retire-

ment coverage can be construed to provide for benefits that extend beyond the duration of the

relevant CBA or SIA.

The Union cites <u>Jensen</u>, and its discussion of <u>Dubuque Packing</u>, for the premise that the

"during his life" language used in the SIAs is a strong expression of an intent to vest.  In <u>Jensen</u>,

the court indicated that a welfare plan document had a termination of coverage provision that

"stated that benefits *will be* provided until the retiree dies, or a spouse divorces, or a child

marries or reaches age 19."  <u>Jensen</u>, 38 F.3d at 950.  The court noted that such provisions support

the argument of vested benefits.  <u>Id.</u> (citing <u>Dubuque Packing</u>, 756 F.2d at 69-70).

> However, these termination-of-coverage clauses are at most an ambiguous
> expression of an intent to vest retiree benefits; they can also be construed as
> dealing only with termination of coverage on an individual basis, not the separate
> questions of whether the Plan may be terminated or its benefit levels modified by
> [the company].

<u>Id.</u>

The termination of coverage language at issue here provides that a retiree "shall [or may]

continue coverage . . . during his life" and does not conclusively express an intent to vest retiree

medical benefits.  Furthermore, the Eighth Circuit has held that the phrase "until your death" in a

termination of coverage clause "is not explicit vesting language."  <u>Crown Cork & Seal</u>, 501 F.3d

at 918.  The language does, however, support the Union's position that the parties intended to

vest the retiree medical benefits because a reasonable plan participant, <u>see</u> <u>Halbach</u>, 561 F.3d at

877, could understand the "during his life" language in the SIAs as entitling a retiree to lifetime

medical benefits.

Consequently, the Union's reliance on <u>Bland v. Fiatallis North America, Inc.</u>, 401 F.3d

779, 786 (7th Cir. 2005) (determining that absent the constraint of a reservations of rights

provision, plan documents designating retiree benefits as "lifetime" were ambiguous as to

vesting), for the proposition that "during his life" language is determinative absent a reservation

of rights clause is misplaced.  Without considering other language in the termination of benefits extended coverage provision and the SIAs as a whole, the absence of a reservation of rights provision in the SIAs would not render "during his life" the necessary clear expression of the Company's agreement to vest retiree medical benefits.  See Newspaper Guild, 641 F.3d at 267-68 ("In the absence of express vesting provisions, 'an intent to confer vested benefits may nonetheless be derived from ambiguous language in [the SIAs] construed in light of the parties' lengthy collective bargaining history." (quoting John Morrell, 37 F.3d at 1304)).  Indeed, when ambiguities are found in the relevant plan provisions, the Eighth Circuit has routinely looked to several provisions in the controlling documents, see Crown Cork, 501 F.3d at 919 (considering several provisions in addition to reservation of rights clause), the plan documents as a whole, see Alpha Portland, 836 F.2d at 1519 ("When interpreting a contract we must not interpret one provision inconsistently with another."), and extrinsic evidence, see Dubuque Packing, 756 F.2d at 69 ("[I]f a contract is deemed ambiguous, then the court may weigh extrinsic circumstances to aid in its construction."), to determine the parties' intent when interpreting language similar to "during his life," regardless of the presence or absence of a reservation of rights clause, see Jensen, 38 F.3d at 950-51 (considered "a wealth of extrinsic evidence" in addition to reservation of rights clause); Alpha Portland, 836 F.2d at 1518 (considered various provisions in agreement not containing a reservation of rights clause).  Therefore, the absence of a reservation of rights clause in the SIAs renders the "during his life" language ambiguous rather than determinative of the parties' intent to vest retiree medical benefits.[6]

---

[6]Bland was an appeal from the grant of summary judgment, and the only issues before that court were "whether the plan documents contain language that unambiguously vested ERISA contract rights or that is so ambiguous as to require a trial on the issue of vesting." Bland, 401 F.3d at 782.  The court concluded that in the absence of a reservation of rights clause, the use of "lifetime" language was ambiguous as to vesting and remanded the case for consideration of extrinsic evidence to determine the issue of vesting. Id. at 787.  Thus, contrary to the Union's assertion, Bland supports the conclusion that in the absence of a reservation of rights clause, durational language such as "lifetime" in that case, and "during his life" in this case, is *ambiguous* not *determinative* on the issue of vesting.

The Court must also consider other language in the termination of benefits extended coverage provision that is relevant to the parties' intent to vest. See Halbach, 561 F.3d at 877 ("That intent [of the settlor] is first sought by careful examination of the trust clause in question . . . ." (alteration in original)).

First, the termination of benefits extended coverage provision provides that the Newton retirees "shall continue coverage" under the medical and prescription drug programs upon retirement. Welfare plan provisions providing that retiree benefits are continued is evidence that benefits were not vested. See John Morrell, 37 F.3d at 1307 ("The provision in the [CBA] that continued health benefits for past retirees is evidence that prior benefits were not vested."); Alpha Portland, 836 F.2d at 1518-19 ("[E]ach [CBA] provided for continuation of benefits from the previous plan. Were there an intent to vest, continuation language would not be necessary."). The 1986, 1989, and 1992 Highlights make it clear that the "shall continue coverage" language indicated that the Newton retirees would continue receiving the coverage provided in previous agreements. In addition, until the 2004 SIA, the level of retiree medical benefits was tied to the level of benefits for active employees. Notwithstanding that some courts have held that parties can provide for vested benefits when they tie the level of retiree medical benefits to the level of medical benefits for active employees, see, e.g., International Union, UAW v. Yard-Man, Inc., 716 F.2d 1476, 1480 (6th Cir. 1983), the 2004 SIA reflects the same "shall continue coverage" language, which, under John Morrell and Alpha Portland, does not support the conclusion that the parties intended to vest retiree medical benefits via the termination of benefits extended coverage provision.

Although the Company's 1980 agreement to change "may" to "shall" in the continuation of coverage provision is more convincing evidence that the Company intended to vest retiree benefits than other evidence the Union presented, the Court is unable to discern the true import of this change. If, on the one hand, the modified language in the 1980 agreement was intended to

strengthen the already vested retiree medical benefits, an intent to vest would be discernible in previous agreements, which it is not. The initial proposal to provide retiree medical benefits was provisional, and the 1961 SIA included "may," which is not a clear indication of an intent to vest. If, on the other hand, the change to "shall" acted to vest retiree medical benefits, the Court is left with the unresolved question of why the Company indicated that the language did not need to be changed, but nonetheless agreed. Evidence is lacking regarding vesting prior to 1980, and nothing in the record indicates that by replacing "may" with "shall" the Company intended to vest welfare benefits. Even if the 1980 change from "may" to "shall" tended to support vesting, the Union offered no documentary or testimonial evidence regarding the language change. Moreover, Teed's testimony that the Company told the Union that the language did not need to be changed is evidence that the switch did not alter the parties' rights regarding vesting and that the Company did not undertake vested benefits by the change in language.

Second, the Union argues that the termination of benefits extended coverage provision granting lifetime retiree medical benefits is explicitly tied to eligibility for "Retirement Benefits under the Retirement Plan," evidencing an intent to vest "because tying the medical and prescription drug benefits to the vested pension benefits [shows] that these benefits were to continue in tandem with those benefits." Defs.' Br. 29, ECF No. 230 (citing Noe v. PolyOne Corp., 520 F.3d 548, 558-59 (6th Cir. 2008)). The Court must disagree. As trial testimony demonstrated, during the terms of the 1961-2001 SIAs, retiree medical benefits were tied to active employee medical benefits and could be changed. See Tr. 419, 527-29. Avery acknowledged, as set out in the 1999 Hourly Retirement and Benefits Summary, "the benefits outlined above have been negotiated between the Company and the Union *and may be subject to change in the future*." Tr. 528 (emphasis added). White similarly acknowledged that when he retired in 2004, he signed a document that stated his benefits were subject to change and that they did in fact change. Tr. 419. And as Williams testified, the changes in the 2004 SIA did not alter the retirees' rights *to*

health insurance; rather, the retiree medical benefits *continued* to be subject to change in the future.  See Tr. 92.  The Company did not agree to vest retiree medical benefits by tying eligibility for those benefits to vested pension benefits.

Third, the SIAs provide continued medical benefits for surviving spouses and eligible dependents of retirement-eligible active employees who die as a direct result of employment. The Union argues that these provisions provide additional evidence of vesting because the provisions indicate specific durations that extend past the terms of the CBAs.  A continuing coverage provision for surviving spouses and dependents that was directly connected to retiree medical benefits was considered in John Morrell wherein the court reasoned,

> The Union argues that [extended coverage] language expressly vests an eligible spouse with [SIA] retirement health benefits until the spouse's death or remarriage.  We have previously noted that such language does support the argument that eligible survivor benefits are vested.  See []Dubuque Packing[], 756 F.2d [at] 69-70[].  But in the context of this case, it is equally plausible to construe this provision as providing that a surviving spouse who is eligible to receive a joint and survivor pension – which is vested – will also receive whatever non-vested retiree health benefits Morrell provides from time to time.  Under this provision, the eligible survivor receives only the "above coverage," which is limited to the three-year term of [the SIA] and the Master Agreement.  Thus, [the surviving spouse provision] is ambiguous and cannot overcome the other provisions, such as the term clauses, that are inconsistent with vesting.

John Morrell, 37 F.3d at 1307-08.  Likewise, because it is equally plausible to construe the surviving spouse provision in the SIAs as providing continued coverage to the surviving spouse and dependents of a retirement-eligible *active* employee who died solely due to work related causes with that coverage limited by the general duration clause, this provision is at best ambiguous regarding vesting, and not conclusive evidence of an intent to vest *retiree* medical benefits.  Here, unlike in John Morrell, no provisions provide for continuing medical coverage for surviving spouses or dependents of the Newton retirees, weakening the Union's argument that other extended coverage provisions show an intent to vest retiree medical benefits.  Cf. Dubuque Packing, 756 F.2d at 69 (holding that language arguably extending benefits beyond the

term of CBA to eligible survivors of certain retirees coupled with the course of dealing between the parties evidenced an implicit intent to vest the retiree medical benefits).

Showing that various non-retiree extended coverage provisions arguably last beyond the termination of the CBA does not meet the Union's burden of showing the Company agreed to vest retiree medical benefits because evidence creating a direct connection between those other extended coverage provisions and the retiree medical benefits is missing from the record before the Court – this is especially salient here due to the requirement that there be a specific expression of the Company's intent to provide vested retiree medical benefits.  See Alpha Portland, 836 F.2d at 1517 (quoting Anderson v. John Morrell & Co., 830 F.2d 872, 877 (8th Cir. 1987) (concluding that for an employer to be bound to maintain and improve a welfare plan, "there must be a specific, if not written, expression of the employer's intent to be bound")). White agreed that a provision in the 1989 SIA that provided prescription drug benefits for eligible dependents and surviving spouses did not suggest vested benefits.  No trial testimony linked surviving spouse extended coverage provisions to retiree medical benefits, and thus the surviving spouse and dependent specific duration extended coverage provisions are, at best, an ambiguous expression of an intent to vest some benefits for non-retirees, and not strong evidence of the Company's intent to vest retiree medical benefits.[7]

Fourth, the 1977-2001 SIAs provided that "Benefit Plan coverages shall terminate at the end of the extended coverage provisions set forth above," Trial Ex. 17 at 82, which the Union argues "applies equally to the retiree extended coverage provision [as to layoff and leave extensions], [consequently] that provision must be read as providing lifetime coverage that

---

[7]This conclusion applies equally to extended coverage provisions for those on layoffs, leaves, and disability and specific duration provisions relating to the vision plan.  Such extended coverage provisions do not provide specific evidence of the Company's intent to vest retiree medical benefits if they provide for continuing benefits but not *retiree* medical benefits. Moreover, as discussed infra Part IV.C.(2), reading such provisions as evidence of vesting would render the term clauses "nugatory."  See Alpha Portland, 836 F.2d at 1519.

survives the termination of the agreement." Defs.' Br. 31. Under <u>Jensen</u>, "this type of provision supports an argument that retiree benefits are vested." <u>Jensen</u>, 38 F.3d at 950; <u>cf.</u> <u>Yard-Man</u>, 716 F.2d at 1481-82 (holding that inclusion of specific durational limitations suggests that benefits were intended to survive termination of the CBA). However, such clauses can "be construed as dealing only with termination of coverage on an individual basis, not the separate questions of whether the Plan may be terminated or its benefit levels modified by [the company]." <u>Jensen</u>, 38 F.3d at 950. The Court's conclusion that specific durational provisions are at best an ambiguous expression of an intent to vest non-retiree medical benefits precludes a determination that such a provision shows that the Company agreed to vest retiree medical benefits. <u>See</u> <u>John Morrell</u>, 37 F.3d at 1307-08.

Based on the trial record, the language the Union puts forth as evidence of vesting is neither determinative nor strong evidence of vesting. Rather, the ambiguous "during his life" language and ambiguous termination of coverage provision, when read in conjunction with the "shall continue coverage" language that is inconsistent with vesting, add up to "relatively little" evidence that the Company clearly agreed to provide vested retiree medical benefits and that the Newton retirees' right to medical benefits did not expire upon termination of the 2004 Maytag CBA. <u>See</u> <u>John Morrell</u>, 37 F.3d at 1307.

### (2) Other SIA Provisions

Under a general duration clause included in each SIA, the SIAs became effective as of a specific date, and the SIAs had a specific expiration date but remained in effect from year to year unless one party notified the other of a desire to change, modify, or terminate the SIA. General duration clauses reflect an intent to limit benefits to the duration of the agreement and are incon-sistent with vesting. <u>See</u> <u>Alpha Portland</u>, 836 F.2d at 1518-19.

The Union, relying on <u>Dubuque Packing</u>, argues that even if an agreement contains a general duration clause, it is not dispositive. In <u>Dubuque Packing</u>, the court concluded that

retiree benefits had vested, in part because "[n]othing in the 1973 and 1976 agreements state[d] that the retirees' benefits [we]re tied to renewal of the agreement or terminate[d] when it expire[d]." Dubuque Packing, 756 F.2d at 69.  However, Dubuque Packing did not discuss how general duration clauses affect vesting.

In Alpha Portland, the welfare benefits plans at issue contained almost identical term clauses to those at issue here.[8]  As in the present case, the plans also provided that retirees would continue to receive medical benefits until death or the remainder of the retiree's life.  Alpha Portland, 836 F.2d at 1514-15.  The Alpha Portland court specifically distinguished Dubuque Packing, noting that the company in Dubuque Packing had continued to pay benefits despite the termination of reaffirmation and continuation language present in previous plans, whereas the plans in Alpha Portland had provided for continuation of coverage.  Id.  The Alpha Portland court concluded that the durational clauses showed an intent to limit the benefits to the term of the agreement, reasoning, "It would render the durational clauses nugatory to hold that benefits continue for life even though the agreement which provides the benefits expires on a certain date."  Id. at 1519.  Additionally, the Alpha Portland court found it significant that the agreement, much like the term provision here, allowed amendment, modification, or supplementation – which is inconsistent with vesting.  Id.

---

[8]The Alpha Portland clauses provided, with the exception of changes to the date:

This Insurance Agreement shall become effective May 1, 1973, and shall continue in effect until May 1, 1975, during which period neither the Company nor the Union may demand any change in its provisions.

After May 1, 1975, the Insurance Agreement shall be automatically renewed for successive one-year periods unless either party to the Agreement has given written notice to the other at least sixty (60) days prior to May 1, 1975 (or any subsequent anniversary of the Effective Date of the Collective Bargaining Agreement) of its desire to amend or modify this Agreement.

Alpha Portland, 836 F.2d at 1514.

In John Morrell, the CBA had a general duration clause limiting its provisions to the three-year term of the master agreement.  John Morrell, 37 F.3d at 1304.  The relevant SIA also included a clause stating that the welfare plan "will remain in effect for the duration of this Agreement."  Id.  The John Morrell court concluded that the duration clause was among the provisions in the master agreement that reflected an intent to confer only non-vested retiree medical benefits.  Id. at 1307.

In Crown Cork & Seal, the company had "agreed to continue [retiree] group insurance agreements 'without modification for the life of' the Master Agreements . . . ."  Crown Cork & Seal, 501 F.3d at 917.  The agreements at issue in Crown Cork & Seal expired under term provisions during the pendency of the court's consideration of the company's unilateral modification of retiree medical benefits.  Id. at 918.  In holding that the retiree medical benefits did not vest before the agreements expired, the court considered the durational provision as one of three provisions that precluded vesting, the other two provisions being coordination of benefits and reservation of rights clauses.  Id. at 917-18 (citing John Morrell, 37 F.3d at 1307).

As with Alpha Portland, John Morrell, and Crown Cork & Seal, this case is distinguishable from Dubuque Packing.  As with those cases, the SIAs in the present case also contain general duration clauses that are inconsistent with an intent to vest.  Coupled with the language allowing for amendment, modification, or termination of the SIAs upon expiration, the SIAs do not show an intent to vest.

The Union nevertheless argues that the Company's continued payment of retiree medical benefits after the term of the CBAs, combined with the extended coverage provisions, is decisive evidence of vesting under Dubuque Packing.  This is because, in the Union's view, none of the SIAs specifically provided for benefits for employees who had retired under previous agreements, yet the Company continued to provide benefits to those retirees.  The Company continuing to provide medical benefits to retirees who had retired under previous agreements

does not show an intent to vest in this case, however.  In <u>Dubuque Packing</u>, the hospital, medical, and surgical benefits provided under previous CBAs were specifically reaffirmed for retirees who had retired under prior CBAs but not in the CBA at issue.  <u>Dubuque Packing</u>, 756 F.2d at 69.  The court concluded that retiree medical benefits were continued because there was no explanation for the absence of a reaffirmation provision and that the course of dealing between the parties showed that each CBA "was simply a modification of the prior agreement and terms were changed only as a result of negotiation."  <u>Id.</u>  It was the unexplained absence of a previous reaffirmation provision – which is strong evidence of vesting in itself – combined with the continued provision of benefits that the <u>Dubuque Packing</u> court found determinative.

<u>Dubuque Packing</u> is distinguishable, because here no SIAs ever contained reaffirmation provisions that were later removed that would indicate a change in the Company's intent regarding vesting.  Moreover, the March 9, 2004, and May 16, 2008, letters of termination function to terminate the CBAs, SIAs, and all other agreements related to those documents, such that each SIA was not simply a modification of prior agreements as in <u>Dubuque Packing</u> but rather a complete renegotiation.

Moreover, coupling the continued payment of retiree medical benefits with extended coverage provisions in the present case does not show that the extended coverage provisions meant to express the Company's intent to vest in light of the parties' collective bargaining history.  The Union's argument implies that a retiree gained a right to vested benefits under the CBA in effect at the time of his retirement, but the Union has not asserted that the retirees under pre-1974 SIAs have no right to prescription drug plans, which were non-existent under pre-1974 SIAs, nor has it argued that the Company must offer an HMO option to retirees who retired under the 1995 SIA.  Additionally, prescription drug co-pays increased over the course of the parties' collective bargaining history, and the option to choose a medical benefits plan was eliminated for all Newton retirees.  Thus, the right to those benefits was impaired for the retirees

43

who retired under SIAs with lower co-pays or the John Deere HMO option, which is counter-indicative of vesting.  Asserting that the retiree medical benefits improved globally over time is contrary to White's testimony that retirees lost benefits as a result of the 2004 negotiations and Avery's concession that, standing alone, an increase in prescription drug co-pays would be a reduction of benefits.  Even if retiree medical benefits improved over time, that is not evidence that the Company had the specific intent to provide vested benefits.  See Alpha Portland, 836 F.2d at 1517.

Acknowledging the evidence in the record of reductions in benefits, the Union argues that such reductions should be considered de minimis and not true impairments of the right to vested retiree medical benefits.  The Court is not in a position to determine what individual retirees considered the most important medical benefits – certainly some retirees could have considered lower co-pays or choice of medical benefits plan options of paramount importance.  When changes were made, such changes ran counter to the definition of "a right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent."  Newspaper Guild, 641 F.3d at 266.  Continued medical and drug coverage after the expiration of each SIA does not show that the extended coverage provisions expressly vest.

Citing Alpha Portland, John Morrell, and Crown Cork & Seal, the Court previously held that the inclusion of a general duration clause is not dispositive when considered in isolation, see Nov. 10, 2011, Order, at 17-18, ECF No. 195; however, inclusion of a general term clause is inconsistent with vesting and renders it difficult for the Union to show that retiree medical benefits were vested, see Alpha Portland, 836 F.2d at 1516 ("Proper allocation of the burden of proof in this case leads to the conclusion that the district court correctly held that retiree welfare benefits were intended to last only for the duration of the CBA.").

Testimony at trial further elucidates the meaning of the general duration clauses in this case and supports the finding that the general duration clauses prevented retiree medical benefits from

44

vesting.  Tipton, a member of the Union bargaining committee between 1971 and 1995, agreed that the termination letter sent pursuant to the general duration clause terminated the SIA, requiring the parties to renegotiate the terms of the SIA or they would be lost.  Tr. 145.  Shaver, the chairperson of the retirees' council during the 2008 collective bargaining session, testified that if a termination letter was filed, then the SIA was terminated and changes could be made.  Tr. 783.  Reid, who participated in the 2008 negotiations, also agreed that when the Union terminated an agreement, "whatever [wa]s in the agreement [wa]s over unless the Union negotiate[d] it back in."  Tr. 357.  Complete termination of the SIAs and the requirement that all terms be renegotiated during every bargaining session is inconsistent with the proposition that the Company could not change the benefits post-expiration.  See Newspaper Guild, 641 F.3d at 267 (stating that "the Retirees' right to fully-paid health insurance premiums was 'vested' if the benefit was fixed under the terms of the [relevant] agreement such that [the company] could not change the benefits post-agreement").

The SIAs also contained coordination of benefits clauses and re-opener agreements.  The coordination of benefits clause indicated that retiree medical benefits would supplement Medicare after the retiree reached age sixty-five, and the re-opener agreements were embodied in letters of understanding allowing the parties to modify the SIA if national healthcare were enacted.  Coordination of benefits clauses are inconsistent with vesting.  See Crown Cork & Seal, 501 F.3d at 918 ("[A] coordination-of-benefits clause . . . is inconsistent with vesting." (quotation marks omitted)); John Morrell, 37 F.3d at 1307 ("We have held that [coordination of benefits] provisions are also inconsistent with vesting.").

Despite this authority, the Union argues that the coordination of benefits clause here should factor little into the Court's analysis, an argument the Court considered in its November 10, 2010, Order at 19, ECF No. 195.  Therein the Court concluded that it could not disregard binding precedent that coordination of benefits clauses are inconsistent with vesting and reflect an intent

to confer only non-vested retiree medical benefits.  Id.  There has been no change in legal authority to convince this Court to alter its conclusion.  Because coordination of benefits clauses can be read differently when focusing on a company's expected obligation to pay for retiree medical benefits versus its intent that retirees have an inviolable right to a certain level of retiree medical benefits, coordination of benefits clauses "are rather weak evidence of an intent not to vest."  Id. at 18-19 (quoting Angotti v. Rexam, Inc., No. 06-0657, 2006 WL 3043130, at *11 (D. Minn. Oct. 25, 2006)).[9]

In sum, when compared to the inconclusive evidence the Union advances in support of vesting, the SIAs reflect an overall intent to confer only non-vested retiree medical benefits due to (1) the absence of explicit vesting language; (2) term clauses limiting the duration of the SIAs; (3) continuation language; and (4) coordination of benefits clauses and re-opener agreements.

### b.  SPDs, Benefits Certificates, and Benefits Summaries

The Court turns next to other written documents related to the Newton retirees' medical benefits, including SPDs, benefits certificates, and benefits summaries, to discern the parties' intent to vest.

### (1) Relevance of SPDs in General

On summary judgment, the Court found the purported SPDs ambiguous on the issue of vesting, resulting in genuine issues of material fact as to the ultimate import of language found in the SPDs, plan descriptions, and benefits certificates.  Nov. 11, 2010, Order at 9-10, ECF No. 195.  After trial, having considered and weighed the credible evidence presented, the Court is satisfied that various SPDs and benefits certificates are relevant to the determination of whether

---

[9]By the same reasoning, the letters of understanding allowing modification of the SIAs in the event of the enactment of national health care are re-opener agreements and are also evidence of an intent not to vest, albeit weak.  Cf. TWA, Inc. v. Indep. Fed'n of Flight Attendants, 809 F.2d 483, 487 (8th Cir. 1987) (noting that a reopener notice was limited by its terms and could not serve as a means for the company to terminate the balance of a CBA).

the Company agreed to vest retiree medical benefits.  The Court notes that SPDs cannot unilaterally deprive a party to a CBA of a collectively bargained right.  Here, though, since the parties' intent regarding vesting is unclear from the language of the CBAs and SIAs, the SPDs serve to further inform the Court as to whether the parties intended to vest retiree medical benefits.

The Union argues that the SPDs were never bargained for and therefore the Court should not consider them.  SPDs are required by law, 29 U.S.C. § 1022(a), and the Union points to no requirement that collective bargaining parties negotiate SPDs.  The Company sent a draft of the 2000 Beyond Your Paycheck to the Union for approval, and the Union was aware of its contents. Teed testified that the Union never approved the SPDs because the parties never held meetings about the SPDs, but that the SPDs were the Company's document.  Tr. 586-87, 589.  The 2006 SPD was distributed to employees.  However, the record is devoid of Union objections to the SPDs; and, although Teed received for approval and read the Draft 2000 Beyond Your Pay-check,[10] the Union never officially objected to it contents.  Thus, the Court is satisfied that the Union was aware of the contents of the SPDs because SPDs were required by law as early as 1974, 29 U.S.C. § 1022; recognized as part of the plan documents by 1994 in the Eighth Circuit, Jensen, 38 F.3d at 949; and sent to Union officers.  Therefore, the Court will consider the SPDs to assist the Court in determining the parties' intent regarding vesting.

Citing no supporting authority, the Union also objects to the relevance of the SPDs, asserting that the SPDs were not mass distributed to the Newton retirees.  Regardless of the distribution of the SPDs to the Newton retirees, the CBAs and SIAs were agreements between the Union and the Company, and, therefore, if the Union was aware of the SPDs purporting to

---

[10]Teed admitted that he could not point to any incorrect information contained in the SPD but instead took the position that the "Union doesn't okay [the SPDs]."  Tr. 587.

explain CBAs and SIAs to Union members, then they are relevant to show the Company's intent and the Union's awareness of the Company's intent.

ERISA's goal in requiring SPDs is disclosure to the plan beneficiaries, <u>Hughes</u>, 281 F.3d at 790, so it seems axiomatic that the contents of an SPD not distributed to plan beneficiaries should not be dispositive of their legal import.  <u>See</u> 29 U.S.C. § 1022(a) (requiring SPDs to be furnished to plan beneficiaries).  Rather, such SPDs are considered with other evidence tending to show whether the Company agreed to vest retiree medical benefits.  This is because the Union negotiated the rights for the Newton retirees rather than the Newton retirees negotiating directly with the Company.  The Union, then, as the Newton retirees' representative, had a duty to understand the agreements it entered into on behalf of the Newton retirees and ensure accurate communication of the rights established by those agreements.  Once the Union came into possession of SPDs that indicated that the Company intended non-vested, terminable, or modifiable retiree medical benefits contrary to the parties' agreement, then the Union was in a position to dispute the SPD language with the Company or inform the Newton retirees that they may not expect vested retiree medical benefits.  The Union's refusal to acknowledge the SPDs cannot be construed an objection to their content and cannot be viewed as constituting evidence of an intent to vest.

### (2) SPD Content

Examination of the 1990 and 1992 Beyond Your Paycheck, 1999 John Deere HMO SPD and 2006 SPD booklets reveals that they are SPDs as anticipated by ERISA and under <u>Hughes</u>, 281 F.3d at 792, and are part of the ERISA welfare benefit plan.  Each SPD included a section disclosing the information required by 29 U.S.C. § 1022(b). Exs. 128 at 7-13; 155 at 9-14; 130 at 36-38; 133 at 186-190.  White indicated that the Beyond Your Paycheck booklets were either passed out at the Newton facility or mailed to the Union membership; Avery testified that he received the John Deere HMO SPD about the time of his retirement; and Krovoruchka testified

that the Company distributed the 2006 SPD to employees.  See 29 U.S.C. § 1022(a).  Thus, the requirements of 29 U.S.C. § 1022, as outlined in Hughes, 281 F.3d at 792, are satisfied regarding the identification of those documents as SPDs.

The provision in the SIAs indicating that "the legal documents" will control in the event of a dispute does not identify the legal documents; however, Tipton testified that one would have to refer to SPDs to determine the extent of the benefits provided by the SIAs and agreed that the SPDs were legal documents necessary for ERISA compliance.  Townsend testified that benefits certificates and SPDs were "the legal documents" that would control in the event of a dispute.  Even so, the Union argues that one would have to refer to the legal documents only to determine whether a particular benefit was included in a benefit plan, but that the legal documents are not relevant for determining the Company's obligation to provide those benefits.  The Court must disagree.  The Union's argument is premised on the retiree medical benefits being vested in the SIAs, yet the SIAs are inconclusive on the issue of vesting.  Therefore, the Court looks to other reliable evidence to determine the intent to vest.  In the present case, the 1990 and 1992 Beyond Your Paychecks and the 2006 SPD are among the legal documents referenced.  The Court concludes, however, that the 1990 and 1992 Beyond Your Paychecks and the 2006 SPD are relevant but not controlling under the SIAs' "legal documents" provision because the record, including White's testimony and Krivoruchka's testimony, only indicates that the SPDs were furnished to the active employees, and not the Newton retirees, which is contrary to ERISA's goal of disclosure and requirement that SPDs be furnished to plan participants and beneficiaries. See 29 U.S.C. § 1022(a).

The 1990 and 1992 SPDs' disclosure that modification or termination of the medical plans is a possible reason for loss of benefits is contra-indicative of vesting.  The Union argues, though, that the Company would have been in breach of the CBA had it unilaterally terminated retiree medical benefits regardless of a reservation of rights clause.  To be sure, as Krovoruchka

agreed in his testimony, the Company would have been in breach of a CBA had it unilaterally modified retiree medical benefits during the term of the CBA.  Tr. 877-79.  The question, though, is whether retiree medical benefits survived the term of the CBAs.  Here, the reservation of rights language disclosed to the medical plan beneficiaries that once the CBAs expired there was a possibility of modification or termination of the plan.  It would render the modification or termination language superfluous if the Company could not modify or terminate the plans.  See, e.g., Hughes, 281 F.3d at 792-93 (holding that to interpret plan provision language that "[t]he Company fully intends to continue this plan indefinitely, but reserves the right to change or discontinue it if necessary" as an intent to vest and the word "intends" as demonstrating finality, would render the words "reserves the right to change or discontinue it if necessary" meaning-less).  The Union's explanation that the clauses provided notice that in the future the plan might be revised or terminated as a result of collective bargaining does not square with the provision allowing for the termination of a plan, which, even through collective bargaining, is the antithesis of vesting.

In Jensen, the court examined similar reservation of rights language permitting the com-pany to amend or terminate retiree medical benefits.  Jensen, 38 F.3d at 950.  The company argued that the reservation of rights language was inconsistent with vesting.  Id.  The court agreed that "a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits," but concluded,

> [T]he reservation-of-rights provisions are not facially unambiguous – they leave at least some doubt as to whether [the company] intended to reserve the right to change or terminate benefits to already retired pensioners, or only the right to make prospective changes for those covered by the Plan but not yet retired. . . .
>
> When we look at the record beyond the reservation-of-rights provisions themselves, we find that [the company] has nothing to offer. . . .
>
> [The retirees] on the other hand, presented a wealth of extrinsic evidence supporting their contention that [the Company] had intended that [the medical plan] benefits would vest when a Class member retired under either Plan.

50

Id. at 950-51.  The modification or termination provisions in the 1990 and 1992 Beyond Your

Paycheck booklets, like in Jensen, are not facially unambiguous; but, unlike Jensen, the Union

has not presented a wealth of extrinsic evidence to overcome the result "in most cases" that "a

reservation-of-rights provision is inconsistent with" vesting.  Id. at 950.

The 2006 SPD includes explicit non-vesting language[11] as well as a clear indication that

retiree medical benefits only apply during the term of the coordinate CBA – the 2004 Maytag

CBA.  The 2006 SPD reflects the Company's intent not to vest retiree medical benefits by virtue

of the 2004 Maytag CBA and strongly supports the conclusion that retiree medical benefits

expired upon termination of the 2004 Maytag CBA.

The 1999 John Deere HMO SPD also contained modification or termination language and

specific non-vesting language.  The Union argues that such language was only specific to the

John Deere HMO and is not relevant to the issue of vesting because even if the John Deere HMO

were eliminated, the other medical benefits option would still have been available, and "Maytag

arguably would have had to replace the John Deere HMO with a comparable HMO option or it

would have been in breach of the 1995 [SIA]."  Defs.' Br. 40, ECF No. 230.  Termination of the

John Deere HMO during the term of the 1995 SIA is irrelevant because although the 1995 SIA

confers a contractual right on beneficiaries to choose the John Deere HMO as an option, that

says nothing about the Company's right to terminate the plan after the expiration of the 1995

SIA.  The John Deere HMO SPD does not disclose that termination may only happen as a result

---

[11]Providing:

The benefits described in this booklet are not vested benefits and Maytag reserves
the right to modify, suspend or terminate the plan or any component or successor
plan, in whole or in part, at any time and for any reason, except to the extent that
the federal labor laws require it to bargain any such changes with the union.

Trial Ex. 133 at 186.

of collective bargaining, and thus the termination of the John Deere HMO is inconsistent with vesting.

The phrase "during his life" does not distinguish between the two welfare plan options in the 1995 SIA, so if the language confers a vested right to the Blue Cross/Blue Shield option, then it follows that the same language confers a vested right to the John Deere HMO option as well. Hence, the non-vesting language of the 1999 John Deere HMO SPD conflicts with the Union's interpretation of the "during his life" SIA language.  A determination that retiree medical benefits were vested only in the Blue Cross/Blue Shield option would require inconsistent application of the SIA language and would not provide plainspoken disclosure to plan participants.  Cf. Ringwald v. Prudential Ins. Co. of Am., 609 F.3d 946, 949 (8th Cir. 2010) ("[T]he policy underlying the 'SPD prevails' rule was ERISA's important goal of providing complete disclosure to plan participants, such that where disclosures made in an SPD pursuant to 29 U.S.C. § 1022(a)(1) – which must 'be plainspoken for the benefit of average plan participants' – conflicted with 'an obscure passage in a transactional document only lawyers will read and understand,' the 'accessible provisions [in the SPD] govern because adequate disclosure to employees is one of ERISA's major purposes.'" (second alteration in original) (quoting Jobe, 598 F.3d at 483)).  The Union's argument implicitly concedes that the Newton retirees did not have any vested rights in the John Deere HMO.  But even without a concession, the Court does not find that the "during his life" language applies inconsistently to the medical benefit options in the 1995 SIA, and the 1999 John Deere HMO SPD reservation of rights language is indicative that the Company did not intend to vest retiree medical benefits.

In addition to the SPDs, retirees would have to refer to benefits certificates to determine the full extent of their benefits.  The Union objects that the benefits certificates are not relevant. Even if benefits certificates were only prepared for newly hired employees as the Union asserts, prior to the 2004 Maytag CBA the Newton retirees received the same benefits as active

employees, hence the Newton retirees as well as the newly hired employees would refer to the same benefits certificates to determine the extent of their benefits.  The Union kept benefits certificates at its office, yet the record contains no evidence that the Union signaled to the Newton retirees, the Company, or insurance carriers that any benefits certificates violated CBA or SIA terms when the benefits certificates were issued.  The 1996 Benefits Certificate includes similar termination or modification language as the SPD language analyzed in <u>Stearns</u>, 297 F.3d at 709, 711-12, and thus suggests that the Company agreed to provide only non-vested retiree medical benefits, because if the active employee medical benefits could be modified, then the retiree medical benefits could also.

Further evidence of the Company's intent and the parties' awareness of its intent is found in the fact that employees who retired from Maytag, including Union officers, received an Hourly Retirement Benefits Summary at the time of retirement.  Those benefits summaries were reviewed by the Union and indicated that retiree medical benefits could be changed.  They serve the important objective under ERISA of disclosure, alerting the Newton retirees to the Company's views of what the Company had agreed to provide under the CBAs and SIAs.  Thus, the benefits summaries are relevant to the determination of the Company's intent to vest retiree medical benefits and support a determination of non-vested retiree medical benefits.

The question certified was whether the retiree medical benefits survived termination of the 2004 Maytag CBA.  The reservation of rights language in the 2006 SPD, along with other documentary evidence – the SPDs, benefits certificates, and hourly retirement summaries – considered as a whole undermine an effort to prove that the Company ever agreed to vesting or that retiree medical benefits were intended to survive inviolable beyond the term of the 2004 Maytag CBA.

### 4. Other Extrinsic Evidence

The Union asserts that overwhelming additional extrinsic evidence shows that the Company agreed to provide vested retiree medical benefits.

The Union points to its rejection during the 1983 negotiations of explicit non-vesting language as evidence that retiree medical benefits are vested. While the Court agrees that such a rejection is indicative of the Union's desire for vested retiree medical benefits, the Union carries the burden of showing the Company agreed to vest retiree medical benefits. See Halbach, 561 F.3d at 877 ("Therefore, an employer may unilaterally modify or terminate medical benefits at any time absent the employer's contractual agreement to the contrary."); Hughes, 281 F.3d at 790 (stating that welfare plan beneficiaries have the burden of proof to show vesting language). As Williams, the Union's secretary treasurer, conceded, a rejection of a proposal does not indicate that the final agreement includes the opposite of the rejected proposal. When viewed as a matter of contractual intent, this evidence shows that the Company did not intend retiree medical benefits to vest and desired to strengthen, rather than change, its position with the addition of explicit non-vesting language. Likewise, during 2004 negotiations, the Company presented a proposal to alter all retiree medical benefits, evidencing that the Company did not intend for a right to retiree medical benefits to extend past the expiration of the 2004 Maytag CBA.[12]

The Union also points to the Company's 1992 proposal of a defined dollar maximum as evidence that the Company understood retiree medical benefits to be vested. The Union asserts that this proposal is evidence of vesting because it only applied to future, and not current, retirees. This evidence cannot be viewed in isolation, and therefore its import is greatly reduced

---

[12]The Union also argues that the Company proposed to alter only future retiree medical benefits during the 2004 negotiations, showing that the Company viewed past retiree medical benefits as vested; however, the Court's factual findings show that the Company proposed to alter current as well as future retiree medical benefits. See Trial Ex. 159 at 5-7, 19.

by evidence of the multiple changes and reductions of retiree medical benefits over the course of the parties' bargaining history.  The record shows changes to prescription drug co-pays and the elimination of the John Deere HMO.  In addition, White testified that as a result of the 2004 negotiations, the retirees lost some benefits, providing further evidence that the Company did not intend for retiree benefits to survive the expiration of the 2004 CBA.  Changes in retiree medical benefits is inconsistent with vesting, and even if the Newton retirees could have agreed to such changes, there is no evidence that they consented or objected to those changes contemporaneously.[13]  See John Morrell, 37 F.3d at 1306-07 ("[T]he modifications included both increases and decreases in the level of benefits, yet neither the Union not any member of the Class ever object that such changes violated vested rights. . . .  In short, there is no basis for concluding that later modification to a retiree's initial level of health benefits are vested.  Rather, the fact that modifications were routinely negotiated is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested." (citing Alpha Portland, 836 F.2d at 1519)).

The Union next argues that the fact that the Company did not terminate retiree medical benefits after the implementation of FAS 106 is strong evidence of vesting.  The Company's letter to the Union concerning FAS 106 states that "[c]ompanies alarmed at th[e] staggering increase in retiree medical costs are taking steps to control future retiree medical liabilities."  Trial Ex. J at 1.  The Union asserts that "[g]iven the 'staggering increase in retiree medical costs'

---

[13]The Union has not argued that the retirees consented to changes by virtue of their representation by the Union, nor was there evidence presented at trial that any of the changes to retiree medical benefits were submitted to the Newton retirees for approval.  See John Morrell, 37 F.3d at 1306 n.8 ("Even if a union collectively bargains benefits for past retirees, 'vested retirement rights may not be altered without the pensioner's consent." [Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.], 404 U.S. [157,] 181 n.20 [(1971)].  [The company]'s modified retiree health benefit plans were never submitted to past retirees for approval, which suggests that neither [the company] nor the Union thought they were modifying vested benefits.").

occasioned by [FAS 106], if it had believe[d] that retiree benefits were not vested, Maytag would [have] simply terminated current retirees' benefits at the termination of the contract and exercised its right to refuse to bargain over retiree insurance on the grounds that it is a permissive subject of bargaining." Defs.' Br. 34-35, ECF No. 230.  Speculation as to the myriad reasons why the Company might not have taken such a drastic action in response to FAS 106 is not proof of an intent to vest.  The letter apprises the Union of the Company's concern about controlling future medical benefit liabilities, not eliminating retiree medical benefits.  In 1992, the parties agreed to language that would limit the Company's medical benefit liability under FAS 106, thus accomplishing the Company's goal while falling short of terminating retiree medical benefits. Additionally, FAS 106 also applied to liabilities for non-vested medical benefits for future retirees, and the Company did not eliminate future retiree medical benefits in response to FAS 106.  Therefore, the Company's response to FAS 106 does not demonstrate an intent to vest retiree medical benefits.

The Union also puts forth the Company's continued payment of retiree medical benefits during the 2004 strike as evidence of the Company's intent to vest.  While "payment of [retiree medical] benefits during a strike *may* show that benefits were thought to vest," Alpha Portland, 836 F.2d at 1518 n.3 (emphasis added), nothing precludes a Company from paying non-vested retiree medical during a strike.  In John Morrell, the company terminated the strikers' medical benefits but continued to pay retiree medical benefits; nonetheless, noting routine modifications to retiree medical benefits, the court determined that "the history of collective bargaining between [the company] and the Union does not support the Union's claim that hourly retirees' health benefits are vested." John Morrell, 37 F.3d at 1305-07.  Here, the Court must also conclude that the continued payment of retiree medical benefits during the 2004 strike does not support the Union's claim of vested retiree medical benefits in light of the routine modifications to those benefits during the parties' collective bargaining history.

56

Both sides rely on retiree medical benefits being a permissive subject of bargaining in support of their positions.  The Union sought to foreclose changes to the levels of retiree medical benefits during the 2004 negotiations by insisting that retiree medical benefits were a permissive subject of bargaining and that the Union would not bargain over them, thus preventing any proposals or counter-proposals and maintaining previous levels of benefits.  The Union understood, though, that if they agreed to bargain, retiree medical benefits could go up or down.  But any bargaining over retiree medical benefits, as was done during previous negotiation sessions without presenting changes to the Newton retirees for approval, is inconsistent with vesting.  See John Morrell, 37 F.3d at 1306-07.  The Company asserts that "[b]y labeling retiree health insurance benefits a permissive subject of bargaining, the UAW's various representatives necessarily conceded that those benefits could be negotiated. . . .  Describing health benefits as a permissive subject of bargaining is the antithesis of treating them as vested."  Pls.' Br. 38, ECF No. 229.  Were the Company's argument so, Courts would never have to consider whether retiree medical benefits were vested – they would by definition not be vestable.  Labeling something a permissive subject of bargaining under national labor laws is distinguishable from conceding that a subject of bargaining is open for negotiation in specific cases.  As the Court has already considered the history of the parties negotiating changes to retiree medical benefits, the Company's argument about permissive subjects of bargaining is not evidence that retiree medical benefits were vested in this case.

The most convincing piece of extrinsic evidence in support of vesting is the April 11, 2002, letter from Teed in which he reports that the Company commented that retirees could waive health benefits.  The Company offered no evidence to rebut the inference that usage of "waive" shows that the Company considered retiree medical benefits vested.[14]  However, the letter was

---

[14]The Court had the following exchange during trial:

THE COURT: Yes, but let me ask you a question, Mr. Darch.  I don't want to be

prepared a week after the meeting, and Teed did not have any recollection at trial of the actual

discussion that would assist the Court in determining the weight to be accorded to the specific

use of the word "waive" in the letter.

Extrinsic evidence presented by the Union, including the proposals that were never

included in the CBAs, along with inferences, if any, that can be drawn from the word "waive" in

Teed's letter is far from the wealth of extrinsic evidence the retirees presented in <u>Jensen</u>.  Unlike

<u>Jensen</u>, no evidence suggests that Whirlpool intended to continue any vesting policy of Maytag;

Company changes to retiree medical benefits were not prospective only; the Company included

reservation of rights clauses in some SPDs it prepared; and no Company representative testified

---

confused by this at some later time.  This Exhibit 158 suggests that the company
believed that the retirees could waive health benefits.  The use of the term
"waive" suggests that there's a right that has to be given up.  Is that the thrust of
this letter, Counsel, because I don't want to give this undue weight at some later
time because you offered it?
. . .
MR. DARCH: I was introducing it to show that there was a discussion that they
could negotiate a cheaper plan.  That's what I was doing with it.

THE COURT: All right.  That's what I assumed until I got a little hung up on the
word "waive."

MR. DARCH: All right.

THE COURT: Well, if there's no dispute with the characterization that you just
provided, then you don't need any evidence.  But if there is a dispute as to what
that means, then there may be an evidentiary issue there.

MR. MACEY: Yes.  And we would not agree with his characterization . . . .

MR. DARCH: Well, there's a dispute –

THE COURT: Well, I point it out simply because I think it's a document that
without further explanation could be very confusing in this record as the court is
working through the process, so I will leave it to you.

Tr. 639-41.  The parties did not introduce further evidence on the issue.

that the Company agreed to provide vested benefits.  See Jensen, 38 F.3d at 951.  Thus, there is no limitation here, as there was in Jensen, that the Company could change retiree medical benefits for future retirees only.

### 5.  Summary

In summation, the Union's inconclusive documentary evidence and underwhelming extrinsic evidence do not satisfy the Union's burden of proof because the general duration provisions, continuation language, coordination of benefits clauses, and reservation of rights language in the written documents and extrinsic evidence of changes to retiree medical benefits demonstrate by a preponderance of the evidence that the parties did not agree that retiree medical benefits would survive the expiration of the retiree medical benefits schedule in the 2004 CBA.

The Court is not unaware of the expectations of the Newton retirees nor unsympathetic in the result reached herein.  However, the Union has not carried its burden under the law of showing that the Company agreed to vest retiree medical benefits.  Regardless of what either side was thinking about vesting, proper allocation of the burden of proof shows that the Union had the obligation to include express vesting language or present specific evidence that the Company agreed to provide vested retiree medical benefits.  This the Union has not done within the structure of the applicable law in this circuit.

### D.  Unilateral Modification of Benefits

The Court must next determine whether the Company had the right to unilaterally enroll the Newton retirees in the Whirlpool plan upon the expiration of the retiree medical benefits schedule in the 2004 Maytag CBA.  "[A]n employer may unilaterally modify or terminate medical benefits at any time absent the employer's contractual agreement to the contrary." Halbach, 561 F.3d at 877 (quoting Jensen, 38 F.3d at 949).  Therefore, because the Company did not contractually agree to vest retiree medical benefits, the Company has the right to unilaterally

modify the retiree medical benefits at issue here and enroll the Newton retirees in the Whirlpool plan.

## V.    CONCLUSION

Based on the foregoing, the Union's Rule 52(c) Motion for Judgment on Partial Findings (ECF No. 216) must be **denied**.

The Court determines and declares that (1) the retiree medical benefits schedule provided for in the July 5, 2004, collective bargaining agreement entered into by the Company and the Union expired on July 31, 2008; and (2) the Company has the unilateral right to enroll class members in the Whirlpool Corporation Group Benefit Plan.  The parties are directed to file briefing on the issue of costs and attorney's fees within fourteen days of entry of this order.

The Clerk of Court is hereby ordered to enter Judgment in favor of Plaintiffs Maytag Corporation and Whirlpool Corporation and against Defendants and Class Representatives International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, UAW Local 997, and the Certified Class.

**IT IS SO ORDERED.**

Dated this 21st day of July, 2011.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT