# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2931

_____

| | | |
|---|---|---|
| Maytag Corporation, a subsidiary of Whirlpool Corporation; Whirlpool Corporation, | * * * * | |
| Plaintiffs - Appellees, | * * | |
| v. | * * * | Appeal from the United States District Court for the Southern District of Iowa. |
| International Union, United Automobile, Aerospace & Agricultural Implement Workers of America; United Automobile Workers Local 997, | * * * * * * | |
| Defendants - Appellants, | * | |

_____

Submitted:  April 18, 2012
Filed:  August 7, 2012

_____

Before LOKEN, COLLOTON, and SHEPHERD, Circuit Judges.

_____

LOKEN, Circuit Judge.

The United Automobile, Aerospace, and Agricultural Implement Workers International Union and Local 997 (collectively, the UAW or the Union) appeal the

district court[1] judgment after a five-day bench trial declaring that Whirlpool Corporation may unilaterally modify the health care benefits it provides to retired hourly workers previously employed at the Newton, Iowa manufacturing facilities of Whirlpool's now-dissolved subsidiary, Maytag Corporation. The issues on appeal are whether an Article III case or controversy existed when Whirlpool filed its declaratory judgment action, and whether the retirees have a vested right to health benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). We affirm.

## I. The Article III Issue.

**A. Background.** For over fifty years, Maytag and the UAW negotiated collective bargaining agreements governing the terms and conditions of employment for hourly workers at the Newton plants. Each CBA included a Supplemental Insurance Agreement (SIA) setting forth the agreed health benefits for active members of the UAW bargaining unit, and for retirees represented by the Union. Each SIA was an "employee welfare benefit plan" under ERISA. See 29 U.S.C. § 1002(1). Whirlpool acquired Maytag in 2006 and assumed its obligations under the CBA negotiated in 2004, which was due to expire unless extended on July 31, 2008. In late 2007, Whirlpool closed most of the Newton facilities, laying off all but thirty of the more than nine hundred active employees. In May 2008, the Union gave Whirlpool notice terminating the 2004 CBA upon its expiration.

By the summer of 2008, Whirlpool had placed health benefits provided to Maytag's salaried retirees "under the Whirlpool model." On July 1, the parties met to begin negotiating a new CBA for the hourly workers. Whirlpool proposed that seven employee benefit programs, including "Retiree Medical," be "synchronize[d]

---

[1]The Honorable James E. Gritzner, Chief Judge of the United States District Court for the Southern District of Iowa.

-2-

with existing Whirlpool salaried benefit plans."  Union negotiator Ron McInroy replied that retiree health care benefits were "carved out" during the 2004 negotiations and the Union would not bargain the issue in 2008.  At a second session on July 15, Whirlpool negotiator Kevin Bradley handed McInroy a letter stating that the Union had advised it would not bargain over retirees' health insurance, and that Whirlpool "will respect your stated intention not to bargain over current retirees' health insurance . . . . without prejudice to our right to make changes in the current retirees' health insurance unilaterally as those benefits are, and have been, subject to change at any time."  McInroy reiterated that the Union would not bargain over retiree health care benefits.

On July 24, Whirlpool filed this action in the Southern District of Iowa against the Union and three individuals, as representatives of a purported class of the more than 3,000 Newton retirees.  The Complaint sought a declaration that Whirlpool had "the right to change the retiree medical benefit schedule effective January 1, 2009." On July 31, Local 997's members ratified a new CBA for the active hourly workers; on August 1, Whirlpool gave Newton retirees notice, timely under ERISA, that their health benefits would change effective January 1, 2009.  On August 8, five retirees filed a "mirror image" class action lawsuit in the Western District of Michigan alleging that Whirlpool's announced changes violated the 2004 CBA.

The district court denied the Union's motion to dismiss this action for lack of an Article III case or controversy and determined that venue was more appropriate in the Southern District of Iowa, the State in which the Newton facilities and 94% of the Newton retirees are located.  The Michigan court deferred to the district court's determination and transferred the Michigan action to the Southern District of Iowa, where it was voluntarily dismissed by the retirees.  The district court then granted, over the Union's objection, Whirlpool's motion to certify a defendants' class, with the Union as representative of the retiree class.  The class action proceeded to trial and

judgment on the merits, with the Union repeatedly urging reconsideration of the Article III ruling it now raises on appeal.

**B. The Merits.**  The Declaratory Judgment Act provides that any federal court, "[i]n a case of actual controversy within its jurisdiction . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The phrase "case of actual controversy" in § 2201 "refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126 (2007).  There must be a concrete dispute between parties having adverse legal interests, and the declaratory judgment plaintiff must seek "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937).  In the declaratory judgment context, the difference between an abstract question and an Article III case or controversy

> is necessarily one of degree, and it would be difficult . . . to fashion a precise test for determining in every case whether there is such a controversy.  Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941), quoted in part in MedImmune, 549 U.S. at 127.

The Union argues there was no Article III case or controversy when Whirlpool filed this "stealth lawsuit" because Whirlpool had not disclosed its plan to modify retiree benefits, the Union had not taken a position opposing unilateral modification, the Union then had no cause of action regarding such a hypothetical change, and therefore Whirlpool failed to show the requisite injury in fact.  The district court

-4-

rejected this contention in four separate orders, and rightly so. The Union's argument avoids the relevant inquiry in declaratory judgment contract actions, *and* it is contrary to <u>MedImmune</u>, 549 U.S. at 132 n.11, which expressly overruled the Federal Circuit's "reasonable apprehension of suit" test in patent infringement cases, where the adverse interests of party-competitors are typically different and less concrete than the adverse interests of parties to an existing contract.[2]

In the context of disputes between parties to a contract, the declaratory judgment remedy "is intended to provide a means of settling an actual controversy before it ripens into a violation of the civil or criminal law, or a breach of a contractual duty." <u>Rowan Cos. v. Griffin</u>, 876 F.2d 26, 28 (5th Cir. 1989). If there is "a real, substantial, and existing controversy . . . . a party to a contract is not compelled to wait until he has committed an act which the other party asserts will constitute a breach." <u>Keener Oil & Gas Co. v. Consol. Gas Utils. Corp.</u>, 190 F.2d 985, 989 (10th Cir. 1951). In these situations, relevant Article III considerations include whether the contractual dispute is real, in the sense that it is not factually hypothetical; whether it can be immediately resolved by a judicial declaration of the parties' contractual rights and duties; and whether "the declaration of rights is a *bona fide* necessity for the natural defendant/declaratory judgment plaintiff to carry on with its business." <u>Hyatt Int'l Corp. v. Coco</u>, 302 F.3d 707, 712 (7th Cir. 2002); cf. <u>MetImmune</u>, 549 U.S. at 132 ("actual or threatened serious injury to business or employment by a private party" is coercive).

In this case, Whirlpool had contractual obligations to the retirees and to the Union under the expiring CBA, statutory responsibilities to the retirees under ERISA, and statutory responsibilities to the Union under the federal labor laws. As the district court found, Whirlpool knew from decades of negotiations that the Union considered

---

[2]<u>Fed. Express Corp. v. Air Line Pilots Ass'n</u>, 67 F.3d 961, 964-65 (D.C. Cir. 1995), on which the Union relies, was factually very different than this case, and the decision was based upon the now-overruled "reasonable apprehension" test.

-5-

retiree health benefits provided in the 2004 CBA to be vested.  But Whirlpool believed
they were not vested and therefore subject to unilateral change when the CBA expired.
When Whirlpool proposed on July 1 to modify retiree health benefits in a new CBA,
the Union advised it would not bargain this issue.  Because retiree benefits are a
permissive rather than a mandatory subject of collective bargaining,[3] the Union's
position foreclosed Whirlpool from negotiating around the vesting issue, as the parties
had done in the past.  Thus, the only way Whirlpool could test its position on this
contractual issue, as it was entitled to do, was to unilaterally modify the benefits being
paid to over 3,000 Newton retirees.

We agree with the district court an actual Article III case or controversy existed
at the time Whirlpool filed its action on July 24, 2008.  Given the prevalence of
litigation over the vesting of retiree benefits in the last 25 years, including retiree
lawsuits brought or sponsored by the UAW, Whirlpool knew litigation was inevitable
if it unilaterally modified benefits.  It had disclosure obligations to the retirees as an
ERISA fiduciary which affected the timing of any unilateral action, and it faced a
formidable array of statutory remedies should it ultimately be liable for failing to pay
vested benefits.  See 29 U.S.C. § 1132(a), (g).  In these circumstances, Whirlpool
reasonably concluded that the contractual dispute was real, substantial, and existing.
The dispute was ripe for immediate judicial resolution because whether retiree
benefits were vested turned on historical rather than hypothetical facts.  And
Whirlpool's statutory and contractual obligations to treat the 3,000 retirees properly
made timely resolution of the dispute in a single forum a *bona fide* business necessity.

Whirlpool responded by filing a declaratory judgment class action in the most
logical federal forum against the retirees and the Union that advocated the retirees'

_____

[3]See Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S.
157, 182 (1971).

Appellate Case: 11-2931   Page: 6   Date Filed: 08/07/2012 Entry ID: 3939723

interests in the past and retained apparent authority to resolve or finesse the dispute in a new CBA. In our view, it is not dispositive that Whirlpool filed the action one week before giving the retirees formal notice of the unilateral modifications it would implement at the end of the plan year. The Union's refusal to bargain the issue made it imperative to seek final and immediate judicial resolution of this significant contract dispute. That the Union and the retirees had no cause of action at that moment is likewise not dispositive of the Article III issue, as <u>MedImmune</u> made clear, 549 U.S. at 131-32 & n.11.

The Union renewed its motion to dismiss throughout the protracted lawsuit, including in its post-trial brief. In granting final judgment for Whirlpool, the district court found "that evidence presented at trial did not change the material facts upon which the Court relied in its prior [Article III] rulings" and therefore incorporated by reference its prior orders that "a case or controversy did exist at the commencement of the lawsuit." This analysis was proper. "Because standing is determined as of the lawsuit's commencement, we consider the *facts* as they existed at that time." <u>Steger v. Franco, Inc.</u>, 228 F.3d 889, 892 (8th Cir. 2000) (emphasis added). But in a declaratory judgment suit, the question "is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." <u>Maryland Casualty</u>, 312 U.S. at 273.

Here, the facts developed at trial confirmed Whirlpool's assessment of the facts it alleged when it filed the lawsuit. The retirees filed a mirror image class action lawsuit *one week* after Whirlpool announced its unilateral modifications. Dennis Williams, a former UAW regional director, testified he took the position "from day one [that retiree medical benefits] were vested." Ted Johnson, former President of Local 997, testified that he gathered documents relating to retiree benefits in 2007 and delivered them to McInroy for the upcoming negotiations because Johnson was concerned Whirlpool would try to change those benefits. In March 2008, two

-7-

representatives of the retirees advised McInroy "what not to lose" in the 2008 negotiations; the Union negotiators then met prior to the July 1 session and decided not to bargain retiree health benefits. Viewed along with the many reported cases in which the UAW has joined local unions in lawsuits challenging retiree benefit modifications, the development at trial of additional facts existing when the lawsuit was filed confirmed the district court's initial conclusion that Whirlpool reasonably perceived that litigation to resolve this real, substantial, and existing contractual dispute was both imminent and inevitable when the declaratory action was filed.[4]

Before we proceed to the merits, a final word is in order given the Union's complaint about Whirlpool's "stealth lawsuit." We consider only whether the district court had subject matter jurisdiction under Article III because that is the only issue the Union preserved for appeal. "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). That includes discretion to curb an abusive use of the remedy that would deprive the real plaintiff of its choice of forum, and to ensure that cases and controversies are resolved in the most appropriate and convenient forum. Those discretionary issues were thoroughly litigated in this case. Two district courts concluded that Whirlpool, not the Union, chose the proper federal forum for this very real dispute, a conclusion supported by the Sixth Circuit's denial of an interlocutory appeal by the Union. We conclude there was no lack of subject matter jurisdiction to make this prudential determination.

---

[4]If the focus is shifted to the facts existing when Whirlpool filed its amended complaint on September 16, 2008, the existence of an actual controversy cannot be doubted. See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473-74 (2007).

Appellate Case: 11-2931   Page: 8   Date Filed: 08/07/2012 Entry ID: 3939723

Case 4:08-cv-00291-JEG-RAW   Document 254-1   Filed 08/09/12   Page 9 of 12

## II. Vesting

The issue is whether members of the retiree class have vested rights to previously granted retiree health care benefits.[5] ERISA does not mandate that employee welfare benefit plans provide vested benefits. See 29 U.S.C. §§ 1002(1), 1051(1). Therefore, unless an employer has contractually agreed to provide vested retiree health benefits, it may unilaterally modify or terminate the benefits at any time. John Morrell & Co. v. Commercial Workers Int'l Union, 37 F.3d 1302, 1303-04 (8th Cir. 1994), cert. denied, 515 U.S. 1105 (1995). We determine the duration of ERISA benefits by examining the plan documents. "If examination of the plan documents reveals ambiguities, extrinsic evidence may be considered." DeGeare v. Alpha Portland Indus., Inc., 837 F.2d 812, 816 (8th Cir. 1988), vacated and remanded on other grounds sub nom., DeGeare v. Slattery Grp., Inc., 489 U.S. 1049 (1989). The Union as representative of the retiree class bears the burden of proof on this issue. Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1516-17 (8th Cir. 1988), cert. denied, 489 U.S. 1051 (1989).

Beginning in 1961, the Union and Maytag (Whirlpool's predecessor-in-interest) negotiated a series of SIAs providing medical benefits to active and retired hourly employees. Consistent with the SIA term clause, the parties terminated each agreement at expiration and negotiated a new SIA.[6] On appeal, the Union argues, as it did in the district court, that each SIA provided vested retiree medical benefits. However, the retirees' mirror image complaint in the Michigan action asserted that

---

[5]A "vested right" is "a right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d 872, 877 (8th Cir. 2009).

[6]That alone casts doubt on the claim that retiree medical benefits were vested. "It would render the durational clauses nugatory to hold that benefits continue for life even though the agreement which provides the benefits expires on a certain date." Alpha Portland, 836 F.2d at 1519.

-9-

Appellate Case: 11-2931   Page: 9   Date Filed: 08/07/2012 Entry ID: 3939723

Whirlpool's unilateral modification of retiree benefits in 2009 violated *the 2004 SIA*. In other words, the class did not claim that each member has a vested right to the retiree medical benefits being provided when he or she retired, the claim asserted in other cases such as <u>Jensen v. SIPCO, Inc.</u>, 38 F.3d 945, 949 (8th Cir. 1994), <u>cert. denied</u>, 514 U.S. 1050 (1995).  Rather, the class claimed that *every* member has a vested right to the benefits provided in the 2004 SIA.  As that is the only contract allegedly preventing Whirlpool from unilaterally modifying these ERISA benefits, the vesting issue turns on whether an intent to vest can be found in the documents comprising the 2004 ERISA plan.[7]

ERISA requires plan administrators to publish a "summary plan description" (SPD) apprising plan participants and beneficiaries "in a manner calculated to be understood by the average plan participant . . . of their rights and obligations under the plan."  29 U.S.C. § 1022(a).  "SPDs are considered part of the ERISA plan documents."  <u>Jensen</u>, 38 F.3d at 948.  Here, the SPD covering "eligible [Newton] hourly retirees during the term of the [2004] collective bargaining agreement" stated:

> The benefits described in this booklet are not vested benefits, and Maytag reserves the right to modify, suspend or terminate the plan or any component or successor plan, in whole or in part, at any time and for

---

[7]The reason the claim was pleaded in this fashion is not hard to fathom.  Each new SIA altered the retiree medical benefits previously provided.  Some changes reduced the prior level of benefits, such as frequent increases to the prescription drug plan co-payments and the elimination in 2001 of a medical plan option referred to as the "John Deere HMO."  Two retirees testified that this latter change, a right expressly reserved in a 1999 SPD, forced them to enroll in a new plan.  "[T]he fact that modifications were routinely negotiated is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested."  <u>John Morrell</u>, 37 F.3d at 1307.  Moreover, that neither Maytag nor the Union sought retiree approval before making these changes "suggests that neither . . . thought they were modifying vested benefits."  <u>Id.</u> at 1306 n.8.

-10-

any reason, except to the extent that the federal labor laws require it to bargain any such changes with the union.

There was evidence the Union actively participated in editing this SPD before it was published.[8] An SPD may not strip collectively bargained rights from the ERISA plan it summarizes, but an unchallenged SPD may clarify that plan benefits are not vested. See United Paperworkers Int'l Union v. Jefferson Smurfit Corp., 771 F. Supp. 992, 995 (E.D. Mo. 1991), aff'd, 961 F.2d 1384, 1385 (8th Cir. 1992).

The district court concluded this SPD "reflects the Company's intent not to vest retiree medical benefits by virtue of the 2004 Maytag CBA."  We agree.  On appeal, the Union concedes that the 2004 SIA contained no unambiguous vesting language. "We have repeatedly held that an unambiguous reservation-of-rights provision is sufficient without more to defeat a claim that retirement welfare plan benefits are vested. . . . [T]here must be an affirmative indication of vesting in the plan documents to overcome an unambiguous reservation of rights." Stearns v. NCR Corp., 297 F.3d 706, 712 (8th Cir. 2002), cert. denied, 537 U.S. 1160 (2003); see Crown Cork & Seal Co. v. Int'l Ass'n of Machinists, 501 F.3d 912, 918 (8th Cir. 2007) (a "blanket reservation of rights . . . to unilaterally modify or terminate the retiree health plans . . . is fatal to any vesting argument").

The Union argues the parties' bargaining history provides "overwhelming extrinsic evidence" of their intent to vest retiree medical benefits.  The district court thoroughly evaluated this evidence and concluded the Union did not satisfy its burden due to its failure "to include express vesting language or present specific evidence that the Company agreed to provide vested retiree medical benefits."  We agree with the court's analysis.  When ERISA benefits are provided in a collectively bargained

---

[8]Earlier SPDs contained similar if less emphatic warnings.  For example, the 1990 and 1992 SPDs warned retirees that "provisions of the [medical plan] may be revised or terminated," a "possible cause[] for loss of benefits."

-11-

agreement that has no express vesting provision, "[t]he Union shoulders a difficult, though not impossible, burden of persuasion . . . since courts are reluctant to read more benefits into an ERISA plan than its plain language confers." John Morrell, 37 F.3d at 1304. The Union primarily relies on the SIA provision that employees eligible for retirement pension benefits "shall continue" the medical and drug plans "for himself and eligible dependents during his life." This is some evidence of intent to provide vested medical benefits. See Jensen, 38 F.3d at 950. But it is not unambiguous. See Crown Cork, 501 F.3d at 918. And there was substantial evidence of an intent not to provide vested benefits. For example, (i) beginning in 1977, the parties included coordination-of-benefits clauses in the SIAs. We have consistently held that these provisions are "inconsistent with vesting." Crown Cork, 501 F.3d at 918. (ii) An Hourly Retirement Benefits Summary signed by retiring employees and reviewed by a board including Union representatives directed retirees to the relevant SPD and provided, "I . . . understand that the benefits outlined above have been negotiated between the Company and the Union and may be subject to change in the future." (iii) A "Benefits Certificate" for retirees who chose the 1995 Blue Cross-Blue Shield medical plan stated, "[Maytag] has the authority to terminate, amend or modify the coverage described in this certificate at any time."

Though we agree with the district court's analysis of the extrinsic evidence, we emphasize this is an alternative reason to affirm. When the applicable SPD, "devoid of vesting language, explicitly reserves the right to modify the retiree medical benefit plan at any time," beneficiaries "have not met the burden of proving vesting language," and extrinsic evidence *may not be considered*. Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 793 (8th Cir. 2002). Here, the SPD unambiguously established that the 2004 SIA did not provide vested retiree health benefits.

We grant Whirlpool's unopposed motion to supplement the record on appeal and affirm the judgment of the district court.

_____

-12-